**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**UNITED STATES OF AMERICA**

**v.**

**MARGO DEAL ANDERSON
JOSEPH ADAM ALBRITTON
ANTONIUS GENZARRA BARNES**
and
**JAMES DAVID FINCH**

_____/

**SEALED
SUPERSEDING
INDICTMENT**
**Case No.: 5:20cr28-MW**

**THE GRAND JURY CHARGES:**

## COUNT ONE

### A.  INTRODUCTION

At all times material to this Indictment:

1.     The City of Lynn Haven was a municipality incorporated under the
laws of the State of Florida. The City of Lynn Haven's Charter provided for a City
Commission, consisting of a "Mayor-Commissioner," described throughout as the
"Mayor," and four Commissioners. The Charter required, among other things, that
the Mayor preside at all meetings of the Commission, that the Mayor was the
official head of the City in certain circumstances, and the Mayor may take

FILED USDC FLND TL
MAR 16 '21 PM 12:27

command of the police and fire departments and govern the city by proclamation during the times of grave public danger or emergency and shall be the judge of what constitutes such danger or emergency. The administrative head of the city government was a City Manager, appointed by the Commission, and subject to its direction and supervision.

2.     **MARGO DEAL ANDERSON** was elected as Mayor of Lynn Haven on April 21, 2015.  **ANDERSON** was re-elected as Mayor of Lynn Haven on April 16, 2019.  As Mayor of Lynn Haven, **ANDERSON** acted as the de facto head of the municipal government and sometimes directed the activities of the City Manager, who was responsible for the day-to-day operations and administrative functions of Lynn Haven.  **ANDERSON,** as Mayor, presided over and participated in Lynn Haven Commission meetings, contributed to the agenda for all Commission meetings, and possessed one vote on the City Commission equal to each Commissioner. As the Mayor of Lynn Haven, **MARGO DEAL ANDERSON** was an agent of the City of Lynn Haven, and had a fiduciary duty to act in the best interests of Lynn Haven and its citizens.

3.     **JOSEPH ADAM ALBRITTON** entered into a contract with Lynn Haven to be the City Attorney for Lynn Haven on or about October 22, 2018, effective October 15, 2018, for one year.  The contract retained **ALBRITTON** to provide professional legal services and perform other related duties to the

2

Governing Body of the City and its employees as specified in the agreement.

**ALBRITTON** executed an addendum to the professional services contract to be

City Attorney on or about October 31, 2019, for an additional period of two years.

As the City Attorney for Lynn Haven, **JOSEPH ADAM ALBRITTON** was an

agent of the City of Lynn Haven, and had a fiduciary duty to act in the best

interests of Lynn Haven and its citizens.

4.      **JAMES DAVID FINCH** was the owner of Phoenix Construction

Services, Inc. ("Phoenix") and JDF Properties, LLC ("JDF Properties"), businesses

incorporated in the State of Florida, which sought contracts with the City of Lynn

Haven.

5.      **ANTONIUS GENZARRA BARNES** was a City Commissioner for

the City of Lynn Haven between 1996 and April 2019. **BARNES** was an agent of

the City of Lynn Haven, and had a fiduciary duty to act in the best interests of

Lynn Haven and its citizens.

6.      Between on or about August 22, 2017, and March 26, 2019, Michael

Edward White ("M. White") was the City Manager of Lynn Haven.  As City

Manager, M. White was responsible for the day-to-day operations and

administrative functions of Lynn Haven.

7.      Erosion Control Specialists ("ECS) was incorporated in the State of

Florida on May 10, 2011.  David Mitchelle White ("D. White") was listed as a

3

director of ECS.  In a 2018 amended annual report and a 2019 annual report filed with the State of Florida, D. White was listed as a director and Vice President of ECS.

8.      On October 10, 2018, Hurricane Michael caused severe damage to public and private property, public utilities, public buildings, public communications systems, public streets and roads, and public drainage systems within the City of Lynn Haven, Florida ("Lynn Haven").

9.      On October 16, 2018, as a result of Hurricane Michael, Lynn Haven adopted a local state of emergency for post disaster relief and planning and approved Hurricane Michael Resolution No. 2018-10-16.  In the resolution, Lynn Haven waived the procedures and formalities otherwise required under Florida law to take action to ensure the safety, welfare, and health of the citizens of Lynn Haven, including: entering into contracts; incurring obligations; acquisition and distribution of materials, supplies, and other expenses related to the storm event; appropriation and expenditure of public funds; and the employment of permanent and temporary workers.  The resolution delegated emergency powers to the mayor of Lynn Haven, **MARGO DEAL ANDERSON,** or her designee, to discharge the duties and exercise powers for the above described activities until the local emergency declared had expired and the resolution was rescinded.  The

4

Declaration of Emergency was to be automatically renewed every seven days until further action was taken by Lynn Haven.

10.    On October 23, 2018, as a result of Hurricane Michael, Lynn Haven again declared and reinstated a local state of emergency for post disaster relief and planning and entered Hurricane Michael Resolution No. 2018-10-23-002. This Declaration of Emergency contained the same provisions as the original declaration of emergency and was effective for seven days. The Declaration of Emergency was required to be renewed or it would automatically expire.

11.    On October 30, 2018, Lynn Haven voted to end the local state of emergency and end the designation of the emergency powers to the mayor or her designee.

12.    Prior to Hurricane Michael, Lynn Haven contracted with two national disaster relief companies to provide disaster relief services for the city following a hurricane. These companies, referred to as Company C and Company D in this Indictment, provided debris removal services for Lynn Haven after Hurricane Michael, submitted invoices with supporting documentation for their services, and received payment from Lynn Haven, which was reimbursed by the Federal Emergency Management Agency (FEMA) for the expenses.

13.    FEMA is an agency of the United States Department of Homeland

5

Security and is responsible for coordinating the federal government's response to

natural and man-made disasters.  The primary purpose of FEMA is to coordinate

the response to a disaster that has occurred in the United States and that

overwhelms the resources of local and state authorities.  In addition to on-the-

ground support of disaster recovery efforts, FEMA provides state and local

governments with experts in specialized fields and the funding for rebuilding

efforts for infrastructure.  FEMA also provides for the reimbursement of many

expenses incurred by local governments in cleaning up and restoration after natural

disasters, such as hurricanes.

14.    On October 22, 2018, with the knowledge and concurrence of

**MARGO DEAL ANDERSON**, M. White, on behalf of Lynn Haven, and D.

White, as owner of ECS, signed an agreement for ECS to provide Lynn Haven

with "Emergency And/Or Exigent Services, Ancillary Construction Services, or

Construction Due To The Effects of Hurricane Michael."  The agreement

referenced ECS as a "contractor," with the effective date of October 11, 2018.  The

term of the agreement was for no more than 90 days to perform services for Lynn

Haven.  As part of the agreement, ECS agreed to provide detailed invoices

requesting payment for services accompanied by such documentation or data,

including back-up documentation sufficient for reimbursement of expenses by

FEMA for Lynn Haven payments to ECS.  **JOSEPH ADAM ALBRITTON**
drafted this agreement.

15.     On or about October 28, 2018, with the knowledge and concurrence
of **MARGO DEAL ANDERSON**, M. White, on behalf of Lynn Haven, and D.
White, owner of ECS, signed an amended agreement for ECS to provide Lynn
Haven with "Emergency And/Or Exigent Services, Ancillary Construction
Services, or Construction Due To The Effects of Hurricane Michael."  Notably, the
90-day term provided for in the original agreement was replaced with no deadline;
rather, the agreement provided the duration to be "for such time as necessary to
perform the services for the project."  Additionally, the amended agreement
included new specific language advising D. White and ECS that FEMA financial
assistance would be used to fund the contract with Lynn Haven, and that ECS
would comply with all applicable federal regulations and executive orders, as well
as all FEMA policies, procedures, and directives.  Under the amended agreement,
ECS also agreed to provide FEMA with access to its books and records, and was
further advised of federal program fraud and false statement prohibitions.
**JOSEPH ADAM ALBRITTON** drafted this amended agreement.

16.     After Hurricane Michael, **MARGO DEAL ANDERSON** requested
that the City Manager and D. White have ECS provide debris removal and repairs
to her personal residence and the private residences of her mother and another

neighbor.  These services were billed by ECS to, and paid by, Lynn Haven in invoices that falsely claimed services were provided for public areas in Lynn Haven.

17.     In late October or early November 2018, **JOSEPH ADAM ALBRITTON** discussed with D. White expanding the work that ECS was performing for Lynn Haven, to include the pick-up of residential trash in Lynn Haven.  **ALBRITTON** drafted a supplemental agreement between Lynn Haven and ECS authorizing ECS to assist Lynn Haven in the removal of residential trash. The effective date of this "task order" was listed as three weeks earlier – October 15, 2018, and the "task order" authorized payment to ECS at a rate of no more than $300.00 per hour, per crew, for removal of trash.  The task order stated that it would terminate upon notice by Lynn Haven, but was not to exceed 45 days from the effective date (October 15, 2018).

18.     On November 8, 2018, M. White and D. White executed an "Exhibit A – Task order 18-001" that ostensibly was an agreement under the Amended Agreement described in paragraph #12 above, authorizing ECS to charge Lynn Haven for residential trash pick-up, including allowing ECS to bill Lynn Haven for residential trash pick-up that had not been performed by ECS during October 2018.

19.     In late October 2018, **JOSEPH ADAM ALBRITTON** provided to City Manager M. White a list of companies that he claimed had provided prices

8

that would be charged to receive reduced vegetative debris or chips.

**ALBRITTON** advised M. White that a company, referred to as Company A in this Indictment, provided the lowest price at $4.70 per cubic yard and there was an immediate need to dispose of reduced debris.  **ALBRITTON** told M. White that Lynn Haven had asked that the debris removal companies associated with the City use only locations that charged at a rate that the haulers could bill to Lynn Haven that was higher than several of the individuals and companies who attempted to submit bids for the debris dumping.  **ALBRITTON** also told the City Manager that the dumping location owned by Company A was the most economic solution and should be selected by debris removal companies associated with Lynn Haven to dispose of vegetative debris or chips.  At that time, **ALBRITTON** was also employed by, and provided legal services to, Company A, a fact that was not disclosed by **ALBRITTON**.

20.     After Hurricane Michael, **JOSEPH ADAM ALBRITTON** directed D. White to have ECS provide debris removal and repairs to his personal residence and the residence of his girlfriend.  These services were billed to Lynn Haven by ECS in invoices that falsely claimed services were provided for public areas in Lynn Haven, which paid ECS.  **ALBRITTON** also requested and obtained from ECS an invoice for the debris removal services provided at his residence, which

invoice **ALBRITTON** submitted to his insurance company falsely claiming he had paid ECS for debris removal and repairs.

21.    At the request of **JAMES DAVID FINCH, MARGO DEAL ANDERSON** caused City Manager M. White to issue a directive to Company C and Company D, debris removal companies that were contracted with Lynn Haven to conduct post-Hurricane Michael debris removal and clean-up, to utilize a site owned by **FINCH** to dispose of all vegetative debris or chips. As directed, Company C and Company D commenced disposing all of its vegetative debris or chips at a **FINCH's** site.  Fees totaling more than $1 million for the disposal of items by Company C and Company D at **FINCH's** site for the next one-year period were paid by Lynn Haven.

22.    **JAMES DAVID FINCH** and **MARGO DEAL ANDERSON** attempted to have the City of Lynn Haven switch from its approved preliminary plan for the rebuild of municipal facilities to allow **FINCH** to conduct construction of a new municipal building/police station in accordance with his plan.

### B.  THE CHARGE

23.    Between on or about August 1, 2015, and on or about February 2,

10

2021, in the Northern District of Florida and elsewhere, the defendants,

**MARGO DEAL ANDERSON,**
**JOSEPH ADAM ALBRITTON,**
**ANTONIUS GENZARRA BARNES,**
**and**
**JAMES DAVID FINCH,**

did knowingly and willfully combine, conspire, confederate, and agree together

and with other persons to:

(a)   devise, and intend to devise, a scheme to defraud and for obtaining

money and property by means of material false and fraudulent pretenses,

representations, and promises, and to cause wire communications to be transmitted

in interstate and foreign commerce for the purpose of executing such scheme, in

violation of Title 18, United States Code, Section 1343; and

(b)   to devise a scheme to defraud and deprive the City of Lynn Haven and

its citizens of their right to the honest services of **ANDERSON,** the elected Mayor

of Lynn Haven, **ALBRITTON,** the City Attorney for Lynn Haven, and **BARNES**

as Commissioner, through bribery or kickbacks, and to cause wire communications

to be transmitted in interstate and foreign commerce for the purpose of executing

such scheme, in violation of Title 18, United States Code, Sections 1343 and 1346;

## C.  MANNER AND MEANS

The manner and means by which this conspiracy was committed included

the following:

11

## Public Official Positions

24.     The defendants and conspirators used **MARGO DEAL ANDERSON's** public official position as the Mayor of Lynn Haven, **JOSEPH ADAM ALBRITTON's** public official position as a City Attorney of Lynn Haven, and **ANTONIUS GENZARRA BARNES'** position as City Commissioner, to offer, give, solicit, receive, agree to accept, and accept things of value from companies and individuals having business interests in Lynn Haven. These things of values were offered to **ANDERSON, ALBRITTON,** and **BARNES** with the intent that they would be influenced in the performance of official acts.  **ANDERSON, ALBRITTON,** and **BARNES** demanded, sought, agreed to accept, and received things of value with the intent that they would be influenced in the performance of official acts.

25.     **MARGO DEAL ANDERSON** used her position as Mayor of Lynn Haven to take official action favorable to Company A, **JAMES DAVID FINCH** and **FINCH's** business interests, and other companies, that included voting on measures pending before the Lynn Haven City Commission, signing resolutions, contracts, agreements, and promissory notes, and pressuring and advising City officials to perform specific official acts. Among other things, **ANDERSON** directed City officials to take official action favorable to **JAMES DAVID FINCH** and **FINCH's** business interests in exchange for financial benefits from **FINCH.**

12

26.     **JOSEPH ADAM ALBRITTON** used his position as City Attorney of Lynn Haven to take official action favorable to Company A, Phoenix, and other companies, including drafting official documents, signing official documents, conducting alleged bid procedures for contracts, and pressuring and advising City officials to perform specific official acts.

27.     **ANTONIUS GENZARRA BARNES** used his position as City Commissioner to take official action favorable **to JAMES DAVID FINCH** and his business interests, including moving, seconding, and voting on items on the Commission agenda.

28.     **JAMES DAVID FINCH**, through his businesses, and otherwise, provided money and other benefits to **ANDERSON** and **ANTONIUS GENZARRA BARNES** in exchange for official acts favorable to his business interests.

### ECS Fraudulent Invoices

29.     D. White used ECS as a means to fraudulently obtain money from Lynn Haven.  D. White submitted invoices requesting payment for services allegedly provided by ECS to Lynn Haven, but which were false and fraudulent as to a number of material matters.

30.     M. White, as City Manager of Lynn Haven, approved all ECS invoices and directed city employees to immediately pay ECS for those invoices,

13

even though other contracted debris removal companies had to wait for payment of invoices submitted for Hurricane Michael disaster relief and debris removal.

31.     After Hurricane Michael, **MARGO DEAL ANDERSON** requested that the City Manager and D. White have ECS provide debris removal and repairs to her personal residence and the private residences of her mother and a neighbor. These services were valued at approximately $48,000 but were billed by ECS to, and paid by, Lynn Haven in invoices that falsely claimed services were provided for public areas in Lynn Haven.

32.     **MARGO DEAL ANDERSON** and M. White signed Lynn Haven checks issued to ECS based upon fraudulent invoices that falsely claimed work by ECS was performed at various Lynn Haven public locations when the invoices included work performed by ECS at private residences and premises of public officials, including **ANDERSON** and the private residences of her mother and a neighbor.

33.     While D. White and ECS were providing services to Lynn Haven, M. White received things of value from D. White, including repairs to, and debris removal from, M. White's residence in Lynn Haven and his farm located outside Lynn Haven in Bay County, money for the purchase of M. White's farm, an automobile, and cash.

14

34.     These repairs to, and debris removal from, the residence and farm of M. White were billed to Lynn Haven with false invoices submitted by D. White to Lynn Haven with invoices falsely stating that work had been performed at locations in Lynn Haven.  M. White approved the ECS invoices and directed Lynn Haven employees to pay the invoices.

35.     While D. White and ECS were providing services to Lynn Haven, **MARGO DEAL ANDERSON** received things of value from D. White, including repairs to, and debris removal from, **ANDERSON's** private residence in Lynn Haven and the private residences of her mother and a neighbor.

36.     After Hurricane Michael, **JOSEPH ADAM ALBRITTON** caused D. White to have ECS provide debris removal and repairs to his personal residence and the residence of his girlfriend.  These services were valued at approximately $25,000, but were billed by ECS to, and paid by Lynn Haven in invoices that falsely claimed services were provided for public areas in Lynn Haven. **ALBRITTON** also requested and obtained from ECS an invoice for the services provided at his residence, which falsely stated that **ALBRITTON** paid the invoice in full, and which **ALBRITTON** submitted to his insurance company falsely claiming that he paid ECS for debris removal and repairs, and requesting reimbursement from the insurance company.

15

37.    While D. White and ECS were providing services to Lynn Haven,

**JOSEPH ADAM ALBRITTON** received things of value from D. White,

including repairs to, and debris removal from, the private residences of

**ALBRITTON** and his girlfriend in Lynn Haven, and cash.

38.    When ECS invoices were being assembled for submission to FEMA

by Lynn Haven for reimbursement, it was apparent that most of the ECS invoices

that had been paid provided no details in support of the requested payments.  When

directed to provide supporting documentation for the monies requested and already

paid, D. White submitted false time sheets prepared by another person.  The time

sheets were false and fraudulent in that they included names of individuals who

had not worked at the claimed location, were off that day, worked at other projects

outside Lynn Haven, or had never worked for ECS at the time of the timesheet.

Additionally, in many invoices, the specific Lynn Haven locations of work claimed

to have been done by ECS were false.  These time sheets describing the attendance

of ECS workers were certified by a Lynn Haven Department Head of Recreation

and Parks, as accurate, but they were not, as the public official well knew.

39.    ECS invoices were submitted to Lynn Haven for payment of services

that were not authorized under the emergency contract and were for the private

residences of some Lynn Haven officials.  The performance of ECS post-hurricane

debris removal and repairs at the private residences of some Lynn Haven officials

16

and other private individuals were concealed and not disclosed in the ECS invoices submitted by D. White. M. White approved the invoices and caused them to be paid to ECS by Lynn Haven.

40.    A check register listing all checks and payments of monies to vendors by Lynn Haven was provided to **MARGO DEAL ANDERSON**, City Manager M. White, and the Deputy Finance Director on a regular basis. The check register included the amount of the Lynn Haven check, the vendor, and related accounting information. **ANDERSON** regularly signed off on the check register detailing Lynn Haven payments to vendors, including ECS. **ANDERSON** signed off on a number of check registers that included the payment of invoices to ECS totaling approximately $5 million between October 26, 2018, and March 2019, and never questioned any of the payments made to ECS until after the resignation of the City manager and the subsequent inquiry concerning the large amount of monies paid by Lynn Haven to ECS.

41.    On October 23, 2018, D. White and ECS submitted to Lynn Haven a false invoice for hurricane clean-up in the amount of $180,722.75 that claimed work by ECS was done at a Lynn Haven park and water plant on eight separate days. The ECS supporting documents submitted to Lynn Haven for this fraudulent invoice included individuals who were in fact working at locations outside Lynn Haven for a different contractor. This invoice, and a separate ECS $44,000 invoice

for painting a Lynn Haven building prior to the hurricane, were approved and paid by Lynn Haven as emergency expenditures.  With the approval of **MARGO DEAL ANDERSON,** M. White issued a handwritten check in the amount of $224,722.75 to ECS within three days after the submission of the invoices, and **ANDERSON** specifically authorized the cashing of the Lynn Haven check.

42.    On November 12, 2018, a false invoice for hurricane clean-up in the amount of $527,512.65 was submitted to Lynn Haven by D. White and ECS that falsely claimed work by ECS was done at a cemetery and sports complexes during a seven day period.  Instead of doing the work at the locations described, ECS workers conducted debris removal and clean-up at the residence of M. White located in Lynn Haven, his farm located outside of Lynn Haven in Bay County, the residences of **MARGO DEAL ANDERSON,** her mother, and a neighbor, and the residences of **JOSEPH ADAM ALBRITTON** and his girlfriend.  The work on these private residences was concealed and not reported in the invoices, and no supporting documents to the invoice were provided.  The invoice was approved by M. White, who directed employees of Lynn Haven to pay this invoice.  This invoice was included in the payment of three invoices to ECS in a Lynn Haven check issued to ECS on November 15, 2018, totaling $1,288,716.54.

43.    For the invoice submitted on November 12, 2018, described in paragraph #17 above, D. White and ECS subsequently submitted false Daily Time

18

Sheets purporting to show numerous individuals worked 12 hours per day on November 11, 2018.  These time sheets were prepared by a conspirator, who also prepared time sheets for the same day for ECS to pay its employees.  The payroll time sheets prepared by the conspirator and used to pay ECS employees listed most of the employees as not working on that day.

### ECS Trash Pick-Ups

44.     After the initial declaration of an emergency by Lynn Haven had been revoked and expired, **JOSEPH ADAM ALBRITTON**, **MARGO DEAL ANDERSON,** and others sought to locate additional Lynn Haven projects that could provide money to D. White and ECS.  One project was the Task Order agreement that **ALBRITTON** drafted and directed the City Manager to execute with D. White, ostensibly as part of the Emergency Agreement with ECS, to conduct trash pick-up using a pick-up truck and a trailer, at a cost of no more than $300 per hour per crew, throughout Lynn Haven.  This action was implemented despite the ability of Lynn Haven waste trucks to pick-up large amounts of household trash and deposit large amounts of trash at the dump at no increased cost to Lynn Haven.

45.     In late October or early November 2018, **JOSEPH ADAM ALBRITTON** discussed with D. White expanding the work that ECS was performing for Lynn Haven, to include the pick-up of residential trash in Lynn

Haven. **ALBRITTON** drafted a supplemental agreement between Lynn Haven and ECS authorizing ECS to assist Lynn Haven in the removal of residential trash. The effective date of this "task order" was listed as three weeks earlier – October 15, 2018, and the "task order" authorized payment to ECS at a rate of no more than $300.00 per hour per crew for removal of trash. The task order stated that it would terminate upon notice by Lynn Haven, but was not to exceed 45 days from the effective date (October 15, 2018).

46.    On November 8, 2018, M. White and D. White executed an "Exhibit A – Task order 18-001" that ostensibly was an agreement under the Amended Agreement described in paragraph #14 of Section A above, authorizing ECS to charge Lynn Haven for residential trash pick-up, including allowing ECS to bill Lynn Haven for residential trash pick-up that had not been performed by ECS during October 2018.

47.    On November 9, 2018, **JOSEPH ADAM ALBRITTON** sent an email to City Manager M. White and **MARGO DEAL ANDERSON** that the trash pick-up work order did not require approval by the Commission, as it confirmed the verbal task order approved by **ANDERSON** and M. White in October. The trash pick-up Task Order was then removed from the agenda for approval by the Lynn Haven Commission.

48.    On November 13, 2018, a false invoice for hurricane clean-up in the amount of $332,387.76 was submitted to Lynn Haven by D. White and ECS that falsely claimed trash pick-up was conducted by ECS during a fourteen day period starting on October 18, 2018.  No documentation was submitted in support of this invoice.  The claimed trash pick-up did not occur, and there was no record of any trash being dumped at the Bay County refuse location, nor did City manager M. White obtain approval from Bay County for ECS to use the account of Lynn Haven to dump items at the Bay County facility until at least October 31, 2018. This invoice was included in the payment of three invoices to ECS in a Lynn Haven check issued to ECS on November 15, 2018, totaling $1,288,716.54.

49.    From the monies fraudulently paid by Lynn Haven for trash pick-up that did not actually occur, **JOSEPH ADAM ALBRITTON** solicited D. White to pay **ALBRITTON** money paid to ECS pursuant to the trash pickup agreement. Over the course of the next twelve weeks, **ALBRITTON** received $10,000 in cash from D. White per week of claimed trash pickup, linking to the payment of twelve weeks of trash pick-up in Lynn Haven.

50.    On November 29, 2018, a false invoice for hurricane clean-up in the amount of $135,445.03 was submitted to Lynn Haven by D. White and ECS that falsely claimed trash pick-up was conducted by ECS during a seven day period starting on November 23, 2018, (the day after Thanksgiving).  However, there

21

were only 6 dump tickets from the Bay County refuse location for this time period,

for which D. White and ECS charged Lynn Haven $19,349 per day.  This invoice

was included in the payment of two invoices to ECS in a Lynn Haven check issued

to ECS on November 30, 2018, totaling $433,365.85.  At the direction of

**ALBRITTON,** D. White paid **ALBRITTON** $10,000 in cash from the proceeds

of the Lynn Haven check to ECS.

51.    On December 13, 2018, a false invoice for hurricane clean-up in the

amount of $185,503.17 was submitted to Lynn Haven by D. White and ECS that

falsely claimed trash pick-up was conducted by ECS during a 13-day period

starting on November 30, 2018.  The actual dump tickets from the Bay County

refuse location for this time period did not support the claims of the invoice.

Additionally, the trash-pick-up agreement had expired on November 29, 2018, and

ECS was not authorized to collect residential trash or receive payment from Lynn

Haven for such services.  This invoice was included in the payment of two invoices

to ECS in a Lynn Haven check issued to ECS on December 14, 2018, totaling

$515,731.31.  At the direction of **ALBRITTON,** D. White paid **ALBRITTON**

$20,000 in cash from the proceeds of the Lynn Haven check to ECS.

52.    On December 28, 2018, a false invoice for hurricane clean-up in the

amount of $481,215.24 was submitted to Lynn Haven by D. White and ECS that

falsely claimed trash pick-up was conducted by ECS during a 17-day period

22

starting on December 13, 2018, and continuing before and after Christmas Day, and through Christmas week.  The majority of ECS workers did not work for the two weeks before and after Christmas.  The invoice falsely claimed trash pick-up totaling between $21,000 and $32,000 per day during this period.  Additionally, the trash-pick-up agreement had expired on November 29, 2020, and ECS was not authorized to collect residential trash or receive payment from Lynn Haven for such services.  This invoice was included in the payment of two invoices to ECS in a Lynn Haven check issued to ECS on December 31, 2018, totaling $725,941.09. At the direction of **ALBRITTON,** D. White paid **ALBRITTON** $20,000 in cash from the proceeds of the Lynn Haven check to ECS.

53.    On January 13, 2019, three months after Hurricane Michael, a false invoice for hurricane clean-up in the amount of $479,020.68 was submitted to Lynn Haven by D. White and ECS that falsely claimed trash pick-up was conducted by ECS during a 13-day period starting the day after New Year's Day. The invoice also falsely claimed that between 11and 13 crews were used to collect trash daily.  The invoice falsely claimed trash pick-up during this period totaling $32,278.68 per day for five days, $38,878.44 per day for seven days, and $45,478.20 for the last day.  Additionally, the trash-pick-up agreement had expired on November 29, 2018, and ECS was not authorized to collect residential trash or receive payment from Lynn Haven for such services.  This invoice was included in

23

the payment of two invoices to ECS in a Lynn Haven check issued to ECS on January 15, 2019, totaling $895,441.52.  At the direction of **ALBRITTON,** D. White paid **ALBRITTON** $20,000 in cash from the proceeds of the Lynn Haven check to ECS.

54.    On January 25, 2019, three months after Hurricane Michael, a false invoice for hurricane clean-up in the amount of $216,771.24 was submitted to Lynn Haven by D. White and ECS that falsely claimed trash pick-up was Conducted by ECS during a six day period.  The invoice also falsely claimed that crews were used to collect trash daily.  The invoice falsely claimed trash pick-up during this period totaling $38,878.44 per day for four days, $35,578.56 for one day, and $25,678.92 for the last day.  Additionally, the trash-pick-up agreement had expired on November 29, 2018, and ECS was not authorized to collect residential trash or receive payment from Lynn Haven for such services.  This invoice was included in the payment of two invoices to ECS in a Lynn Haven check issued to ECS on January 31, 2019, totaling $433,259.16.  At the direction of **ALBRITTON,** D. White paid **ALBRITTON** $10,000 from the proceeds of the Lynn Haven check to ECS.

### Disposal of Vegetative Debris or Chips

55.    On October 30, 2018, **JOSEPH ADAM ALBRITTON** provided to City Manager M. White a list of companies that he falsely claimed had provided

24

prices that would be charged to receive reduced vegetative debris or chips, and

advised M. White that Company A provided the lowest price at $4.70 per cubic

yard and there was an immediate need to dispose of reduced debris. **ALBRITTON**

further told M. White that Lynn Haven had asked that the debris removal

companies associated with the City use only locations that charged a price of $4.70

per cubic yard or less.

56.     At the time that **JOSEPH ADAM ALBRITTON** advised the City

Manager that the dumping location owned by Company A was the most economic

solution and should be selected by debris removal companies associated with Lynn

Haven to dispose of vegetative debris or chips, **ALBRITTON** was employed by,

and provided legal services to, Company A, and **ALBRITTON** was the registered

agent for 14 companies of the owner of Company A.  Additionally, **ALBRITTON**

was a co-owner with the owner of Company A in another company and had been

since February of 2017.  None of these ties, financial interests, and relationships

with Company A and its owner were disclosed by **ALBRITTON** to Lynn Haven.

57.     One of the companies that **JOSEPH ADAM ALBRITTON** falsely

claimed had not provided a price for the vegetative debris or chips disposal had

actually advised officials in Lynn Haven, including **ALBRITTON**, in writing that

it would accept the vegetative debris or chips for $4.00 per cubic yard, or even

lower at $3.50 per cubic yard, and save the taxpayers money both as to the price

and the costs of transportation since its disposal sites were closer to Lynn Haven than Company A or the other possible disposal sites.

58.     After the selection of Company A became public and an objection to the selection by Lynn Haven of Company A to be used by debris removal companies associated with Lynn Haven to dispose of vegetative debris or chips was made to Lynn Haven officials, one of Company A's owners asked **JOSEPH ADAM ALBRITTON** to forward **ALBRITTON's** summary of the obtaining of prices to a representative of Company D, a large debris removal company contracted with Lynn Haven to conduct post-Hurricane Michael debris removal, so Company D could incorporate and justify the use of the Company A site for vegetative debris or chips disposal.

59.     In or about late October, **MARGO DEAL ANDERSON** convened a meeting with **JAMES DAVID FINCH**, one of the owners of Company A, City Manager M. White, and several other persons at **FINCH's** personal residence.  At the meeting, **ANDERSON** praised **FINCH** and his previous post-hurricane assistance to Lynn Haven, and **FINCH** complained about not receiving enough of Lynn Haven post-Hurricane Michael business.

60.     On November 1, 2018, at the direction of **MARGO DEAL ANDERSON,** City Manager M. White issued a directive to Company C, a debris removal company that was contracted with Lynn Haven to conduct post-Hurricane

26

Michael debris removal and clean-up, to utilize a site owned by **JAMES DAVID FINCH** to dispose of all vegetative debris or chips. Company C, which had been disposing of vegetative debris or chips at another site location, stopped dumping at that site location and commenced disposing all of its vegetative debris or chips at **FINCH's** site. Fees totaling more than $1 million for the disposal of items by Company C at **FINCH's** site for the next one-year period were paid by Lynn Haven.

61.     On or about November 11, 2018, at the direction of **MARGO DEAL ANDERSON,** City Manager M. White issued a directive to Company D, a debris removal company that was contracted with Lynn Haven to conduct post-Hurricane Michael debris removal and clean-up, to utilize a site owned by **JAMES DAVID FINCH** Phoenix to dispose of all vegetative debris or chips. Company D, which had been disposing of vegetative debris or chips at another site location, ended dumping at that site location and commenced disposing of all of its vegetative debris or chips at **FINCH'S** site.  Fees totaling more than $1 million for the disposal of items by Company D at **FINCH'S** site for the next year period were paid by Lynn Haven.

62.     On November 19, 2018, at the request of the co-owner of Company A, **JOSEPH ADAM ALBRITTON** sent to the vice-president of Company D, contracted to remove debris in Lynn Haven after Hurricane Michael, an email with

27

the subject, "Justification Notice," and provided his summary and analysis that the

Company A site be used to dispose of vegetative debris or chips by all debris

removal companies associated with Lynn Haven.

### Disaster Debris Management Site

63.     While Lynn Haven was finalizing its decision concerning the location

to be utilized for the disposal of vegetative debris or chips, City Manager M. White

consulted with the City Engineer and planned to have real property owned, but not

used by, Lynn Haven, permitted by the State of Florida to be used by debris

removal companies associated with Lynn Haven to dispose of vegetative debris or

chips.

64.     However, **MARGO DEAL ANDERSON** instructed City Manager

M. White to stop the permitting process for the Lynn Haven property for the

disposal of vegetative debris or chips and stated that it would be unnecessary.

65.     **MARGO DEAL ANDERSON** then directed City Manager M. White

to seek authorization from the State of Florida for Lynn Haven to obtain a new

Disaster Debris Management Site (DDMS) at property owned by **JAMES DAVID**

**FINCH** in Bay County.  Accordingly, on November 7, 2018, City Manager M.

White filed a written request with the State of Florida requesting authorization for

Lynn Haven to use a new DDMS for temporary storage and processing of disaster

debris generated as the result of Hurricane Michael.

66.     During the same period of time that the DDMS authorization was arranged for the company of **JAMES DAVID FINCH,** two disaster debris companies, previously contracted with Lynn Haven for debris removal, were directed to dispose of the vegetative debris or chips at **FINCH's** site, and **FINCH'S** company received payment of fees for that dumping from Lynn Haven, **MARGO DEAL ANDERSON** accepted things of value from the **FINCH,** including travel in a private airplane for **ANDERSON** and another person to Biloxi, Mississippi, and the Florida Keys, lodging, meals and entertainment, and lodging aboard a private yacht and meals in Key West, Florida.

### 17th Street Projects and ½ Cent Surtax Design/Build Contract

67.     In August 2015, Lynn Haven approved an agreement for **JAMES DAVID FINCH's** company to perform work in the amount of $3.72 million for the 17th Street Ditch Stormwater Project ("17th Street project"). Lynn Haven also approved the financing of the project by Phoenix at an interest rate of 2.55 per cent for a term of 20 years. **ANTONIUS GENZARRA BARNES** was not present for the vote.

68.     On or about February 28, 2017, the City Commission considered a modification to the 17th Street project. The City Manager recommended adding $668,000 to a promissory note to **JAMES DAVID FINCH's** company for piping on the west side of the street, and to increase the promissory note term to 30 years.

**ANTONIUS GENZARRA BARNES** moved to approve these recommendations. **BARNES** and **MARGO DEAL ANDERSON** voted in favor.

69.     On March 20, 2017, **MARGO DEAL ANDERSON** signed, on behalf of Lynn Haven, a promissory note to pay Phoenix, **JAMES DAVID FINCH's** company, $3.72 million with respect to the 17th Street project.  The promissory note was for a period of 30 years and required Lynn Haven to pay interest of 2.55 per cent annually and make monthly payments to Phoenix.  In financing the 17th Street project with Phoenix, Lynn Haven agreed to pay Phoenix approximately $1.6 million, as interest, in addition to the $3.72 million the City would pay Phoenix for its work on the 17th Street project contract.

70.     On July 29, 2017, **MARGO DEAL ANDERSON** and the Lynn Haven Commission approved a resolution authorizing the issuance by Lynn Haven of a $3,910,000 municipal revenue bond and a loan agreement to be signed with a financial institution to provide the funding for Lynn Haven to pay for infrastructure work in the City that was to be conducted by **JAMES DAVID FINCH's** company, Phoenix.  The term of the loan was for 10 years and the interest rate was 2.18 per cent per annum.  **ANDERSON** signed the resolution and bond loan agreement.

71.     On August 9, 2017, **MARGO DEAL ANDERSON** signed an agreement between Lynn Haven and **JAMES DAVID FINCH** designating

Phoenix to be the contractor or vendor for various projects that would be

conducted in Lynn Haven under a ½ Cent Surtax Design/Build Contract, utilizing

proceeds from the ½ cent Bay County sales tax that was in effect for ten years.

This agreement, negotiated by **ANDERSON** and the owner of Phoenix, made

Phoenix the contractor for numerous multi-million dollar Lynn Haven

infrastructure projects that would not require any bid procedure for any of the

projects related to the agreement.

72.     On October 24, 2017, **JAMES DAVID FINCH** sent a letter to City

Manager M. White advising that he had completed phase one of the project earning

the total amount ($3.8 million) authorized to date.  The letter further stated that

**FINCH's** company would proceed with the next phase but not invoice Lynn

Haven until the City had obtained the new loan. The amount of the referenced

additional work in the amount of $1.8 million was submitted to Lynn Haven by

**FINCH** in an invoice in January 2018.

73.     **MARGO DEAL ANDERSON** directed M. White to allow **JAMES**

**DAVID FINCH's** company to proceed as requested with the work despite no

funding being available, a new loan had not been obtained, the City had not

approved the specific roads that Phoenix was paving, and engineering work had

not been completed on many of the roads that Phoenix had finished its work on.

31

74.     On December 12, 2017, **MARGO DEAL ANDERSON** and the Lynn Haven Commission, including **ANTONIUS GENZARRA BARNES,** approved a resolution authorizing the issuance by Lynn Haven of a $6,090,000 municipal revenue bond and a loan agreement to be signed with a financial institution to provide the funding for Lynn Haven to pay for infrastructure work in the City that was to be conducted by **JAMES DAVID FINCH's** company.  The term of the loan was for 10 years and the interest rate was 2.35 per cent per annum. **ANDERSON** signed the resolution and bond loan agreement.

75.     On January 4, 2018, **JAMES DAVID FINCH** submitted an application to Lynn Haven for payment of $1,850,170.66 for work performed on phase two during approximately a two month period.

76.     In June 2018, **JAMES DAVID FINCH** and **MARGO DEAL ANDERSON** requested City Manager M. White to proceed with an additional phase of the 17th Street project. M. White told **ANDERSON** and **FINCH** that he wanted to put the project on hold as it was going to cost the City a large amount of money to continue the project and the City did not have the money to pay for the project at that time.  **ANDERSON** and **FINCH** told M. White that **FINCH** wanted to proceed with the project.

77.     **ANDERSON** pressured M. White to have Lynn Haven proceed with the project and stated that the **JAMES DAVID FINCH** would finance the

32

additional approximate $1 million cost of the project. Despite protestations by City Manager M. White that Lynn Haven did not need the additional debt, **ANDERSON** directed M. White to make it happen.

78.     On August 21, 2018, Lynn Haven advertised for sealed bids from businesses to perform additional work on the 17th Street project. Since the Florida Department of Transportation (FDOT) had become a partner with Lynn Haven to provide some of the funding for the project, Lynn Haven was required to solicit bids for the additional work on the 17th Street project and obtain the concurrence of FDOT.

79.     Three sealed bids for the additional work on the 17th Street project were submitted: one from **JAMES DAVID FINCH's** company, one from **FINCH**'s relative, and one from Company A. In the past, these three companies had bid on contracts with public entities, agreeing among themselves that one company would submit the lowest bid on a specific project and the other two companies would submit higher bids. Then, in another public project, a different company would submit the lowest bid. Phoenix's $957,000 bid was determined to be the lowest bid and recommended to be awarded to Phoenix by the Lynn Haven City Engineer.

80.     The sealed bid procedure was intended to make it appear as if the award of the additional work for the project was fair and above board, and would

receive the concurrence of the FDOT, which had signed a Joint Participation

Agreement with Lynn Haven in the 17th Street project.

81.     Seven months before the selection of **JAMES DAVID FINCH's**

company for the additional work on the 17th Street project, **FINCH** arranged to

have the Lynn Haven City Engineer sell his 2006 ITAS Motorhome (Motorhome),

valued at approximately $106,000, to **MARGO DEAL ANDERSON** without the

payment of any money by **ANDERSON,** by the following means:

        a.     **FINCH** issued a personal check to the City Engineer in the

amount of $75,000, which allowed the City Engineer to pay off, with additional

funds that he possessed, a $105,993.70 loan on the Motorhome;

        b.     The motor vehicle title for the Motorhome was transferred to

the name of **ANDERSON's** husband after the City Engineer initially listed the

purchaser as **FINCH**;

        c.     The transfer of title filed with the Florida Division of Motor

Vehicles falsely stated that $35,000 was paid by **ANDERSON's** husband to

purchase the Motorhome;

        d.     The Motorhome was titled in the name of **ANDERSON's**

husband;

        e.     No money was paid by **ANDERSON** or her husband to obtain

this Motorhome valued at approximately $106,000; and

34

f.       Approximately 22 months after the transfer of the Motorhome to **ANDERSON** and her husband, **ANDERSON's** husband issued a $20,000 check to **JAMES DAVID FINCH**.  This action followed the public reporting of the Federal investigation into public officials in Lynn Haven, including an indictment of two Lynn Haven public officials and three other individuals charged with conspiracy, fraud, and related offenses arising from the defrauding of Lynn Haven. That indictment included allegations that the Lynn Haven Mayor received post-hurricane repairs to her private property and the work was paid for by Lynn Haven based upon fraudulent invoices that concealed and did not disclose that work performed for Lynn Haven was instead performed at a number of public officials' private residences and the private residences of a few other individuals, yet billed as work performed at Lynn Haven public properties.

82.       On November 6, 2018, **MARGO DEAL ANDERSON** and the Lynn Haven Commission, including **ANTONIUS GENZARRA BARNES,** voted for and **ANDERSON** signed a resolution of Lynn Haven amending the Joint Participation Agreement with FDOT relating to the 17th Street project stating that Lynn Haven had agreed to contract for and complete the work as described in the Joint Participation Agreement with **JAMES DAVID FINCH's** company.

83.       On November 7, 2018, less than a month after Hurricane Michael and at the time that **JAMES DAVID FINCH** complained to **MARGO DEAL**

**ANDERSON** about not receiving enough hurricane clean-up work, M. White awarded the contract to **FINCH's** company and executed a contract for Phoenix to perform an additional amount of work on the 17th Street project in exchange for $957,000. As directed by **ANDERSON**, this amount was added to the amount of the March 2017 promissory note that Lynn Haven had signed payable to **FINCH**, increasing the amount that Lynn Haven agreed to pay **FINCH** for the project to $5,178,555. In addition, Lynn Haven was required to pay 2.55 per cent interest annually to **FINCH** on the new note amount.

84.     During the same period of time that **MARGO DEAL ANDERSON** provided approval for **JAMES DAVID FINCH's** company to proceed with the 17th Street project, and for which **FINCH** received from Lynn Haven regular monthly payments of approximately $15,000 (including interest) and subsequent work by **FINCH's** company, and during the same time period that **ANDERSON** provided approvals for **FINCH,** signed various documents, and caused Lynn Haven to incur significant financial obligations for **FINCH** to proceed with numerous projects in Lynn Haven pursuant to the ½ Cent Surtax Design/Build Contract, **MARGO DEAL ANDERSON,** in addition to receiving a free Motorhome from **FINCH**, also accepted things of value from **FINCH**, including travel in a private airplane to Biloxi, Mississippi, and the Florida Keys, and lodging, meals, and entertainment.

36

85.     Between August 2015 and December 2017, **ANTONIUS GENZARRA BARNES** moved, seconded, and voted on matters before the Lynn Haven City Commission favorable to **JAMES DAVID FINCH**'s business interests, including the 17th Street project. Meanwhile:

a.      On or about September 8, 2015, **FINCH** provided **BARNES'** business, Barnes Insurance Services, Inc. with a check in the amount of $8,000. Marked in the memo section of the check was the word "Loan." The check was deposited by **BARNES** into his Barnes Insurance Services, Inc. account.

b.      On or about September 28, 2015, **FINCH** provided a check in the amount $12,000 to **BARNES'** business, Barnes Insurance Services, Inc. Marked in the memo section of the check was the word "Loan." The check was deposited by **BARNES** into his Barnes Insurance Services, Inc. account.

c.      On or about October 28, 2015, **FINCH** provided a check in the amount of $5,000 to **BARNES'** business, the Antonius G. Barnes Insurance Agency, Inc. Marked in the memo section of the check was the word "Loan." The check was deposited by **BARNES** into his Antonius G. Barnes Insurance Agency, Inc. account.

d.      On or about January 26, 2016, **FINCH** provided a check in the amount of $10,000 to **BARNES'** business, the Antonius G. Barnes Insurance Agency, Inc. Marked in the memo section of the check was the word "Loan." The

check was deposited by **BARNES** into his Antonius G. Barnes Insurance Agency, Inc. account.

e.     On or about November 14, 2016, **FINCH** provided a check in the amount of $2,500 to **BARNES'** business, the Antonius G. Barnes Insurance Agency, Inc. The check was deposited by **BARNES** into his Antonius G. Barnes Insurance Agency, Inc. account.

f.     On or about March 15, 2017, **FINCH** provided a check in the amount of $2,500 to **BARNES'** business, the Antonius G. Barnes Insurance Agency, Inc. The check was deposited by **BARNES** into his Antonius G. Barnes Insurance Agency, Inc. account.

g.     On or about December 4, 2017, **FINCH** provided a check in the amount of $5,000 to **BARNES**, which was cashed by **BARNES.**

### WorldClaim Insurance

86.     Following Hurricane Michael, Lynn Haven received a request from WorldClaim public adjusters to work with Lynn Haven to assist in documentation and adjustment of its claim with insurance companies with respect to losses that Lynn Haven incurred on October 10, 2018, associated with Hurricane Michael. One of Lynn Haven's engineers recommended to the City Manager that Lynn Haven select WorldClaim.

87.    Individual A advised City Manager M. White that Individual A was to receive a percentage of whatever money was brought in by WorldClaim from Lynn Haven, and agreed to share some of the money with M. White, and that M. White, **MARGO DEAL ANDERSON**, and a Lynn Haven Commissioner would not be charged any claims fees by WorldClaim to adjust any private insurance claims for those public officials.

88.    On October 24, 2018, and pursuant to the continuing Declaration of Emergency, **MARGO DEAL ANDERSON** and M. White signed a contract retaining WorldClaim to assist in documentation and adjustment of Lynn Haven's claim under a primary insurance policy with respect to losses that occurred due to Hurricane Michael.  The contract obligated Lynn Haven to pay a sliding fee scale from 3 to 10 per cent of the net recovery between $0 and $60 million.  This contract was entered into without any request for bids or requests for qualifications, incurring a significant financial obligation for the City, in accordance with a local state of emergency resolution that had been extended by Lynn Haven for seven days the day before the signing of the WorldClaim contract and which emergency resolution was scheduled to, and did, expire six days later.

89.    Following Hurricane Michael, City Manager M. White sought a claims adjuster for his personal residence and farm for damages sustained to the

properties.  White asked Individual A if WorldClaim could help **MARGO DEAL**

**ANDERSON,** M. White, and a City Commissioner.  Individual A advised that

WorldClaim would help all three public officials.  WorldClaim handled the

insurance claims for hurricane damage to the private residences and properties of

**ANDERSON**, M. White, and a City Commissioner.

90.    WorldClaim sent M. White a bill in the amount of $10,000 for its

work in adjusting the insurance claims of M. White relating to his private property.

The invoice amount of $10,000 was marked through, there were initials next to the

mark, and zero dollars was shown as the amount due.  M. White told both

**MARGO DEAL ANDERSON** and a City Commissioner that WorldClaim was

going to help them with their insurance claims at no cost to them.  WorldClaim

agreed to charge both **ANDERSON** and a City Commissioner no fee for its work

in adjusting the insurance claims of **ANDERSON** and the City Commissioner

relating to their private property.

91.    No money was paid by the City Commissioner for WorldClaim to

represent him and assisting him in obtaining approximately $75,000 from an

insurance company for damages done to his private property.  Through the efforts

of WorldClaim representing her and assisting her with her insurance claim,

**MARGO DEAL ANDERSON** obtained approximately $81,125 from an

insurance company for damages done to her private property. After the federal

investigation of **ANDERSON** and others was made public, **ANDERSON** issued a

check to WorldClaim for a reduced fee of only $3,646.

### City of Lynn Haven Design & Rebuild

92.     On September 24, 2019, the Lynn Haven City Manager reported to

the City Commission that staff was working with legal counsel and FEMA on

issuing the first round of Request For Qualifications (RFQ) for architectural design

and engineering services for Lynn Haven's rebuild of municipal facilities. She

further explained that contractors to rebuild the municipal facilities would be in the

second round.

93.     On January 14, 2020, the Lynn Haven City Commission voted to

approve the City Manager to proceed with negotiations and contracts to the top

three Architect/Design teams for the Lynn Haven rebuild.

94.     In the days after, the City Manager began negotiations of contracts

with three architect firms for the Lynn Haven rebuild of municipal facilities. The

contracts included designs for the old City Hall, new City Hall, Police Department,

Commission Chambers building and the sports complex.

95.     On April 3, 2020, Defendant **JAMES DAVID FINCH**, through JDF

Properties, purchased land at 201 14th Street West, Lynn Haven, for $750,000,

41

which property was represented by **FINCH** and **ANDERSON** sought to be the property for the rebuild of municipal facilities to be built by **FINCH**.

96.     On April 15, 2020, **MARGO DEAL ANDERSON** requested that the City Manager and Police Chief meet with **JAMES DAVID FINCH** at his place of business to discuss an alternative plan for the City rebuild to be done by **FINCH**.

97.     On April 20, 2020, the City Manager and Police Chief met with **JAMES DAVID FINCH** and **MARGO DEAL ANDERSON** at **FINCH's** office. **FINCH** advised that he had purchased property that would be good for the Police Department and Fire Department, that he would build a fortified concrete building, and that the architects will cost too much. **FINCH** claimed that his property was the best place in Lynn Haven, and that the City Commission would be interested in hearing his price for a design, build, and finance plan of $13 million for 37,000 square feet. **MARGO DEAL ANDERSON** supported **FINCH's** plan and told the City Manager and Police Chief that **FINCH** was willing to finance the costs of building the facilities like he did for the 17th Street ditch.

98.     On April 22, 2020, **MARGO DEAL ANDERSON** discussed with the Police Chief the Architects meeting from the previous day and the price. **ANDERSON** stated that **JAMES DAVID FINCH** has advised her since becoming Mayor, and that she didn't trust the City employees and their knowledge. **ANDERSON** stated that **FINCH** would stay out of the rebuild until

the architects make their presentations and the City has workshops. Then, **FINCH** would come in and show the Commission what he can do. **ANDERSON** further stated that **FINCH** will finance the rebuild at 2% like the 17th Street Ditch, and **FINCH** makes more money than putting his money in a bank.

99.   On April 23, 2020, **JAMES DAVID FINCH** discussed with the Police Chief renderings that **FINCH** had already provided to **MARGO DEAL ANDERSON** for the new police building.

100.   On April 30, 2020, **JAMES DAVID FINCH** met with the Police Chief and discussed the rebuild of the Police Department building. **FINCH** also stated that he wanted to rebuild all city buildings. After discussing rebuilding with the architects' plans and having FEMA involved, **FINCH** stated that he could receive the insurance money that the City is going to obtain and financing the rest of the building costs at 2.5% interest. At the meeting, **FINCH** had in his possession documents that had handwriting and notes on them by **MARGO DEAL ANDERSON** as Mayor relating to the presentations of three different architects regarding their proposed projects and pricing for City Hall, the Police Department, and renovation of the old City Hall.  **FINCH** told the Police Chief that he would get at least 4 votes from the City Commission on rejecting the architects' plan. When the Police Chief tried to explain that the Emergency Operations Center (EOC) should not be separated from the Police Department, **FINCH** threatened the

Police Chief that if he did not agree with **FINCH's** plan, the easiest thing to do is for the Sheriff's Office to come in and take over the Police Department at a cost of half the Police Department's budget.

101.   On May 12, 2020, at the City Commission workshop, the Architects made a presentation of renderings of the new City Hall, City Buildings, and Police Department, and Sports Complex and ball fields. **JAMES DAVID FINCH** attended the workshop. At the City Commission meeting later that day, the City Manager reported to the City Commission that the City had eight projects planned in the City with FEMA funding.

102.   On May 19, 2020, **MARGO DEAL ANDERSON** called the City Manager and asked her to call **JAMES DAVID FINCH** to get him on the agenda for the upcoming City Commission meeting. The City Manager was concerned that **ANDERSON** wanted **FINCH** placed on the agenda by the City Manager instead of **ANDERSON** who was making the request. Later that day, **FINCH** met with the City Manager and complained about the architect fees and the drawings that had been submitted. **FINCH** claimed that he could build his building much cheaper and he would do a workshop with the Commission for the Police Department building, and he wanted to add the Community Building to the project, but the City Manager refused. **FINCH** asked the City Manager how much money she had for the rebuild, which the City Manager refused to provide a dollar amount.

44

103.   On May 26, 2020, **JAMES DAVID FINCH** made a presentation at a City Commission workshop regarding problems he claimed existed with the projects proposed by the Architects. **FINCH** presented his proposal for rebuild of the City, at a cost of $15 million, 2% financing, which included the property that **FINCH** recently purchased at 201 14th Street West in the City. **MARGO DEAL ANDERSON** stated at the workshop that **FINCH**'s proposal was a wonderful idea.

104.   On May 28, 2020, **JAMES DAVID FINCH** called the City Manager multiple times complaining that the City Commission had already made a decision to deny his proposal for the Police Department. The City Manager advised **FINCH** that the City Attorney had advised that any project over a specific amount had to be bid out or it would be in violation of state law. **FINCH** continually stated that the architect was going to charge the City $40 million to build the Police Department and City Hall, which the City Manager told **FINCH** was not true. The responses appeared to anger **FINCH**.

105.   On May 29, 2020, the City Manager spoke to **MARGO DEAL ANDERSON,** who told the City Manager that **JAMES DAVID FINCH** had spoken to City Attorney **ALBRITTON** who determined it was legal to bid out the project that **FINCH** wanted and it could be placed on the Commission agenda. The City Manager told **ANDERSON** all she wanted was to make sure things were done

45

legally and if the Commission wanted to do this, it would be up to them. The City

Manager further advised **ANDERSON** that **ALBRITTON** had contacted the

Commissioners about the project and that anything over $300,000 would have to

be bid out. The City Manager stated that she had spoken with one of the architects

who was very disappointed that the City is going in a different direction and he

stated that it was being done illegally.

106.   On June 8, 2020, **MARGO DEAL ANDERSON** called the Police

Chief and mentioned giving him a raise. She stated she wanted to fulfill her

promise of making him a highly paid Police Chief. She said she did not want him

to ever leave the City and go somewhere else. **ANDERSON** also told the City

Manager that she wanted to do the same thing with the City Manager and her

salary. Salary increases for City employees are determined by the City Manager

and not the Mayor.

107.   On June 9, 2020, **MARGO DEAL ANDERSON** placed on the City

Commission meeting agenda Item #19 concerning the planning and construction of

Municipal facilities and at the meeting urged re-consideration of **JAMES DAVID**

**FINCH's** plan. **FINCH** spoke at the meeting and complained about the architects'

proposal as too expensive, and stated that the Police Chief wanted a "Suite" as his

office and a $400,000 kitchen.  The Commission voted to hold a workshop on the

matter. The Police Chief later met with **ANDERSON** and told her he was angry

46

that **FINCH** referenced his office as a "Suite" and had inflated the price of the

kitchen, and told her that **FINCH** did not need to threaten the Police Chief with the

Sheriff taking over the Police Department in the future for not supporting

**ANDERSON's** and **FINCH's** proposed plan.

108.   On June 23, 2020, **MARGO DEAL ANDERSON** placed on the City

Commission meeting agenda Item #17 concerning the City rebuild process. At the

City Commission meeting, **ANDERSON** discussed **JAMES DAVIDS FINCH's**

proposal and the architect's proposal, highlighting benefits of a guaranteed

maximum price that **FINCH** offered. **ANDERSON** stated priority should be to get

started on the Police Department. City Commissioner J.T. advocated for moving

forward with design build with guaranteed price of **FINCH** and moved that the

Commission do so. However, no Commissioner seconded the motion.

**ANDERSON** then passed the gavel to the Mayor pro tempore and seconded the

motion. The City Manager explained such a path may result in loss of FEMA

funds. **ANDERSON** replied that she wanted to use insurance funds because they

were not subject to FEMA guidelines and complained about not always receiving

good advice from the FEMA consultants. **ANDERSON** stated she wanted to get

off this $40 million dollar ship and go a different course. The motion to have Staff

work on plan and proposal to bid out a portion of the City work through design

build process and bring back before the Commission passed on a 3-2 vote.

47

109.   On July 2, 2020, **MARGO DEAL ANDERSON** called the City Manager and discussed the design/build project proposal of **JAMES DAVID FINCH**. The City Manager explained to **ANDERSON** that she was concerned about losing FEMA funds. **ANDERSON** responded there was no guarantee the City would receive the FEMA money. However, the City Manager advised **ANDERSON** that in the May Commission meeting it was clearly explained to the Commission that the project was designated a "428" project and the money had already been set aside as a fixed cost and bridge funds of $1 million dollars had already been obligated and any of the bridge money not used could be used for the Police Department. As she had expressed to the City Commission and **ANDERSON,** the City Manager reiterated that the City stood to lose in excess of $5 million by doing a design/build project as proposed by **FINCH.**

110.   On July 14, 2020, **MARGO DEAL ANDERSON** placed on the City Commission meeting agenda Item #21 concerning the creation of an Assistant City Manager position.

111.   On July 22, 2020, **JAMES DAVID FINCH** met with the City Manager and stated the City was dragging its feet on the rebuild. **FINCH** accused the City Manager of being against him on this project. The City Manager stated she was against leaving $5 million dollars on the table and not following the law. **FINCH** then claimed the City was going to spend $40 million dollars rebuilding to

48

which the City Manager told **FINCH** that he kept repeating false information as to the cost. In his conversation with the City Manager, **FINCH** spoke as if he had already been awarded the Police Department contract. **FINCH** stated that no one could do his architect fees of $150,000 for the building. He then accused the City Manager of holding up the process. The City Manager replied that she had no reason to work against anything, that she had been given a task by the Commission and she was following it, and she was not going to break the law for anyone. **FINCH** stated that he had supported the City Manager for her position, but they were now going in two different directions.

112.   On July 27, 2020, **MARGO DEAL ANDERSON** contacted the City Manager and requested copies of the contracts with the architects for the rebuild projects and the amount of money spent on renting the temporary Police Department and City Hall. The City Manager suspected that this information was, in reality, for **JAMES DAVID FINCH.** She emailed the requested documents to **ANDERSON.**

113.   On July 28, 2020, **JAMES DAVID FINCH** appeared for the City Commission meeting approximately 40 minutes prior to the beginning of the meeting, and had in his possession all of the City documents that the City Manager had provided by email to **MARGO DEAL ANDERSON.** During the Commission meeting, **FINCH** commented on architect's design issues on the agenda, and

49

objected to concession stand costs and the City paying rent for temporary buildings. **FINCH** quoted some numbers that the architects had in their designed build of the City Buildings and Ball Fields, and quoted the amount of money the city was spending on renting the two temporary buildings. The City Manager explained that the projects were "428" FEMA projects and that the City is only responsible for any project costs in excess of the FEMA and insurance proceeds for the projects.

114.    On July 30, 2020, **MARGO DEAL ANDERSON** contacted the City Manager and asked the City Manager who authorized her to pay the architects. The City Manager told **ANDERSON** that the Commission authorized it and that the architects had been working since February and not received any payments. **ANDERSON** stated the architects did not have a contract. Prior to this discussion, **ANDERSON** had already been advised by the City Attorney that the City Manager was well within her authority to pay the architects.

115.    On August 11, 2020, the City Manager advised the City Commission at the Commission meeting of the tentative re-building of City and budget, FEMA reimbursement amounts, and the City's share of rebuild projects. The City Manager noted that the City had $19 million dollars in its' restoration account and anticipated FEMA to reimburse the City $20 million dollars to cover the cost to rebuild the City.

50

116.   On August 12, 2020, **MARGO DEAL ANDERSON** met with the City Manager and stated that she had wanted someone from Tetra Tech and FEMA at the next workshop. **ANDERSON** stated that she was upset with a statement that the City Manager made during the workshop about saving the City $19.3 million dollars. The City Manager advised **ANDERSON** that the Commission meetings were getting out of control and that people from the audience should not be allowed to attack people on the dais. The City Manager provided **ANDERSON** with two examples where **JAMES DAVID FINCH** personally attacked the City Manager. **ANDERSON** told the City Manager that **FINCH** used to like the City Manager but no longer. The City Manager asked **ANDERSON** about information that **FINCH** was talking with City employees and vendors telling them that he and **ANDERSON** had spoken and **FINCH** recommended that the Mayor hire an Assistant City Manager and fire the City Manager, so that **ANDERSON** could do what she wanted or go around the City manager. **ANDERSON** denied that she was trying to get rid of the City Manager and stated that **FINCH** was just being mean.

117.   On August 14, 2020, **JAMES DAVID FINCH** sent a letter to the City Manager withdrawing his offer to build the new Police Department and offering to sell the land located at 2011 4th Street West to the City.

51

**Concealment of Benefits**

118.   As Mayor of Lynn Haven, **MARGO DEAL ANDERSON** was a public official who was required under Florida law to file a Form 9, "Quarterly Gift Disclosure" with the Florida Commission on Ethics if she accepted a gift valued at more than $100.  This Form 9 was required to be filed during the calendar quarter for which the gift was received, and describe the gift, the name and address of the person making the gift, and the date the gift was received. **ANDERSON** failed to file a Quarterly Gift Disclosure form as required by Florida law from the date of her election as Lynn Haven Mayor in 2015 through June of 2020, despite receiving numerous things of value in excess of $100 from various individuals.  **ANDERSON** concealed the receipt of these items.

119.   As the City Attorney for Lynn Haven, **JOSEPH ADAM ALBRITTON** was a public official who was required under Florida law to file a Form 9, "Quarterly Gift Disclosure" with the Florida Commission on Ethics if he accepted a gift valued at more than $100.  This Form 9 was required to be filed during the calendar quarter for which the gift was received, and describe the gift, the name and address of the person making the gift, and the date the gift was received.  **ALBRITTON** failed to file a Quarterly Gift Disclosure form as required by Florida law from the date of his appointment as City Attorney in October 2018 through June of 2020, despite receiving numerous things of value in excess of

$100 from various individuals.  **ALBRITTON** concealed the receipt of these items.

120.   As City Commissioner of Lynn Haven, **ANTONIUS GENZARRA BARNES** was a public official who was required under Florida law to file a Form 9, "Quarterly Gift Disclosure" with the Florida Commission on Ethics if he accepted a gift valued at more than $100.  This Form 9 was required to be filed during the calendar quarter for which the gift was received, and describe the gift, the name and address of the person making the gift, and the date the gift was received. **BARNES** failed to file a Quarterly Gift Disclosure form as required by Florida law from the date of his election as City Commissioner of Lynn Haven in 1996 through April 2019, despite receiving numerous things of value in excess of $100 from various individuals.  **BARNES** concealed the receipt of these items.

121.   **MARGO DEAL ANDERSON** directed Lynn Haven employees to assemble, print, and provide various city records to her that she in turn provided to **JAMES DAVID FINCH** relating to ongoing and planned Lynn Haven projects.

122.   On or about July 13, 2020, **JAMES DAVID FINCH** made false statements to Special Agents of the Federal Bureau of Investigation concerning the transfer of the 2006 ITAS motorhome to **MARGO DEAL ANDERSON** and her husband, and provided to the Special Agents a claimed bill of sale relating to the motor home that falsely stated the motor home was sold by **FINCH** to

**ANDERSON's** husband on July 6, 2018, for $70,000 that was paid "half down and half due with 6 percent interest."

123.   On or about October 1, 2020, **JAMES DAVID FINCH** caused a wire transfer of $200,000 from **FINCH's** revocable trust to attorneys representing **MARGO DEAL ANDERSON** in this matter.

124.   On or about May 10, 2016, **ANTONIO GENZARRA BARNES**, on behalf of Antonius G. Barnes Insurance Company, executed a line of credit agreement with Whitney Bank, a Mississippi state-chartered bank, d/b/a Hancock Bank ("Hancock Bank"). On the application for the line of credit, **BARNES** did not disclose any loan obligations to **JAMES DAVID FINCH** or any businesses owned and-or controlled by **FINCH**. **BARNES** personally guaranteed the loan. On or about October 25, 2017, Hancock Bank filed a lawsuit against Antonius G. Barnes Insurance Company and **BARNES**, alleging that the loan was in default due to lack of payment and $20,675 was owed to Hancock Bank.

125.   On or about December 13, 2019, **ANTONIO GENZARRA BARNES,** on behalf of The Barnes Insurance Agency, LLC, executed loan documents for a $23,681 loan from Innovations Federal Credit Union. On the loan application, **BARNES** did not disclose any loan obligations to **JAMES DAVID FINCH** or any businesses owned and-or controlled by **FINCH**.

54

The conspirators performed acts and made statements to hide and conceal, and cause to be hidden and concealed, the purpose of the conspiracy and the acts committed in furtherance thereof.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH FORTY

### A.  INTRODUCTION

1.     The allegations of Count One, Section A, are hereby realleged and incorporated by reference as if fully set forth herein.

### B.  THE CHARGE

2.     Between on or about August 1, 2015, and on or about August 11, 2020, in the Northern District of Florida and elsewhere, the defendants,

**MARGO DEAL ANDERSON,**
**JOSEPH ADAM ALBRITTON,**
**ANTONIUS GENZARRA BARNES,**
**and**
**JAMES DAVID FINCH**

did knowingly and willfully:

(a)  devise, and intend to devise, a scheme to defraud and for obtaining money and property by means of material false and fraudulent pretenses, representations, and promises, and to cause wire communications to be transmitted in interstate and foreign commerce for the purpose of executing such scheme, and

(b)  devise and intend to devise a scheme to defraud and deprive the City

55

of Lynn Haven and its citizens of their right to the honest services of

**ANDERSON**, the elected Mayor of Lynn Haven, **ALBRITTON**, the City

Attorney for Lynn Haven, and **BARNES** the elected City Commissioner, through

bribery or kickbacks, and to cause wire communications to be transmitted in

interstate and foreign commerce for the purpose of executing such scheme.

## C. SCHEME TO DEFRAUD

3.      The allegations of Count One, Section C, Paragraphs 24 - 125, are

hereby realleged and incorporated by reference as if fully set forth herein.

## D. WIRE COMMUNICATIONS

4.      On or about the following dates, for the purpose of executing the

scheme to defraud, the defendants,

**MARGO DEAL ANDERSON,**
**JOSEPH ADAM ALBRITTON,**
**ANTONIUS GENZARRA BARNES,**
**and**
**JAMES DAVID FINCH**

knowingly did cause wire communications to be transmitted in interstate and

foreign commerce as set forth below:

| COUNT | DATE | WIRE COMMUNICATION | NATURE OF DEPRIVATION | DEFENDANTS CHARGED |
|-------|------|--------------------|-----------------------|--------------------|
| **TWO** | 1/26/2016 | Deposit of $10,000 check and related wire | Honest Services | **BARNES FINCH** |
| **THREE** | 11/14/2016 | Deposit of $2,500 check and related wire | Honest Services | **BARNES FINCH** |

| | | | | |
|---|---|---|---|---|
| **FOUR** | 3/15/2017 | Deposit of $2,500 check and related wire | Honest Services | **BARNES FINCH** |
| **FIVE** | 12/4/2017 | Deposit of $5,000 check and related wire | Honest Services | **BARNES FINCH** |
| **SIX** | 10/6/2017 | Deposit of $2,272,669.87 check and related wire | Honest Services & Money and Property | **ANDERSON BARNES FINCH** |
| **SEVEN** | 10/13/2017 | Deposit of $72,000 check and related wire | Honest Services & Money and Property | **ANDERSON BARNES FINCH** |
| **EIGHT** | 10/25/2017 | Email with letter from M. White to engineering firm | Money and Property | **ANDERSON FINCH** |
| **NINE** | 11/6/2017 | Deposit of $1,455,330.13 check and related wire | Honest Services & Money and Property | **ANDERSON FINCH** |
| **TEN** | 1/8/2018 | Deposit of $1,850,170.66 check and related wire | Honest Services & Money and Property | **ANDERSON FINCH** |
| **ELEVEN** | 2/16//2018 | Deposit of $75,000 check from **FINCH** into the account of Individual A for Motorhome and related wire | Honest Services | **ANDERSON FINCH** |
| **TWELVE** | 10/23/2018 | Text messages between **ALBRITTON** and D. White re work @306 N. Palo Alto | Honest Services & Money and Property | **ALBRITTON** |
| **THIRTEEN** | 10/23/2018 | Text message **ALBRITTON** to D. White requesting ECS invoice | Honest Services & Money and Property | **ALBRITTON** |

| | | | | |
|---|---|---|---|---|
| **FOURTEEN** | 10/24/2018 | Text messages between **ALBRITTON** and D. White requesting electrician at girlfriend's residence | Honest Services & Money and Property | **ALBRITTON** |
| **FIFTEEN** | 10/30/2018 | Deposit of $224,722.75 check and related wire | Honest Services & Money and Property | **ANDERSON ALBRITTON** |
| **SIXTEEN** | 10/30/2018 | Email from **ALBRITTON** to City Manager re use of Company A pit | Honest Services & Money and Property | **ALBRITTON** |
| **SEVENTEEN** | 10/30/2018 | Text message from M. White to City Engineer to cancel permit application | Honest Services & Money and Property | **ANDERSON FINCH** |
| **EIGHTEEN** | 11/1/2018 | Email from M. White to Company C directing it to use **FINCH's** pit | Honest Services & Money and Property | **ANDERSON FINCH** |
| **NINETEEN** | 11/8/2018 | Email including letter of M. White to State of Florida requesting approval for DDMS site for **FINCH** Company | Honest Services & Money and Property | **ANDERSON FINCH** |
| **TWENTY** | 11/8/2018 | Text messages between **ALBRITTON** and D. White requesting D. White to come sign task order | Honest Services & Money and Property | **ALBRITTON** |

| | | | | |
|---|---|---|---|---|
| **TWENTY-ONE** | 11/9/2018 | Text messages between **ALBRITTON** and D. White to go to 2114 CC Dr., tarp and patch broken windows | Honest Services & Money and Property | **ALBRITTON** |
| **TWENTY-TWO** | 11/9/2018 | Text messages between M. White and D. White re **ANDERSON's** property clean-up | Honest Services & Money and Property | **ANDERSON** |
| **TWENTY-THREE** | 11/15/2018 | Text messages between **ALBRITTON** and D. White re needing invoice | Honest Services & Money and Property | **ALBRITTON** |
| **TWENTY-FOUR** | 11/15/2018 | Deposit of $1,288,716.54 check and related wire | Honest Services & Money and Property | **ANDERSON ALBRITTON** |
| **TWENTY-FIVE** | 11/19/2018 | Email from **ALBRITTON** to Company A Executive re justification for Company A pit | Money and Property | **ALBRITTON** |
| **TWENTY-SIX** | 11/28/2018 | Text message From D. White to **ALBRITTON** ("$$$") | Honest Services & Money and Property | **ALBRITTON** |
| **TWENTY-SEVEN** | 11/30/2018 | Deposit of $433,365.85 check and related wire | Honest Services Money and Property | **ANDERSON ALBRITTON** |
| **TWENTY-EIGHT** | 12/14/2018 | Deposit of $515,731.31 check and related wire | Honest Services & Money and Property | **ANDERSON ALBRITTON** |

59

| | | | | |
|---|---|---|---|---|
| **TWENTY-NINE** | 12/26/2018 | Text messages of M. White and D. White re **ANDERSON** has a "good job" for D. White | Honest Services & Money and Property | **ANDERSON** |
| **THIRTY-** | 12/31/2018 | Deposit of $725,941.09 check and related wire | Honest Services & Money and Property | **ANDERSON ALBRITTON** |
| **THIRTY-ONE** | 1/7/2019 | Text messages of **ALBRITTON** and M. White | Honest Services & Money and Property | **ANDERSON ALBRITTON** |
| **THIRTY-TWO** | 1/1/4/2019 | Text messages between **ALBRITTON** and D. White requesting D. White to sign addendum to Lynn Haven contract | Honest Services & Money and Property | **ANDERSON ALBRITTON** |
| **THIRTY-THREE** | 1/15/2019 | Deposit of $895,441.52 check and related wire | Honest Services & Money and Property | **ANDERSON ALBRITTON** |
| **THIRTY-FOUR** | 1/16/2019 | Text messages between **ALBRITTON** and D. White re trailer invoice | Honest Services & Money and Property | **ALBRITTON** |
| **THIRTY-FIVE** | 1/31/2019 | Deposit of $433,259.16 check and related wire | Honest Services & Money and Property | **ANDERSON ALBRITTON** |
| **THIRTY-SIX** | 2/8/2019 | Email from WorldClaim to **ANDERSON** including attachment of contract and no fee addendum for WorldClaim to be private insurance adjuster | Honest Services & Money and Property | **ANDERSON** |

| | | | | |
|---|---|---|---|---|
| **THIRTY-SEVEN** | 2/12/2019 | Email from **ANDERSON** to WorldClaim including signed contract for WorldClaim to be private insurance adjuster | Honest Services & Money and Property | **ANDERSON** |
| **THIRTY-EIGHT** | 2/18/2019 | Text message from **ALBRITTON** to D. White re need for invoice for enclosed trailer | Honest Services & Money and Property | **ALBRITTON** |
| **THIRTY-NINE** | 3/9/2019 | Text message from **ALBRITTON** to D. White re need for invoice for both storage units | Honest Services & Money and Property | **ALBRITTON** |
| **FORTY** | 1/16/2020 | Deposit of $20,000 check on **ANDERSON** account payable to **FINCH** and related wire | Honest Services | **ANDERSON** |

In violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNT FORTY-ONE

1.      The allegations of Count One, Sections A and C, are hereby realleged

and incorporated by reference as if fully set forth herein.

2.      Between on or about October 10, 2018, and on or about April 30,

2019, in the Northern District of Florida, and elsewhere, the defendants,

**MARGO DEAL ANDERSON**
**and**
**JOSEPH ADAM ALBRITTON,**

61

being agents of an organization and agency of the local government, that is, the

City of Lynn Haven, Florida, receiving in the one-year period beginning October

10, 2018, benefits in excess of $10,000 under a federal program involving grants,

contracts, subsidies, loans, guarantees, and other forms of federal assistance, did

knowingly embezzle, steal, obtain by fraud, without authority convert to the use of

a person other than the rightful owner, and intentionally misapply property that

was valued at $5,000 or more and under the care, custody, and control of such

organization, local government, and agency.

In violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

## COUNT FORTY-TWO

1.     On or about November 18, 2019, in the Northern District of Florida

and elsewhere, the defendant,

## MARGO DEAL ANDERSON,

did knowingly and willfully make materially false, fictitious, and fraudulent

statements and representations in a matter within the executive branch of the

Government of the United States, that is, during a criminal investigation of public

corruption involving the City of Lynn Haven conducted by the Federal Bureau of

Investigation, the defendant falsely stated that:

a.     **ANDERSON** was unaware of the role of Erosion Control

Specialists (ECS) in the post-Hurricane Michael clean-up of Lynn Haven; and

    b.    **ANDERSON** was first introduced to David "Mickey" White in December 2018 or January 2019, when volunteers were used to clean up various streets designated by Lynn Haven as needing some attention and clean-up.

These statements and representations were false because, as **ANDERSON** then well knew:

    a.    **ANDERSON** was aware that ECS had been contracted by Lynn Haven to conduct debris removal and repairs in the City of Lynn Haven after Hurricane Michael;

    b.    **ANDERSON** was introduced to David "Mickey" White through City Manager Michael White shortly after Hurricane Michael and requested David "Mickey" White to have ECS clean up her private residence.

In violation of Title 18, United States Code Section 1001(a)(2).

## COUNT FORTY-THREE

1.    On or about July 13, 2020, in the Northern District of Florida, the defendant,

## JAMES DAVID FINCH

did knowingly and willfully make materially false, fictitious, and fraudulent statements, representations, and writings in a matter within the executive branch of the Government of the United States, that is, during a criminal investigation of

public corruption involving the City of Lynn Haven conducted by the Federal Bureau of Investigation, the defendant falsely stated that

    a. **FINCH** had sold a 2006 ITAS motorhome to **ANDERSON** and her husband for $70,000 that he had purchased from Individual A for $75,000; **FINCH** presented a false bill of sale dated July 6, 2018 that stated the sale of the motorhome was $70,000 of which half was paid down and half due to **FINCH**  with 6% interest; and

    b. **FINCH** stated that he sold the motorhome to **ANDERSON** and her husband for $70,000 and they had paid him with a check and the difference in cash;

    c. **FINCH** stated that he purchased the motorhome to flip.

These statements and representations were false, and the claimed bill of sale dated July 6, 2018, contained false statements, because, as **FINCH** then well knew:

    a. **FINCH** was aware that **ANDERSON's** husband had registered the purchase of the motorhome from Individual A, as the seller, and **ANDERSON's** husband as the buyer in early March 2018;

    b. The transfer of title to the motor home was signed by Individual A as the seller and **ANDERSON's** husband as the purchaser with a sale price of $35,000 with a sale date of February 13, 2018;

64

c. The motorhome was titled in the name of **ANDERSON's** husband;

d. **FINCH** issued a check to Individual A in the amount of $75,000 on February 14, 2018;

e. Approximately 22 months after the transfer of the motorhome to **ANDERSON** and her husband, **ANDERSON's** husband issued a $20,000 check to **FINCH** allegedly in relation to the motorhome.

In violation of Title 18, United States Code Sections 1001(a)(2)&(3).

## COUNT FORTY-FOUR

### A. CHARGE

Between on or about October 10, 2018, and April 1, 2019, in the Northern District of Florida and elsewhere, the defendant,

### JOSEPH ADAM ALBRITTON,

did knowingly and willfully devise, and intend to devise, a scheme to defraud and for obtaining money and property by means of material false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme, did cause a matter to be delivered by the United States Postal Service and commercial interstate carrier.

### B. SCHEME TO DEFRAUD

It was part of the scheme to defraud that:

1.     The defendant, **JOSEPH ADAM ALBRITTON,** made, and caused
to be made, false and fraudulent representations to the St. John's Insurance
Company concerning damages to his residence in Lynn Haven, Florida, as a result
of Hurricane Michael in order to fraudulently obtain money from the St. John's
Insurance Company.

2.     **JOSEPH ADAM ALBRITTON** represented in a claim that his
residence had been damaged by Hurricane Michael and falsely represented that he
had paid for tree removal, debris removal, and installation of a tarp to his
residence totaling $9,600.

3.     In fact, the tree removal, debris removal, and installation of a tarp to
the residence and property of **JOSEPH ADAM ALBRITTON** had been made by
Erosion Control Specialist (ECS) at no cost to him, as ECS received payment from
the City of Lynn Haven for its employees making the repairs and conducting debris
removal at **ALBRITTON's** residence.  However, the City of Lynn Haven was not
aware that ECS had made repairs to **ALBRITTON's** personal residence, as the
City of Lynn Haven was falsely billed for alleged work on city properties.

4.     To facilitate the scheme, **JOSEPH ADAM ALBRITTON** solicited
ECS to create a false and fictitious invoice attesting to repair work done to his
residence after the hurricane by ECS in the amount of $9,600, and that the amount
of the invoice was paid in full on October 24, 2018, which invoice **ALBRITTON**

then submitted to St. John's Insurance Company in support of his fraudulent insurance claim.

5.      Based upon the false claim, St. John's Insurance Company issued payment in the amount of $6,100 to **JOSEPH ADAM ALBRITTON** that was based upon the false ECS invoice for the tree removal, debris removal, and installation of a tarp to **ALBRITTON's** residence and represented payment of the $9,600 less a deductible under the insurance property.  This payment was mailed to **ALBRITTON's** address in Lynn Haven.  **ALBRITTON** caused the St. John's Insurance Company insurance check to be deposited into a bank account belonging to him.

### C.  MAILING

On or about November 29, 2018, the defendant,

### JOSEPH ADAM ALBRITTON,

knowingly did, for the purpose of executing the fraudulent scheme and attempting to do so, cause to be transmitted by United States mail and private and commercial carrier, a $6,100 check issued from the St. Johns Insurance Company.

In violation of Title 18, United States Code, Sections 1341 and 2.

### CRIMINAL FORFEITURE

The allegations contained in Counts One through Forty-One, and Forty-Four of this Indictment are hereby realleged and incorporated by reference for the

purpose of alleging forfeiture. From their engagement in the violations alleged in

Counts One through Forty-One, and Forty-Four of this Indictment, the defendants,

**MARGO DEAL ANDERSON**
**JOSEPH ADAM ALBRITTON,**
**ANTONIUS GENZARRA BARNES,**
**and**
**JAMES DAVID FINCH**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section

981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all of the

defendants' right, title, and interest in any property, real and personal, constituting,

and derived from, proceeds traceable to such offenses, including the following:

    a.    2006 ITAS Motorhome, VIN#4UZACKDC26CW30357.

If any of the property described above as being subject to forfeiture, as a

result of acts or omissions of the defendants:

    i.    cannot be located upon the exercise of due diligence;

    ii.    has been transferred, sold to, or deposited with a third party;

    iii.    has been placed beyond the jurisdiction of this Court;

    iv.    has been substantially diminished in value; or

    v.    has been commingled with other property that cannot be

        subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code,

Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c),

to seek forfeiture of any other property of said defendant up to the value of the

forfeitable property.

A TRUE BILL:

FOREPERSON

3 /16 /2021

DATE

JASON R. COODY
Acting United States Attorney

STEPHEN M. KUNZ
Assistant United States Attorney

ANDREW J. GROGAN
Assistant United States Attorney

69