# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PANAMA CITY DIVISION

**UNITED STATES OF AMERICA**

**v.**                                                                    **Case No. 5:20cr28-MW/MJF**

**MARGO DEAL ANDERSON, et al.,**

                    **Defendants.**

_____/

## GOVERNMENT'S (REDACTED) SUPPLEMENTAL RESPONSE TO DEFENSE MOTIONS TO DISMISS

On November 16, 2021, a federal grand jury returned a 26-count second superseding indictment in this case against Defendants Margo Anderson and James Finch. ECF 214. Defendants have filed four motions to dismiss the second superseding indictment.

Pursuant to their request for a two-hour evidentiary hearing on non-specific matters raised in their motions, and without identifying any material factual dispute, the Court indulged Defendants by holding a three-day proceeding, which was essentially a mini-trial on a smorgasbord of claims of government misconduct plainly designed to avoid at any cost a trial on the merits of the case; a case that,

1

fundamentally, concerns whether Defendant James Finch bribed Defendant Margo Anderson and another City Commissioner (who has so admitted), whether Defendants lied to the FBI, and whether Defendant Anderson was on the take from others in ways that are factually intertwined with the rest of the case.

The government respectfully submits this supplemental response following the evidentiary hearing.[1] For the following reasons, some stated before, but some not, this Court should deny the motions to dismiss and set the case for trial.[2]

## I.   **Background**

As the government knows, this Court has often said that facts matter. And indeed they do. Some, but not all, of the facts presented here have been presented before. At the risk of being duplicative, some are presented again here to create a single, comprehensive narrative for the Court's always thoughtful consideration. Some of those reasons include

---

[1] This redacted version is filed on the public docket pursuant to Local Rule 5.5(D) and also corrects several scrivener's errors identified in the redaction process.

[2] The government regrets the length of this filing. But it is necessary to comprehensively respond to the Defendants' submissions. As indicated at the hearing, the government has endeavored to address every issue raised by the defense, document by document.

the behavior of Defendants and defense counsel. In putting forward those reasons, the government does not mean to "take aim"[3] at defense counsel but to provide the Court a complete understanding of the surrounding circumstances and respond to the misstatements of defense counsel at the evidentiary hearing and in their supplemental briefs.

The factual allegations about the pending charges are described at some length in the second superseding indictment. ECF 214. In sum, it details how Defendant Finch bribed a Lynn Haven City Commissioner ($45,000 worth of checks, which the Commissioner has admitted he accepted in return for official acts)[4] and then Mayor, Defendant Anderson

---

[3]   In their pending motions to dismiss, both Defendants criticized the government for seeking attorney-fee records. In its response, the government addressed, briefly, why it believed that action was warranted, and the case law supports the government seeking admission at trial of evidence of one conspirator procuring and paying for counsel for another conspirator. In their replies, Defendants criticized the government for addressing the issue, stating that government "again takes aim at defense counsel" and "refuses to let the issue go." ECF 241 at 17. Respectfully, if the defense did not want the government to go there in its response, perhaps they should not have raised the issue in their motions with an expectation that the government should not have a fair opportunity to respond. Defendants have attacked the government again about the same issue in their supplemental papers, and so a response is warranted. It is also fair to note that across two motions, two replies, two lengthy supplemental papers, and three days of a hearing, defense counsel expressly took aim at the government attorneys and law enforcement, with multiple false accusations of wrongdoing.

[4] See *United States v. Barnes*, 5:21cr31, ECF 12 ¶¶10, 13 (N.D. Fla. Oct 6, 2021).

(a free Motorhome and numerous travel), before Hurricane Michael struck in October 2018.

The second superseding indictment describes at some length City projects, including the 17th Street ditch and the ½ Sales Tax Contract. This was done for several reasons. First, it sets out official acts taken by Commissioner Barnes whilst Defendant Finch provided him with $45,000 in "loans" that were never repaid, and which Commissioner Barnes admitted he solicited and accepted with the understanding he was expected to support Defendant Finch's projects in return. Second, while Defendant Anderson voted on projects and performed ministerial acts related to them, the second superseding indictment details her pressuring then City Manager Michael White to take official action for Defendant Finch's benefit. Third, the defense complained, in several earlier motions, that the March 2021 superseding indictment was not sufficiently specific.

After the hurricane, Defendant Anderson procured and accepted hurricane cleanup at her residence and that of her relatives, which she was not entitled to, by a City contractor (ECS) who was defrauding the

City. Defendant Anderson is not charged with the entirety of ECS' scheme; only the portion that relates to her property and her relatives.

Defendant Anderson agreed to accept free adjustment services from a company after the City Manager told her she would get those services should the company (WorldClaim) get the City business. The City Manager agreed to accept free services of his own and a cash kickback through an intermediary and sought to collect on the arrangement for himself, another commissioner, and Defendant Anderson. This is a classic *quid pro quo* bribe/kickback.

While Defendant Finch was absent from Lynn Haven for medical reasons until about October 31, 2018, Defendant Anderson prevented the City from disposing of certain hurricane debris on City property and, upon Defendant Finch's return, steered that hurricane recovery business to Defendant Finch to his ultimate benefit, and taxpayer detriment, of approximately $3.4 million.

When suspicions of ECS's fraud arose, and other persons were indicted for it, Defendant Anderson lied to the FBI about her involvement with and knowledge of ECS' activities and sought to cover up the bribes from Defendant Finch by paying Defendant Finch some money (obtained

from her insurance settlement) for the Motorhome some 22 months after Defendant Finch provided it to her and her husband at no charge, just after she had pressured the City Manager to do things Defendant Finch's way. Defendant Finch lied to the FBI about the nature of the Motorhome transfer. After Defendant Anderson was charged, and the charges implicated Defendant Finch, Defendant Finch has paid his longtime lawyer at least half a million dollars to represent Defendant Anderson.

Defendant Margo Anderson is apparently a retired schoolteacher. In 2009, she filed for bankruptcy under Chapter 7.[5] Her petition listed $210,133.90 in assets, almost entirely her home at 513 Tennessee Avenue in Lynn Haven, $292,457 in debts, and a current monthly income of $4,844.[6] Defendant Anderson's spouse, Virgil Lee Anderson Jr., who reportedly worked on Defendant Finch's car racing team for some time, filed for bankruptcy the next year.[7] His petition listed $10,025 in assets and $88,939 in debts, and a current monthly income of $4,708. *Id.* The bankruptcy petitions indicate that the Andersons were of limited means,

---

[5] *In re Anderson*, 09:50701-LMK, ECF 1 (N.D. Fla. Bankr. Oct. 8, 2009).

[6] *Id.* at 4-5.

[7] *In re Anderson*, 10-50337-LMK, ECF 1 at 4-5 (N.D. Fla. Bankr. Apr. 29, 2010).

and provide a baseline for the government's financial analysis that they did not pay anything for the Motorhome until after the FBI interviewed Defendant Anderson and the indictment of Michael White, David "Mickey" White and others was unsealed.

In April 2015, Defendant Anderson was elected Mayor of the City of Lynn Haven. ███████████████████████████, Defendant Anderson ran on a platform that certain City employees made too much money and should be fired. ██████ resisted firing employees because the City would be sued and insurance would not cover the costs. ██████ thought the 17th Street project was good for the City and it was recommended and approved. Initially Defendant Anderson "loved him." But that stopped the first time he told her no, and she did not talk to him for several weeks. ████████████████ Defendant Anderson did not like the fact that ██████ would not conform to how she "did business." ██████████████ once Anderson was elected, that the City went from being run using best practices to "dirty politics." ██████████ ██████████.[8]

---

[8] Defense contends that ████████ FD 302, ██████ produced in July 2021, is favorable to the defense. But the second superseding indictment does not charge Defendant Anderson with pressuring ████████ to award contracts to Defendant Finch's business.

The defense has focused on David "Mickey" White of ECS having invoices created for work done at Defendant Anderson's property and that of her relatives. These are described in the second superseding indictment, ECF 214 ¶93, but an additional factual baseline may be helpful.

██████████████████████████████████████████ Defendant Anderson approached ████ after Hurricane Michael and told him the City had a drainage ditch behind her house that floods the area when it rains. Defendant Anderson also stated that she needed someone to clean her property.[9] Michael White told her that she could hire Mickey White to clean her property.[10] Mickey White ████████████████████ ██████ was eating lunch with Michael White at the city tent, and was approached by Defendant Anderson, who was talking about debris in her yard. Michael White made the statement, "Mickey can get that for you."[11] Michael White repeatedly asked Mickey White when the latter was going



8

to start working at Defendant Anderson's property, explaining that she wanted to know.[12]

After about two weeks, Michael White, Mickey White, and Josh Anderson went to Defendant Anderson's property. On November 9, 2021, Michael White texted Mickey White about Defendant Anderson's residence: "U get over Mayors" to which Mickey White replied "Yes we're here now."[13]  Michael White sent this text because Defendant Anderson had asked him "Where is Mickey?"[14]

When Josh Anderson and Mickey White arrived at Defendant Anderson's property, there were 4-5 ECS workers cleaning up debris and another truck of ECS workers soon arrived.[15] Defendant Anderson was just leaving on a golf cart.[16]  Michael White came and instructed Mickey White to clean the easement on the adjoining property.[17] After Michael



White left, ███████████ showed Josh Anderson the work that needed to be done at Defendant Anderson's relatives' homes, which were nearby.[18] ███████████ wanted everything cleaned up in the yards of the first two houses and everything in the yard of the third house pushed to the road in the front of the third house.[19] When they got back to Mickey White, ███████████ said to Mickey White "you got us on this?"[20] Mickey White responded, "ya, I got you." When Mickey White and Josh Anderson left the residence in Mickey White's truck, Josh Anderson asked Mickey White, what does he ███████████ mean?[21] Mickey White told Josh Anderson that everything we do over here was to be billed to the City of Lynn Haven.[22]

After Mickey White left, he had equipment moved to Defendant Anderson's property immediately.[23] Mickey White later admitted that

---

[18] ████████████████████████████

[19] ████████████████████████████

[20] ████████████████████████████

[21] ████████████████████████████

[22] ████████████████████████████

[23] ████████████████████████████

10

Defendant Anderson asked him to perform work at her house and her mother's house, and his crew worked at those locations. [24] When Josh Anderson returned to Defendant Anderson's residence a couple days after the crews had finished, the place was flawless.[25] The yards looked good.[26] The beds around the houses had been cleaned, etc.[27] Approximately ten ECS workers (or subcontractors) ████ were there performing work. █████████████████████████████ ████████ this work (and similar work on Michael White's property and another private property) was completely outside of what the city should have paid for, ████ it was a matter of city officials taking advantage of the situation. ████████████ although there is a 20-foot easement behind Defendant Anderson's house, this easement is on her neighbor's property, and not hers. ████████ the fact that trees fell on her property are not the responsibility of the city, and instead were



her responsibility, just as all the other property owners in the city had to take care of. [28]

████████████████████ A stormwater easement does not oblige the holder to clear felled trees on the easement. By way of analogy, if a city has an easement for an underground water pipe across the front yard into one's home, it does not oblige the city to mow the lawn, rake leaves, or pick up felled branches or trees. But the easement is not on Defendant Anderson's property. Under Florida law, where a live tree falls on an adjoining property and damages that property, the adjoining property landowner is responsible for the damages and not the owner of the property where the tree was rooted. See 1 Fla. Jr 2d Adjoining Landowners §8 [2014]; *Gallo v. Heller*, 512 So. 2d 215, 216 (Fla. 3d DCA 1987); see also *Balzer v. Ryan*, 263 So. 3d 189 (Fla. 1st DCA 2018); *Scott v. McCarty*, 41 So. 3d 989, 989 (Fla. 4th DCA 2010).

On March 17, 2019, Michael White was arrested for a domestic violence incident ████████.[29] ████████████████████████

████████████████████████████████████████

---

[28] ███████████████████████████

[29] ██████████████████████████████

███████████████████████████ On March 19, 2019, BCSO

Captain ███████ obtained a warrant to search Michael White's cell

phone regarding the domestic violence incident.[31]

████████████████ following the release of Michael White

from jail (March 19), ████████ called Mickey White and related he

(███████ got a call from Defendant Finch. Defendant Finch asked

████████ to come to Defendant Finch's office.[32] ███████ relayed

to Mickey White that ECS invoices were laid out at Finch's office, and

Finch said Defendant Anderson was going to the Sheriff about ECS. [33]

According to Mickey White, ███████ said he told Defendant Finch

not to go through with his plan, and said "don't give it to them, make

them come get it."[34]

The BCSO began analyzing Michael White's cell phone.[35] There

were concerning text messages on the phone between Michael White and



[30] ████████████████████

[31] ████████████████████

[32] ███████████████

[33] ███████████████

[34] ███████████████

[35] ███████████████

13

Mickey White about bids, and indications that Michael White was fixing tickets as a bargaining chip.[36]

On March 22, 2019, the Sheriff received information from the Lynn Haven Police Chief about Michael White. The Chief reported that Michael White was living above his means and a source indicated that Michael White had recently deposited a $300,000 check from the sale of his farm to Mickey White. The Chief said Defendant Anderson was concerned about money paid to ECS. ███████████████████ ███████████████████████████████████████████ ██████████████████[37]

Soon Michael White resigned as City Manager. According to Michael White, █████████ promised that if Michael White did not get a severance package, █████████ and Defendant Finch would pay him $30,000.[38]

On March 27, 2019, BCSO advised FBI Special Agent Borghini that in a search of Michael White's cell phone, the BCSO observed information

---

[36] ████████████████████

[37] ██████████████

[38] ████████████████████

14

and texts that appeared to indicate corruption. The FBI requested, and AUSA Kunz approved, a grand jury subpoena for phone records for Michael White, Mickey White, █████████ and James Finch, which was issued on March 29, 2019.[39] A meeting between the FBI and the BCSO to discuss the investigation in Lynn Haven took place on April 1, 2019, at 10:00am.

On April 1, 2019, that meeting was held. Later that day, Defendant Anderson met with the Sheriff and asked that office to investigate Michael White's dealings with ECS.[40] The Sheriff's Office appointed Lt. Jeremy Mathis, Investigator Aubrey Chance, and Analyst █████████ to investigate. On April 4, 2019, the Sheriff, this group, Major Jimmy Stanford, and Special Agent Borghini met to discuss the case.[41] On April 10, 2019, the FBI obtained a federal search warrant for Michael White's cell phone.[42] On April 11, 2019, Lt. Mathis obtained a state court search warrant for ECS' place of business.



[39] ██████████████████████████████

[40] ███████████████████████████

[41] ███████████████████████████

[42] ████████

In interview reports disclosed to the defense in July 2021 (the substance of which was already disclosed in an earlier government filing, ECF 157 at 4), Mickey White told the government that ██████████ subsequently called Mickey White and asked if he had any invoices or documentation for the work done at Defendant Anderson's property. Mickey White told ███████ "no." ███████ told him "you better get some and bring them to me."[43] Mickey White's cell phone records show that, after two prior attempts, ███████ called him at 12:01pm on April 11, 2019, in a conversation lasting 42 seconds.[44] According to Mickey White, he already had documents that showed how many people were working at Defendant Anderson's property and the equipment that was used.[45]

Based on ███████ instructions, Mickey White had an ECS employee, ███████, create invoices and back-date them to November 2018. Mickey White says he told ██ to create invoices so they would accurately reflect Defendant Anderson's information and the work

---

[43] ███████████████████

[44] ████████████████████████

[45] ████████████████

that was completed on her property, her mother's property next door, and her relative's property next to her mother's residence. To create the new invoices, Mickey White called people to verify the work that was done. Mickey White told ██████ which dates to use on the invoices. Mickey White had three invoices created for the work that was done on Defendant Anderson's property. That evening, Mickey White delivered the invoices to ███████████ during a meeting at the Blue Moon Bar and Grill, Defendant Finch's restaurant.[46] The two were drinking alcohol.[47] ████████ ███████ again said that the FBI was "coming" but did not say how he knew this or when.[48] ██████████████ did not specifically mention a search warrant. █████████████████████████████ was "halfway full of shit" and liked to "play mind games and pretend that he knew everything" and for this reason Mickey White "didn't pay it no

---

[46] ████████████████████████████████

[47] ██████████████████████████████

[48] DX 42 ██████████████████████ According to Mickey White, ██████ ████ said this before on Halloween, which would have been several months before the investigation began.

attention."[49]  Mickey  White  took  no  action  based  on ██████████████

statements and went home.[50]

The government obtained ████████s phone records as part of

its investigation of him. As far as the government can tell, they disclose

no phone contact between ████████ and Major Stanford (or anyone

else at the Sheriff's office) prior to the search. They do, however, disclose

a call between ████████ and Defendant Finch the evening of April

10, and around 8:19 am on April 11, 2019, not long before ██████████

called Mickey White to have the latter create the invoices.[51] Defendant

Finch presumably knows the substance of those conversations. But the

government does not.

The early morning of April 12, 2019, the FBI and BCO searched

ECS pursuant to a state court search warrant. Mickey White was not

there when law enforcement arrived but came soon after. His phone

records indicate he tried to call ████████ and Defendant Finch.

While  the  search  was  ongoing, ████████  had  two  phone

---

[49] ████████████████████

[50] ████████████████████

[51] ██████████████

conversations, at around 8:30 am, with Defendant Finch, and another later that morning.[52]

During the search, FBI Special Agents Borghini and Heather Johnson interviewed Mickey White, with Major Stanford present. Mickey White admitted that Defendant Anderson asked him to perform work at her house and her mother's house, and his crew worked there. Mickey White then asked for an attorney and that ended the interview.[53] During the search, law enforcement found backdated invoices for the properties in question, along with the following note, which was disclosed to the defense in September 2020 (to Defendant Anderson, which quickly made its way to Defendant Finch and ███████████ and again in March 2021 (all Defendants):

---

[52] ██████████████████████████████

[53] ████████████████████████████████████



The investigation continued. ████████████████

████████████████ Defendant Finch stated he would not be indicted

on federal charges but ████████ and ████████ (Mickey White)

would be indicted.

On November 18, 2019, FBI Special Agents Borghini and Kevin

Cwirka interviewed Defendant Anderson. In the interview, Defendant

Anderson claimed that that she did not know anything about ECS and

was not aware of its role in the cleanup.[54] Defendant Anderson claimed

---

[54] ████████████████████████████████

that she first met Mickey White in December 2018 or January 2019 while volunteers were cleaning up streets.[55]

The indictment against Michael White, Mickey White, Josh Anderson, and others, was unsealed the next day on November 19, 2019.[56] The indictment specifically alleged that Michael White directed City employees to pay an ECS invoice for $527,512, which falsely claimed that ECS had performed work at a cemetery and sports complexes when in fact ECS workers were at Michael White's property (outside of Lynn Haven) and the residences of "the Mayor and her mother."[57]

In December 2019, Defendant Anderson retained attorney Ron Johnson to represent her. On December 30, 2019, a check from the Anderson's joint bank account was signed by Lee Anderson and made out to Defendant Finch, $20,000 for the Motorhome.[58]

On February 25, 2020, Michael White pleaded guilty to four counts of that indictment, conspiracy to commit wire fraud, wire fraud, and

---

[55] ███████████████████████████████████████████

[56] *United States v. White et al*, 5:19cr78-RH/MJF, ECF 12 (N.D. Fla.).

[57] 5:19-cr-00078, ECF 1 ¶22.

[58] ████████████████████████████████

honest services wire fraud (two counts). In the statement of facts, among other things, Michael White admitted that he directed the City to pay invoices from ECS that falsely claimed ECS personnel worked at a cemetery and sports complexes when the workers were actually at Michael White's property, David Horton's property, Adam Albritton's property, another City Commissioner's property, Defendant Anderson's property, and that of her relatives. Michael White also admitted to honest services wire fraud relating to his approval of false invoices submitted to the City in exchange for the sale of real property (a farm that Mickey White owned). Michael White also admitted to accepting cash from Mickey White.[59] That same day, Mickey White pleaded guilty to four counts of that indictment: conspiracy to commit wire fraud, two counts of wire fraud, and one count of filing a false claim. In the statement of facts, among other things, Mickey White admitted that he submitted to the City false invoices from ECS that falsely claimed ECS personnel worked at a cemetery and sports complexes when the workers were actually at Michael White's property, David Horton's property, Adam Albritton's

---

[59] 5:19-cr-00078, ECF 64, 65 & 66.

property, another City Commissioner's property, Defendant Anderson's property, and that of her relatives. Additionally, Mickey White admitted that he submitted a false invoice in the amount of approximately $180,000 on behalf of ECS to the City that falsely claimed ECS personnel worked at City locations when the ECS workers were actually working at locations outside of Lynn Haven, and a false invoice in the amount of approximately $332,000 that falsely claimed that his workers conducted trash pick-up in the City for a period of time when they had not done so. Mickey White also admitted to causing the submission of a false claim to FEMA by the City of Lynn Haven relating to reimbursement for the false $332,000 invoice.[60]

On March 19, 2020, Joshua Anderson pleaded guilty to wire fraud. Joshua Anderson admitted that he submitted a false invoice to the City for services provided at 37 properties when his employees were actually working for ECS and performing debris clean up, for which ECS billed the City, the City paid ECS, and ECS paid Joshua Anderson.[61]

---

[60] 5:19cr78, ECF 70, 71 & 72

[61] 5:19cr78, ECF 81, 82, & 83.

23

On July 13, 2020, Special Agent Borghini interviewed Defendant Finch. During the interview, Defendant Finch falsely claimed that the Andersons had paid him for the Motorhome in cash from the sale of their old motorhome and a motorcycle.[62] When asked for a bill of sale for the Motorhome, Defendant Finch stated "funny you ask," turned and opened a desk drawer and produced a bill of sale, dated July 6, 2018, and the December 2019 check from the Anderson's bank account, signed by ████.[63] That same day, Defendant Finch made or attempted the following phone calls:

9:29 am: Margo Anderson (118 seconds)

11:41 am: ██████████ (2 seconds)

11:57 am: ██████████ (2 seconds)

1:09 pm: █████████ (153 seconds)

1:11 pm: █████████ (56 seconds)

---

[62] ████████████████████████████████████████ The Andersons executed a consignment/sales agreement with R/V Connections for their old motorhome on July 27, 2018, which was sold by that dealer on August 13, 2018. On August 27, 2018, R/V/ Connections paid the Andersons with a check for $10,304.56, which was deposited. There was not a cash withdrawal of these funds to pay Defendant Finch. The last time the Andersons had a registered motorcycle it was sold in 2016 for $5,000. The bill of sale Defendant Finch presented to FBI falsely states that $35,000 had been paid as of July 6, 2018.

[63] ████████

24

1:29 pm: Margo Anderson (418 seconds)

5:58 pm: ██████████ (15 seconds)

The grand jury returned the original indictment in this case under seal on August 18, 2020. ECF 1. On August 19, 2021, pursuant to a federal seizure warrant, law enforcement seized the Motorhome at the Andersons' residence in Lynn Haven and attempted to execute an arrest warrant. Defendant Anderson was not there. Law enforcement informed ██████████ that some of the charges included the clean up on the property. ██████████ said the City was responsible for cleaning up the easement and then pivoted to claim that the only trees cleaned up were in the roadway. When law enforcement told him they had aerial pictures showing that to be false, ██████████ discontinued the conversation.[64] That same day, the FBI arrested Defendant Anderson in Jacksonville, Florida, and had an initial appearance there. ECF 19. That same day, there were *18* phone calls made or attempted between ██████████ and James Finch.[65]

---

[64] ██████████████████████

[65] ████████████████

On August 24, 2020, retained Attorney Ronald Johnson entered an appearance for Defendant Anderson. ECF 24.

On August 25, 2020, the Court held an initial appearance for Defendant Anderson. While the Court was considering release conditions, Attorney Johnson requested that Defendant Anderson be allowed to have contact with Defendant Finch (who was not charged at the time but was described as an unindicted co-conspirator in the original indictment) to maintain a social relationship without discussing the case. ECF 114 at 15. Attorney Johnson also asked that Defendant Anderson be able to communicate with Defendant Finch in the presence of counsel to prepare for trial. ECF 114 at 25. The government objected, noting that it was clear that Defendant Finch would be a witness. ECF 114 at 25. The Court, Judge Fitzpatrick, stated that if Defendant Anderson needed to communicate with an identified witness, there would need to be another hearing, but Defendant Anderson was to avoid contact with any person who is or may be a victim or witness, though she was not bound until she received such a list from the government. ECF 114 at 25-27, 33. The Court entered an order setting standard release conditions, including a requirement to "avoid all contact, directly or indirectly, with

any person who may be a . . . witness in the investigation or prosecution."[66] ECF 27 at 2.

In August 2020, after the original indictment was unsealed, Defendant Finch contacted his longtime lawyer, Mr. Vezina. According to counsel, Defendant Finch inquired about the indictment, the allegations (which alleged Defendant Finch committed illegal acts, though not by name), and solicited legal opinions. ECF 167 at 20-21.

On August 26, 2020, Countrywide Surveying did a boundary survey on Defendant Anderson's property at ███████████ apparent request. The survey recognized the easement on the adjoining property, 510 Virginia Avenue.[67]

On September 4, 2020, the government responded to Defendant Anderson's initial discovery request with a lengthy letter itemizing its initial production. While the letter represented that the government did

---

[66] Defendant Anderson's demonstrated violation of this release condition, which was repeated, blatant, and accomplished through surreptitious means, is relevant both to the discovery/production issues and Defendant Anderson's complaint that the government did not provide a fuller no-contact list until sometime later.

[67] ████████████████████████████████████

not have additional *Brady* information at that time,[68] it indicated the government was compiling available *Giglio* information.[69]

On September 10, 2020, Defendant Anderson paid Attorney Johnson with a check for $15,000.[70]

On September 11, 2020, Defendant Finch provided ▮▮▮▮▮▮▮▮ a check for $8,000, with a notation it was a "loan."[71]

Defendant Anderson flagrantly violated the release condition regarding contact with Defendant Finch. Except for some calls in late December 2020, calls between Defendant Finch and Defendant Anderson's phone stop abruptly on August 22, 2020.[72] Between August

---

[68]   Whether information is actually encompassed by *Brady* depends on a determination that there is a reasonably probability that the outcome of the proceeding would be different. See *United States v. Bagley*, 473 U.S. 667, 682 (1985). In hindsight, the letter probably should have said "We do not have information which we have identified as favorable to the defense to provide but we are working to compile additional information which might arguably be favorable to the defense in accordance with Department policy and the Court's pretrial orders," which would have been a more accurate description of the government's efforts and intent.



[72] An additional reason for the cessation may be that Defendant Anderson's phone belonged to the City, and she had to transfer the number to a private account at T-Mobile.

20, 2020, and April 12, 2021, there were 368 calls between Defendant

Finch and ███████████ cell phone. Recalling that Defendant

Anderson's attorneys moved for substitution on October 2, 2020, there

were a significant number of phone calls between Defendant Finch's cell

phone and Defendant Anderson's attorneys' cell phones[73] prior to

counsel's appearance in the case on October 2, 2021, interspersed around

calls between Defendant Finch and ███████████ phone.[74]

On October 2, 2020, defense counsel appeared for Defendant

Anderson. A few days later, the Court held a status conference.[75]

During the conference, the Court granted an unopposed motion to

continue the trial to March 2021. The Court directed the parties to

submit a proposed pretrial schedule. The parties later agreed to a

January 1, 2021, pretrial motion deadline. ECF 45. After the hearing,

there were 4 calls between Defendant Finch's phone and ███████████

phone totaling approximately 14 minutes.

---

[73] In the opening statement, Mr. Lewis stated, without any conceivable factual basis, that the government had obtained his phone records and contacts with Mr. Vezina. ███████████████████████ That is not true.

[74] ███████████████████████

[75] ECF 41.

On October 27, 2020, ███████████ (more on him later) told the FBI that ███████████ came to his house said that he (███████████ was concerned about Adam Albritton and Defendant Finch, and apparently ███████████ had access to discovery provided to either Defendant Anderson or Defendant Albritton's attorneys.[76] Phone records indicate that between August 20, 2020, and October 15, 2020, there were approximately 134 calls made or attempted between ████████ and James Finch.[77]

On or about December 18, 2020, Defendant Finch submitted some materials to the Bay County Sheriff. The materials included a statement by Defendant Finch criticizing the original indictment, a certificate showing his completion of a rehabilitation program on October 30, 2018, and a news article critical of the prosecutor on the case at the time.[78]

On December 31, 2020, Defendant Anderson's attorneys filed a motion to dismiss several counts of the original indictment. On January

---

[76] ███████████████████

[77] ████████████████████

[78] ECF 228-1.

30

4, 2021, the Court ordered the government to file expedited responses to pending defense motions by January 12, 2021.[79]

On January 5, 2021, the U.S. Attorney's Office leadership, the prosecutors, and the FBI met with Defendant Anderson's three attorneys of record at their request. During the meeting, Defendant Anderson's attorneys presented information that the City Commission approved Defendant Finch's projects (including the 30-year promissory note),[80] that she and Defendant Finch were just friends with no corrupt bargain between them, that she simply had the City Manager clean up a city easement, and that she declined free services from WorldClaim. That presentation missed the point, in the government's view, because the prosecution theory, ████████████████████████ was primarily that Defendant Anderson *pressured* City officials with respect to Defendant Finch's projects (say, by steering $3.4 million of hurricane

---

[79] ECF 53.

[80] This information caused the government to remove allegations related to the promissory note from the superseding indictment, and there is no allegation in the second superseding indictment that Defendant Anderson did this without Commission approval; the charging document accurately alleges it was approved. Regarding the City Commission votes, these are official acts, and it is not a legal defense that the project was a good idea, that the official would have taken the official act anyway, or that the project would have been approved without the official's action.

recovery business to him, and overruled the City Manager about the conduct of Defendant Finch's other projects), that Defendant Anderson took many benefits from Defendant Finch and they covered up the nature of the largest one (the Motorhome), that ███████████████ ████████████████████ her minimalistic description of the work done at her property by ECS was not accurate, and Defendant Anderson *agreed to accept* the WorldClaim benefits in exchange for a contract with the City and later balked when the stark reality of the *quid* was spelled out in bold on a written contract.

Prior to the meeting, the U.S. Attorney informed the prosecution team that he knew Mr. Vezina from private practice, had great respect for him, but thought it was unusual for him to appear on a federal criminal case. The U.S. Attorney indicated that he was concerned that counsel's presence may have been procured/financed by other subjects or targets of the investigation. The FBI responded that it was aware of the $200,000 check from September 30, 2020, and that counsel had represented Defendant Finch's business in the past. So, the government was surprised when, during the meeting, Mr. Judkins indicated that Mr.

Vezina's presence on the case was some sort of happenstance (an assertion Mr. Vezina affirmed). It clearly was not.[81]

On January 12, 2021, the government met with Defendant Finch's counsel. During the meeting, defense counsel apologized for Defendant Finch submitting the materials to the Sheriff in December 2020 and said Defendant Finch should not have done so. Defense counsel requested that Mr. Finch be able to testify before the grand jury before he was charged and asked to send a letter outlining Mr. Finch's position.

On January 18, 2021, Mr. Lewis sent the government a letter.  ECF 228-2. The letter included certain factual assertions and conclusions to the effect that Defendant Finch was innocent, and he should not be charged.

On January 29, 2021, the Court granted in part defense motions to dismiss. ECF 60. Relevant here, Defendant Anderson moved to dismiss Count 29 of the original indictment (relating to federal program fraud) because it did not incorporate by reference factual allegations elsewhere included in that indictment and moved to dismiss Count 63 (relating to

---

[81] The government does not believe, and does not mean to suggest, that Mr. Judkins intended to deceive. Perhaps he was unaware. Mr. Judkins withdrew as defense counsel in April 2021.

false statements to a federal agency) as failing to allege essential facts; that is, which federal agency Defendant Anderson allegedly lied to. ECF 49. In an expedited response on January 12, 2021, the government conceded that, under case law identified by Defendant Anderson, Count 29 should have had the referenced specific incorporation of other allegations but argued Count 63 was sufficient, pointing to materially similar charges that were upheld in another case. ECF 55. The Court said it was an "extraordinarily close call" but that Count 63 omitted which agency Defendant Anderson allegedly made the false statement to and, noting the government indicated it was pursuing a superseding indictment, dismissed Count 63 as well as Count 29. [82]  ECF 60 at 16-17.

Two days before that order, on January 27, 2021, the government and another defendant (who since pleaded guilty to some charges) filed a joint motion to continue the trial. ECF 56. Defendant Anderson opposed

---

[82] As far as the government can tell, the Court never "ordered the government to 'clean up' the original indictment," as Defendant Finch has repeated time and again in his papers. See, *e.g.*, ECF 228 at 5 n.6. In a ruling on a motion brought by then Defendant Albritton, the Court determined that some traditional wire fraud counts relating to the same wires as honest services fraud counts were multiplicious and, rather than merging counts at sentencing or addressing the issue with jury instructions, and because the government was seeking a superseding indictment anyway, the Court directed the government to consolidate both theories into single counts. ECF 60 at 14.

the motion. ECF 58. A substantial part of the government's motivation for the request was that the lead prosecutor had been suffering from a significant case of COVID-19 and was out of pocket for a time, which was intended to be spent working on this case.

On February 3, 2021, during a hearing on the continuance request, the Court also indicated its desire to have the superseding indictment returned more than 30 days before a new May 3, 2021, trial date.[83] The government indicated it was planning to obtain a superseding indictment within 30 to 40 days, and that the superseding indictment may include additional matters.[84] Accordingly, the government scheduled the extended grand jury, which had previously heard evidence in the matter, to meet on March 16, 2021, to consider a superseding indictment and meet the Court's requested timetable.

On March 9, 2021, because Mr. Lewis, representing Defendant Finch, had asked for the opportunity, the government sent Mr. Lewis a letter via email inviting Defendant Finch to testify before the grand jury on March 16, 2021. The letter included standard warnings about rights

---

[83] ECF 99 at 36.

[84] ECF 99 at 22-23.

a witness would be giving up by so testifying, which warnings are required by Justice Department policy. ECF 228-3 (invitation letter); Justice Manual §9-11.151. On March 10, 2021, Attorney Lewis sent a letter to the government via email stating Mr. Finch was "anxious to testify before the Grand Jury" but that there was insufficient notice of the grand jury date, that this attorney had an (unspecified) conflict on March 16, and that it seemed the government was "using the Grand Jury to investigate the defense as proffered in court."

Defendant Finch now says that his status changed from witness to target only *after* Defendant Anderson's counsel indicated in a January 28, 2021, pleading (opposing a continuance) that Defendant Finch would be an exculpatory witness for Defendant Anderson.[85] That is not correct. As defense counsel well knew, see ECF 228 at 2 n.1, Defendant Finch was described (though not by name) as an unindicted co-conspirator in the August 18, 2020, indictment, and defense counsel had asked for a meeting (held on January 12) and written a letter (dated January 18) asking that Defendant Finch not be charged.

---

[85] ECF 228 at 5.

The government made the decision to propose charges against Defendant Finch to the grand jury and had previously requested its meeting on March 16. This was the same (extended) grand jury that returned the original indictment in August 2020. So, on March 12, 2021, the government responded to Defendant Finch's counsel that the invitation to testify on March 16 remained open.[86] The government further explained that it had represented to the Court at the February 3 status conference that it would attempt to obtain a superseding indictment within 30 to 45 days and could not delay the proceeding. But Defendant Finch did not appear.

On March 16, 2021, the grand jury returned a superseding indictment adding charges against Defendant Finch and former Commissioner Antonius Barnes, with mostly the same substance of the charges against Defendant Anderson. ECF 64. Regarding the March 16 superseding indictment, Defendant Finch's current motion incorrectly asserts that the "the government declined [to present exculpatory evidence in accordance with Justice Department policy] because it

---

[86] ECF 228-4.

'disagreed with [our] characterization of the evidence.'"[87] What the government actually said was (as an exhibit offered in support of Defendant Finch's motion establishes) "[w]hile we largely disagree with your characterization of the evidence, we do intend to address those points in our presentation of a superseding indictment. We appreciate you bringing those arguments to our attention." ECF 228-4 at 3.

On March 18, 2021, Defendant Finch had his initial appearance before a magistrate judge. Defendant Anderson's counsel of record appeared on behalf of Defendant Finch. A government attorney advised the Court that it believed there may be a conflict of interest due to Defendant Finch paying Defendant Anderson's attorney and the government would be requesting a conflict hearing.[88] That evening, the government requested defense counsel's position via email on a motion

---

[87] ECF 228 at 4.

[88] Defendant Finch has since asserted, on several occasions, that the "Magistrate Judge dismissed the suggestion [of a conflict] out of hand[.]" See *e.g.*, ECF 228 at 7. The government's recollection is that Judge Fitzpatrick indicated he was not going to deal with such an issue at the hearing, which was appropriate; the government did not ask the Court for any relief at that time; it had informed the Court it would bring the matter up later. The government attempted to obtain a transcript of the hearing but understands that is not possible due to a failure of the recording systems in the second-floor courtroom during the hearing. Neither of Defendant Finch's attorneys of record were present at the hearing, which may explain the inaccurate assertion.

for a conflict hearing regarding Defendant Finch's payment of Defendant Anderson's attorneys' fees.[89]

On March 22, 2021, the government discussed the conflict issue with Mr. Vezina. After the government explained its belief that the conflict inquiry needed to include the circumstances of how counsel came to represent Defendant Anderson, and Defendant Finch's role, counsel stated that the defense agreed to state on the record that counsel had complied with bar rules regarding third party payment of attorney's fees but opposed any broader inquiry.

On March 23, 2021, the government filed a motion for a conflict inquiry. ECF 78. Between the government bringing this to defense counsel's attention on March 18, and over the weekend to Defendant Finch's interview on March 24, there were seventeen phone calls made or

---

[89] As noted in the motion for a conflict inquiry, ECF 78 at 6-7, the government has a duty to bring such matters to the Court's attention. See, *e.g.*, *United States v. Santini*, 85 F.3d 9, 13 (2d Cir. 1996) ("Convictions are placed in jeopardy and scarce judicial resources are wasted when possible conflicts are not addressed as early as possible. We therefore reiterate our admonition to the government in earlier cases to bring potential conflicts to the attention of trial judges."); *United States v. Tatum*, 943 F.2d 370, 379–80 (4th Cir. 1991) ("[W]hen a conflict situation becomes apparent to the government, the government has a duty to bring the issue to the court's attention[.]"). This Court should reject Defendant Finch's suggestion, ECF 228 at 7, that doing so is improper.

attempted between Defendant Finch and ██████████████████████ ████████ phone totaling over 60 minutes of conversation.[90]

On March 24, 2021, Defendant Finch gave a recorded interview to local media citing reasons for his non-appearance before the grand jury quite different from that the government heard from defense counsel:

> My lawyer said, let me tell you how that is. Because they invited me to go up there last Tuesday and, uh, he says, *"James they didn't turn your evidence into the grand jury so there ain't no use in going."*
>
> . . . .
>
> *I said, "well I'm not going, I'm not going to the grand jury."* [91]

Additionally, Defendant Finch stated that Defendant Anderson came to him with a quit claim deed to her home, asked him for money, and he "loaned" her money for her lawyer bills.[92]

---

[90] ██████████████████████████████████ Assertions by Defendant Anderson's counsel that she was not having contact with Mr. Finch after August 25, 2020, are not credible.

[91] ████████████████████████████████████ In a letter dated April 20, 2021, Defendant Finch's attorney indicated he had a teaching commitment on March 16 and stated that Defendant Finch remained "ready, willing, and able" to testify before the grand jury. In an October 5, 2021, conference counsel for Defendant Finch stated that he hoped the government could understand how counsel's assertion that Defendant Finch wanted to testify but there was a scheduling issue and Defendant Finch's public statements that his lawyers advised him not to and he agreed could both be true. The government does not understand how to reconcile those assertions.

[92] ████████████████████████████████████

The Court's order for a response to the conflict-inquiry motion (ECF 93) did not require Defendant Finch to respond. But he did respond. ECF 98. Among other things, Defendant Finch sought to distinguish cases cited in the government's motion.[93] The response cited *United States v. Urutyan*, 564 F.3d 679 (4th Cir. 2009), for the proposition that the "government presented suspicious recorded telephone calls referencing agreements to cover legal expenses in cash, among other inculpatory evidence." The response cited *United States v. King*, Case No. 4:19cr77, ECF. No. 67 at 4 (E.D. Va. Oct. 26, 2020), for the proposition that "the government's presentation of travel records and phone calls between defense counsel and the third-party payor showed clear influence over the case." The response asserted that "[u]nlike the government in *King* and *Urutyan*, the government here has not claimed that it possesses any evidence to support a similar outcome. Of course, there is none."[94] Of course, there was.

---

[93] ECF 98 at 4-5.

[94] ECF 98 at 5.

41

Defendant Anderson filed a response stating that no hearing was required, and the Court should not hold one because it would "prejudice Defendant Anderson." The response referred to payments by Defendant Finch as the "sole basis of the alleged actual or potential conflict."[95] The response stated that "[t]he Government's interest in knowing more is strategic" and the "information is not necessary for the Court's analysis and most certainly not for a waiver colloquy."[96] The response stated that if an inquiry was conducted it should be *ex parte*, "[b]ut Defendant Anderson adamantly opposes the Government's request that a record be created in open court as to the details and circumstances of payments by Defendant Finch to Defendant Anderson's counsel."[97]

On April 6, 2021, the Court held a hearing and accepted Defendant Anderson's waiver.[98] However, there was no disclosure that Defendant Anderson's attorney (1) had formerly represented Defendant Finch's business extensively; (2) was currently retained to represent Defendant

---

[95] ECF 97 at 5.

[96] ECF 97 at 6.

[97] ECF 97 at 3.

[98] ECF 104.

Finch's business; (3) had an attorney-client relationship with Defendant Finch regarding the allegations in this case prior to being retained by Defendant Anderson; and (4) was currently representing Defendant Finch's business on matters directly related to this case.[99] At the conclusion of the hearing, the Court set trial for August 16, 2021.[100]

As noted, Defendant Finch had his initial appearance on March 18, 2021. After the hearing, the Court entered an order setting conditions of release regarding Defendant Finch largely the same as the Court's standard order. But a modified condition of release was that Defendant Finch was to "avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including co-defendants; no direct of personal contact with City of Lynn Haven officials, including department heads, City Manager, and Chief of Police." Defendant Finch acknowledged the conditions of release and promised to obey them.[101] The government understands that the pretrial

---

[99] The government believes that ensuring on the record that Defendant Anderson was aware of that would have been significant to determining whether the waiver was knowing and voluntary.

[100] ECF 108.

[101] ECF 87 at 5.

services officer went over this condition with Defendant Finch in some detail.

Defendant Finch promptly and repeatedly disregarded that condition. On March 22, 2021, Defendant Finch directly contacted a City department head.[102] Between March 26, 2021, and April 5, 2021, Defendant Finch directly contacted a Lynn Haven City Commissioner by initiating and participating in six phone calls totaling approximately 35 minutes of conversation.[103] On April 6, 2021, Defendant Finch directly contacted a City department head.[104] On April 12, 2021, Defendant Finch caused an email to be sent from his email address to the Lynn Haven City Manager and four City Commissioners.[105] The email demanded payment for the 17th Street project, which was a subject of both the original and superseding indictments. The email was signed "Sincerely, James Finch."

On April 13, 2021, Defendants Finch and Anderson filed a joint motion to modify their conditions of release to allow "direct and indirect



contact" between themselves "with and without the presence of counsel to assist in the preparation of pretrial motions, to prepare for trial and to present common defenses."[106] The motion made the technically true but actually misleading statement that "Pretrial Services will confirm that [Defendant Anderson] has faithfully followed the Court's condition" regarding no contact with witnesses.[107] The motion further stated that "[a]lthough subject to pretrial release for a shorter time, Defendant Finch has honestly adhered to the Court's command as well."[108] That representation was false because Defendant Finch had violated the restriction on contacting City officials at least eight times by the date of the filing. Because of concern that Defendant Anderson had been communicating with Defendant Finch in violation of the condition, the government contacted the pretrial services officer to consult before taking a position. But the next day, April 14, 2021, the Court granted the joint

---

[106] ECF 110 at 5.

[107] ECF 110 at 1.

[108] ECF 110 at 1-2.

motion before the government's time to file a response elapsed, noting the risks involved with the arrangement.[109]

On Thursday, April 15, 2021, counsel for Defendant Finch requested the government's position on another motion to allow Defendant Finch to have "direct or personal communication with [C]ity of Lynn Haven officials to conduct official business only." On Monday, April 19, 2021, the government responded that it had concerns with such a modification, citing the April 12, 2021, email to the City Manager and Commission (the government was not aware of other violations at that time), and requested an explanation from Defendant Finch's counsel about the apparent violation of the release condition.[110] Defendant Finch's counsel never provided an explanation to the government. That evening, the government asked the pretrial services officer his opinion about the request and mentioned Defendant Finch's email to the City Manager and Commission. The pretrial services officer asked for a copy of the email, which the government provided.

---

[109] ECF 111.

[110] █████████████████████████████████████

On April 20, 2021, Defendant Finch's counsel sent an email to the pretrial services officer regarding the April 12 email.[111] Counsel represented that Defendant Finch's employee prepared and sent the April 12 email. The employee stated in a forwarded email "I sent the attached email on behalf of James Finch. I didn't know that it was supposed to be addressed ███████ *on behalf of James Finch*. I've sent e-mails for James for years, because he doesn't send emails." *Id.* The government understands that defense counsel conceded to the pretrial services officer that Defendant Finch told his employee exactly what to say in the email. Defense counsel represented that "James understands that he cannot communicate directly with the city." *Id.* More directly, counsel stated "James has not spoken with or attempted to speak to any City official directly via telephone or in person." *Id.*

On April 21, 2021, the pretrial services officer submitted a petition that Defendant Finch had violated pretrial release conditions based on

---

[111] The email stated "unfortunately the government did not provide context with the April 12, 2021 email, indicating that James communicated with a City employee." ███████████████████ Since the government had asked for that "context" the day before, it did not appreciate the insinuation that it had withheld information from the pretrial services officer.

the April 12 email.[112] The Court set a hearing for April 26, 2021. The morning of the hearing, the government learned about some (but not all) of Defendant Finch's other violations. The additional information did not change the government's position that the Court should simply admonish Defendant Finch to abide by the condition rather than revoke pretrial release, and the government told the Court as much. But the government placed some additional violations on the record[113] so the Court was aware that the explanation proffered by the defense did not hold water.[114]

In his motion to dismiss, Defendant Finch complains about a motion the government filed seeking a Court order for early returns of subpoenas to law firms representing Defendant Anderson in this case but

---

[112] ECF 115.

[113] The government was not aware of the repeated phone calls to City Commissioner ███ at that time. Notably, when the City Manager asked if any City personnel had such contacts, the ██████████ denied the contacts and after doing so asked whether the FBI was behind the inquiry. ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

[114] ECF 206 at 4. Following the hearing, Defendant Finch's counsel accused the government of knowingly misleading the magistrate judge about the nature of one of the violations; that the City Manager had told Defendant Finch to contact a City employee. The government checked and learned that Defendant Finch attempted to contact a department head (in direct violation of the express terms of the release condition) and the City Manager redirected him to a lower-level employee.

paid by Defendant Finch for fee records and non-privileged communications.[115] The government could have issued grand jury subpoenas for the documents it sought since it concerned investigation of additional potential charges. But, expecting motions to quash, the government sought Rule 17 subpoenas as a more efficient way to bring the matter to the Court's attention and reach the same end. The Deputy Assistant Attorney General authorized issuance of the subpoenas after the government sought approval based on the facts set out in the motion.[116]

The government brought its concerns to the attention of defense counsel prior to filing the motion, provided a draft of it, and asked if there were additional facts that could provide context before bringing the matter to the Court's attention in a public filing.[117] Defense counsel declined to provide anything, but suggested that the government asking the question was similar to extortion. Defense counsel asked that the

---

[115] ECF 228 at 7.

[116] ████████████████████████████████████████████

[117] In preparing the motion, the government had reviewed similar filings by government attorneys around the country which were not filed under seal and did not apprehend a legal basis to do so.

motion be filed under seal, citing their reputational interests. [118] The government agreed.

The government has regard for Defendant Anderson's attorneys and said so repeatedly before filing the motion, in the motion, and at the hearing. The focus was on the conduct of the Defendants. The evidence showed (1) Defendant Finch paid hundreds of thousands of dollars for Defendant Anderson's attorneys while knowing he was an unindicted alleged co-conspirator; (2) Defendant Anderson's lead counsel (with no known experience in criminal law) had extensively represented Defendant Finch in important matters; (3) records indicated that Defendant Finch procured the representation of Defendant Anderson; (4) Defendant Finch apparently persuaded and arranged for Defendant Anderson to hire his attorney (when he was not supposed to be having contact with her); (5) Defendant Finch had extensive and at the time unexplained contact with Defendant Anderson's lead counsel after counsel's appearance in the case; (6) Defendant Anderson's counsel refused to explain and resisted inquiry into the circumstances of his appearance in this case after counsel had misrepresented that he

---

[118] ECF 142.

appeared by coincidence; (7) after the government brought payment of fees up, Defendant Finch stated publicly that Defendant Anderson came to him with a quit claim deed to her house and asked for money and he "loaned" her some; (8) Defendant Anderson's attorney later suggested the interaction about the deed took place before August 25, 2020; (9) the deed is dated September 4, 2020, witnessed by Defendant Finch's employees, and falsely states that he had already paid her $200,000 for the sale of her home; (10) the deed was not recorded until April 27, 2021 (after the government suggested there was a conflict); and (11) Defendant Finch's employee (███████████) caused another employee to illegally execute an attestation that the deed was executed on September 4.

In response to the motion, neither Defendant contested any of the facts put forth. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████.[119] ███████████████████████████████████████

████████████████████████████████████████████████.[120]

In the meantime, the government had provided discovery to Defendant Finch's attorneys on or about April 15, 2021.[121] The discovery took the form of a hard drive loaded with 43 separate folders of documents. The government also provided FBI FD-302 reports of interviews of Defendants and search warrant applications related to ECS and another entity in hard copy.  That production did not include reports of other witness interviews. The government intended to provide pertinent reports in a subsequent production to all four defendants and did so after a protective order was entered during break in the *Burnette* trial.

Soon after providing that discovery to Defendant Finch's attorneys, the government received information from ███████ indicating that Defendant Finch had provided a hard drive containing the government's discovery to ███████ and that Defendant Finch was often combing

---

[119] ECF 167 at 21.

[120] ECF 173.

[121] ████████████████████████

through that discovery with ████████████ at ████████████. ████████████

was reportedly interesting in learning what information the government

had on him. According to ██████ ████████████ called ████████████████

quoted information from ████████ bank statements, and suggested

that ████████ must be cooperating. ████████████ has subsequently

confirmed that this did happen. ████████████████████████████████████

████████████████████████████████ was previously attempting to learn

what Mickey White had told law enforcement.[122]

A few weeks later, counsel for Defendant Finch and Defendant

Anderson asked for FD-302 reports of witness interviews. Some of the

reports contained information suggesting criminal conduct by ████████

████. In general, the government's information was that ████████████████

defrauded other government entities in the aftermath of Hurricane

Michael, that ████████████ sought City of Lynn Haven clean-up work

too, and that Defendant Finch used his influence on Defendant Anderson

to make sure that Defendant Finch got the business instead, or least as

much of it as she could.[123] Defendant Finch's company had a substantial

---

[122] See ECF 227-1 ¶7.

[123] The government's information is that ████████████ aided Defendant Finch
by purposefully submitting bids above Defendant Finch's bids and later being

business relationship with ████████████████████ While this was ongoing, the FBI was working to prepare an application for a search warrant related to ████████████████

At this point, on June 3, 2021, with trial set for two and half months away, the government notified the defense via email that it was prepared to provide numerous FD-302s, some agent notes, and potential *Giglio* information relating to cooperating defendants and various individuals. The government requested that the defense agree to a protective order concerning those materials. The email included the statement "Mr. Finch has been known to provide information to other individuals in this case," which was not specific but was meant to refer to Defendant Finch's December 20, 2020, submission to the Sheriff and similar communications.[124] Defense counsel asked for more information, suggesting it was "just another phony allegation."[125] The government was

---

awarded subcontract work after Finch got the contract. ████████████ ████████████ planned to seek a City of Lynn Haven project but called him off stating "that looks like a job for James Finch." ████████████

[124] See ECF 228-1.

[125] ████████████████████████████

not referring to ▮▮▮▮ information and did not wish to take ▮▮▮▮ word for it (as a convicted perjurer), and so notified defense counsel that it would not include a suggestion that Defendant Finch provided information to other individuals in a motion for a protective order. Defense counsel then objected to a protective order covering previously provided discovery. The government responded that it had not asserted that Defendant Finch disseminated *discovery*, that if he had it would not be a violation of an order that had not been entered at that time, and asked defense counsel to provide assurances he had not.[126] But no such assurances were forthcoming. Obviously, defense counsel could not provide such assurances because Defendant Finch had already disseminated to ▮▮▮▮ every bit of information produced to Defendant Anderson's attorney in September 2020 and produced to Defendant Finch's attorneys in April 2020.

On June 18, 2021, the government filed a motion for protective order.[127] The government noted a defense objection that it should only apply to subsequently provided discovery. Because the material already

---

[126] ▮▮▮▮

[127] ECF 160.

provided included sealed material and other sensitive material such as bank records of third parties, the government requested that it apply to all discovery, but not retroactively, so any earlier dissemination would not be a violation. [128]

On June 25, 2021, Defendant Anderson responded to the motion for a protective order.[129] The response asserted "Anderson has possessed government discovery since September 2020 and, even absent a protective order, has not disseminated any of it."[130] That assertion was not correct because Defendant Anderson had actually disseminated the government discovery to Defendant Finch (not charged at that time), and Defendant Finch had disseminated it to ███████████ by November 2020.[131]

That same day, Defendant Finch also responded to the motion for a protective order.[132] In the response, Defendant Finch falsely suggested,

---

[128]ECF 160 at 5.

[129] ECF 166.

[130] ECF 166 at 4.

[131] ███████████████████████████████████████████████████

[132] ECF 165.

obliquely, that the government had leaked discovery material to news media.[133] Defense counsel then stated unequivocally that "Finch has possessed copies of the Government's discovery since April 2021 and has not shared any portion of it."[134] But that was false. Indeed, pursuant to a search warrant ███████████████████████ the FBI searched ███████ ███████ computer and found a complete copy of the electronic discovery provided to Defendant Finch's counsel in April 2021[135]:



---

[133] ECF 165 at 6-7. The government did not provide that information to the media. The insinuation otherwise was misleading.

[134] ECF 165 at 6. Another reason why that was not true: Defendant Finch possessed the government's discovery provided to Defendant Anderson in September 2020 by November 2020, because he had provided it to ███████████

[135] ████████████████████████████████

57

According to the FBI, preliminary analysis indicates it was electronically created in ▇▇▇▇ computer (an off-network stand-alone laptop set up for this purpose, not his regular computer) on April 22, 2021, roughly a week after the government provided it to defense counsel, and the day after the pretrial services petitioned regarding Defendant Finch's improper contact with City officials. The government believed this corroborated the earlier information from ▇▇ that Defendant Finch provided the government's discovery to ▇▇▇ in or around April 2021, and refuted defense counsel's assertion that "Finch has possessed copies of the Government's discovery since April 2021 and has not shared any portion of it." At the recent evidentiary hearing, however, defense counsel indicated he was well aware that Defendant Finch was doing this.[136] And the text messages from ▇▇ (offered by defense counsel) indicate that ▇▇▇ returned the actual drive to Defendant Finch after "his attorney told him to stop sharing."[137] It thus appears that defense counsel knew exactly what Defendant Finch had done, had

---

[136]



[137]

approved of it, and falsely denied it to avoid a more restrictive protective order which would have prevented (in the legal sense) Defendant Finch from doing with witness interview reports what he had already done twice with other discovery.

On July 6, 2021, the Court issued a protective order applicable only to discovery produced going forward.[138] Accordingly, the government produced several hundred pages of interview reports, which appears defense counsel still has not fully reviewed.[139] Because of Defendant Finch's behavior, and counsel's false denials about his behavior, a few reports relating to cooperating defendants had redactions concerning information as to other investigations.

In the meantime, Defendants challenged aspects of the first superseding indictment. Some were successful and others were not.

Defendant Finch first contested Count 2, relating to a payment to Commissioner Barnes. Although the local rules do not require conference on a dispositive motion, defense counsel sought the government's position that it was outside the statute of limitations. Defense counsel followed up

---

[138] ECF 174.

[139] ████████████

the next day. The government politely replied that it was not able to agree at that time but would respond to the motion. Defendant Finch moved to dismiss Count 2. The government considered the issue carefully and responded (in a Court-ordered expedited manner) conceding that Count 2 should be dismissed, which the Court did.

Defendants then filed another round of motions attacking the honest services fraud counts and the conspiracy charged in Count 1.[140] Much of Defendants' argument was that the charging document was not sufficiently specific. Defendant Anderson moved to dismiss the false statement charge against her, asserting it did not properly allege that false statements to the FBI were made "willfully."[141]

On August 19, 2021, the Court entered an order dismissing Count 1 of the superseding indictment without prejudice, holding that as pled Count 1 alleged separate conspiracies which could not be cured with a jury instruction.[142] The Court denied motions to dismiss other charges against Defendant Anderson and Defendant Finch, recognizing some

---

[140] ECF 131, 138.

[141] ECF 138.

[142] ECF 185 at 7.

practical concerns with the dismissal of Count 1 and its impact on other counts that incorporated factual allegations from Count 1.[143]

On September 17, 2021, the Court held a status conference. At the status conference, the government indicated that there were developments in the case which may affect the nature of a second superseding indictment.[144] The Court entered an order continuing trial.[145]

On September 24, 2021, Defendant Adam Albritton pleaded guilty to two counts of wire fraud relating to accepting bribes/kickbacks from ECS and defrauding his insurance company with a false invoice for hurricane repairs when ECS had provided those services without charge (and then billed the work to the City).[146]

On October 6, 2021, Commissioner Barnes pleaded guilty to an information charging he made false statements to a bank to secure a loan

---

[143] ECF 185 at 7.

[144] ECF 190.

[145] ECF 191.

[146] ECF 195, 196, 197.

but admitted as part of his plea that he took money from Defendant Finch in exchange for performing official acts.[147]

In the meantime, Defendant Finch's counsel had circled back about discovery matters.   Defense counsel requested unredacted FD-302 reports, stating that the defense believed that the redactions contained *Brady* information, and that the defense had deduced that the redactions pertained to ██████████████████████. Defense counsel further stated "we have also developed independent evidence that tends to demonstrate the falsity of multiple witnesses' statement to the authorities."[148]

A learned treatise has described how "[a] prosecutor may not know the defendant's theory of defense, and thus not know what qualify as exculpatory evidence."[149] It elaborates that "[b]ecause the defendant is not required to announce the theory of the defense and the prosecution is not required to maintain an 'open file' policy, there is inevitably a degree of uncertainty about compliance with Brady." *Id.* With that wisdom in

---

[147] See *United States v. Barnes*, 5:21cr31-MW/MJF, ECF 12 (N.D. Fla. Oct. 6, 2021).

[148] ████████████████████████████████

[149] Eleventh Circuit Criminal Law Handbook §206(a) (2021 Edition).

mind, the government asked why the defense thought the redacted material was *Brady* and what witnesses were supposedly lying to authorities. Defense counsel responded by accusing the government of "[o]nce more dodg[ing] direct answers to [counsel's] questions" and "[t]his has become a pattern and practice of yours in this case."[150] Defense counsel wanted to know the legal basis for the redactions (which, if it was not clear in the exchange, was that if the material is not *Brady*, it was not discoverable). The government wanted to know why the defense thought it might be so it could fulfil its obligations.[151]

Eventually, on October 5, 2021, the government had a telephone conference with Defendant Finch's counsel at his request. Defense counsel asked about the FD-302 redactions. The government asked again why the defense believed the redactions contained *Brady* material. Defense counsel stated the defense believed that ███████████ was orchestrating a massive conspiracy. Since the government's information was that Defendant Finch had been in cahoots with ███████████, that

---

[150] 2021.9.15 email exchange re 302.pdf.

[151] 2021.9.15 email exchange re 302.pdf; 19. 2021.10.5 email exchange with Forman.pdf.

seemed odd.[152] The government asked how that tended to negate Defendant Finch's guilt on the charges in this case. Defense counsel had no answer, or at least none he cared to share.  Defense counsel asked about the presentation of exculpatory evidence to the grand jury. The government replied that it had presented the information in the January 18 letter to the earlier grand jury and would do the same regarding the superseding indictment, but again told defense counsel that counsel's factual assertions in a letter are not really evidence. Defense counsel indicated he would attempt to put together a presentation. The discussion then turned to whether Defendant Finch would testify before the grand jury. The government stated it was unsure whether such offers were sincere given Defendant Finch's public statement on March 24 that his attorney advised him not to testify. But defense counsel stated that the offers were "absolutely sincere."

After significant internal discussion, the government elected to postpone the presentation of a second superseding indictment to November 16-17 to afford defense counsel time to assemble a

---

[152] The timing of this new-found defense theory makes more sense when one remembers that ███████████████████████

presentation of actual evidence the defense viewed as exculpatory, and to provide sufficient lead time for Defendant Finch's counsel to arrange their schedules to be present for his requested grand jury testimony, the reason counsel gave for his previous non-appearance. The government informed Defendant Finch's counsel of this in an email on October 25, 2021, among other things.[153]

In the meantime, on October 22, 2021, Defendant Finch moved to compel discovery of unredacted FD-302 reports and motions to continue sentencing of cooperating defendants.[154] The Court ordered an expedited response.[155] The government filed an expedited response which set out some but not all of its concerns (described more fully below in the discovery section) about Defendants' behavior and explained defense counsel's failure to engage in a meaningful conference on the issue.[156] The government did not rely on information provided by ██████ (a convicted perjurer) because it did not want to take his word for it. On November 9,

---

[153] ████████████████████████████████████████████████████.

[154] ECF 200.

[155] ECF 201.

[156] ECF 209 at 7.

the Court entered an order reciting the parties' positions and reasoning that the protective order was sufficient to address any concerns about confidentiality, ordering the government to produce the motions and the unredacted FD-302s by November 12, 2021.[157]

On October 26, 2021, the Court held a status conference. The government informed the Court that it planned to present the second superseding indictment on or about November 16, 2021. Defense counsel, Mr. Lewis and Mr. Vezina, seizing the opportunity presented, complained at some length about the delay in returning another charging document. Mr. Lewis referred to "[p]resentations we've made to the U.S. Attorney that last spring where we detailed and presented information, proffers, testimony, conflicts in the case, [and] documents."[158] That is precisely the sort of information the government had previously asked Defendant Finch's counsel to provide in several emails and by phone on October 5,

---

[157]  ECF 211. The government noted in earlier correspondence that the Court had ordered production without reviewing the material and determining it was favorable to the defense. Defendant Finch has repeatedly asserted that this was a criticism of the Court. ECF 274 at 13. It is not. It is a statement of fact. The government did not ask in its response for the Court to conduct an *in camera* inspection, which is the ordinary procedure. See, e.g., *United States v. Jordan*, 316 F.3d 1215, 1252 (11th Cir. 2003) ("Not infrequently, what constitutes *Brady* material is fairly debatable. In such cases, the prosecutor should mark the material as a court exhibit and submit it to the court for in camera inspection.").

[158] ECF 219 at 10.

2021, if they wished to, which counsel on the call said he would try to provide, and which they did not provide.[159]

Instead, on November 8, 2021, Defendant Finch's counsel sent the government another letter. It did not cite to any particular documents or testimony. The letter rehashed counsel's earlier factual assertions and ultimate conclusion that, in their view, Defendant Finch is innocent.

For example, defense counsel asserted that within days of paying the City Engineer $75,000 for the Motorhome, Defendant Finch agreed to sell the Motorhome to Defendant Anderson's spouse for $70,000 and that the spouse asked Defendant Finch to "finance" it without Defendant Anderson's involvement. But, as detailed in second superseding indictment,[160] the evidence is that (1) Defendant Finch paid the City Engineer $75,000 for the Motorhome; (2) the City Engineer transferred title to the vehicle to Defendant Anderson's spouse; (3) Defendant

---

[159] Candidly, Defendant Anderson's attorneys of record presented documents to the government in January 2021, which were largely from government discovery. Perhaps that is what defense counsel meant by "we."

[160] Without contesting these allegations in the second superseding indictment, which are undisputedly true, Defendant Finch complains that the original indictment and superseding indictment have internally inconsistent factual allegations. ECF 228 at 18-19. The operative pleading, though, is the second superseding indictment. But in any event, the allegations in the earlier charging documents are consistent which the above description, and no basis to dismiss the second superseding indictment.

Anderson's spouse falsely asserted to state authorities that the sale price was $35,000; (4) the Andersons paid no money for the Motorhome at that time; (5) Defendant Anderson was routinely seen about town driving the vehicle; (6) Defendant Anderson ordered the City Manager to have ECS clean-up her property after the hurricane so she could move what she later publicly claimed was "our" Motorhome; (7) the Andersons paid Defendant Finch $20,000 by check (and perhaps $15,000 in cash withdrawn)[161] 22 months after receiving the Motorhome and only after individuals were indicted in the related case and the FBI interviewed Defendant Anderson about her involvement with ECS; and (8) Defendant Finch gave the FBI a bill of sale which falsely described the nature of the transaction; that ███████████ had paid $35,000 for it by July 2018.[162]

---

[161] The source of these funds appears to be the settlement Defendant Anderson received from her insurance company from hurricane damage to her residence. Defendant Finch later claimed to the FBI that Defendant Anderson's spouse paid him with a check and the difference in cash. But if the contention is that Defendant Anderson's spouse paid the $15,000 in cash too, it seems odd to withdraw that much cash from a bank account rather than just another check, or a check for $35,000 rather than $20,000. In any event, there is no discernible source for the remaining $35,000 on a sale price of $70,000 which Defendant Finch claimed to the FBI, and no source of funds for $35,000 supposedly paid as "half down" as of July 6, 2018, when no money was paid until December 2019. ████████████████████
███████████

[162] ███████████████████████ Following the dismissal of Count 1 of the superseding indictment, in September 2021, the government conferred with Defendant Anderson's attorney about the case and a potential second superseding

For another example, regarding hurricane debris disposal, Defendant Finch's letter asserted that the government should produce exculpatory evidence that Defendant Finch was in a coma after the hurricane and did not return until October 31, 2018, that his employees tried to get the required permit without his involvement, that his dumpsite would alleviate damage to the City property and reduce costs, that the City property was not prepared to receive debris, and that the City would have to incur more costs to dump the debris elsewhere later. None of that is really exculpatory, though, because the evidence and the allegations are that, prior to Defendant Finch's return to Lynn Haven in late October, Defendant Anderson killed the City's plan to use a property next door to Defendant Finch's property to dispose of debris,[163] Defendant

---

indictment. Defense counsel asked whether there was any particular information that might change the government's mind about pursuing charges against her. The *single thing* the government requested was evidence that Defendant Anderson or her spouse had actually paid $35,000 (or any money at all) for the Motorhome by July 6, 2018, the date indicated on the bill of sale Defendant Finch presented to the FBI, which indicated $35,000 had been paid as of that date, or any information that any money was paid before the November 2019 indictments. After some time, counsel politely declined to provide anything in that regard, which of course they are not obligated to do.

[163] While Defendant Anderson was killing that permit, ███████████ and another contractor, ███████████ traveled to Jacksonville to meet with Finch, apparently to discuss hurricane business. ███████████ told ███████████ that he was going to make sure Defendant Finch got his share of the business and, on October 23, 2018, sent Michael White two

Anderson and Defendant Finch leaned on the City Manager to redirect the disposal to his site *after* he returned (and all the hauling business too), it does not cost $3.4 million to prepare land to dispose of hurricane vegetative debris, the City could have sold the debris to the company across the street for approximately $500,000 just as Defendant Finch later did and had Defendant Anderson *not* so intervened to benefit Defendant Finch, the taxpayers would have been $3.4 million better off.

Defense counsel's letter also demanded that the government submit to the grand jury a package of materials Defendant Finch provided the Sheriff in December 2020, including a news article about a prosecutor on the case.[164] It made Defendant Finch's grand jury testimony contingent that he be allowed to testify on a wide range of items, many outside of his personal knowledge, including the December 2020 package. It insisted the government present a letter dated November 4, 2021, which

---

text messages stating "You need to call me ASAP per James Finch." ███████████
████████████████████████████

[164] Such an article, which defense counsel included in the record at ECF 228-1 at 10, is not relevant to the grand jury's consideration of the second superseding indictment and a determination of probable cause. Notably, Defendant Finch's type-written complaints about the original indictment bear a strong resemblance to both the false bill of sale and the quit claim deed, ██████████████████████████████████
████████████████████████████████████

Defendant Finch had submitted to the media, which concluded by inviting someone (presumably the reader) to "kiss my ass."[165]

On November 10, 2021, the government responded to Defendant Finch's counsel's letter by email. The email affirmed the government's intention to comply with Justice Department policy regarding the presentation of exculpatory evidence before the grand jury and explained that Defendant Finch "can tell the grand jury whatever he wishes, so long as he explicitly waives his privilege against self-incrimination, on the record before the grand jury, states on the record that he is represented by counsel . . . and consents to full examination under oath." Defendant Finch's counsel replied that same day accepting the invitation.[166]

But, after getting everything they had asked for, Defendant Finch's counsel introduced another condition; that the government state whether it "has any intentions of inquiring about matters unrelated to this case."[167] The government replied it was unsure what "matters unrelated



[165] ██████████████████████████████████

[166] ████████████████████████████████████████

[167] █████████████████████████████████████ It is not clear what defense counsel were concerned what else the government might ask about. But one thing the government can think of is Defendant Finch having ████ give $10,000 to an elected official's brother who would "know what to do with it."

to this case" meant but explained that Defendant Finch's "consent to full examination under oath includes matters relevant to the ongoing grand jury investigation, which may include questions from grand jurors which we cannot necessarily anticipate."[168] Not satisfied, defense counsel demanded to know "[d]oes the government intend on soliciting information from [Defendant Finch] about matters unrelated to this case?"[169] The government replied "[w]e will only being asking questions regarding this grand jury investigation.  But if Mr. Finch wishes to testify, he must consent to full examination under oath."[170]

When the government agreed to every concession, the defense strategy seemed to shift. If Defendant Finch was going to put himself out there and testify (which counsel could not really have wanted him to do), it would of course be helpful to have a more sympathetic witness to back him up. Out of the blue, on November 11, 2021, Defendant Anderson's attorney contacted the government and asked that she too be allowed to testify before the grand jury on November 16, 2021, so long as she could



say and present whatever she wanted. No such request had been made before. The government replied the next day, November 12, 2021, that she could testify as well under the same conditions as Defendant Finch.[171]

On Friday afternoon, November 12, 2021, the government produced unredacted FD-302 reports of certain individuals pursuant to the Court's order. On the morning of November 15, 2021, Defendant Finch's counsel informed the government that it was "shocked" about the unredacted FD-302s. That seemed odd, since defense counsel had previously asserted they had already deduced much of it was about ███████████  The defense asked for a postponement of the grand jury to bring the current motion and represented, again, that Defendant Finch would testify if the case went forward, and if the government pressed forward to make sure to present their letters, and, specifically, Defendant Finch's presentation to the Sheriff on December 22, 2020. Less than 30 minutes later, Defendant Anderson's counsel informed the government she was not appearing before the grand jury either.[172]

---

[171] ████████████████████████████████████████████

[172] ████████████████████████████████████████████

On November 16, 2021, a grand jury returned the second superseding indictment against Defendant Finch and Defendant Anderson.

On December 2, 2021, Defendant Finch moved to dismiss the second superseding indictment alleging the whole of it is duplicitous.[173] On December 3, 2021, Defendant Anderson moved to dismiss the second superseding indictment on similar grounds.[174]

On December 6, 2021, Defendant Finch moved to dismiss the second superseding indictment with prejudice.[175] On December 10, Defendant Anderson moved to dismiss on similar grounds.[176]

On December 22, 2021, the government filed a lengthy response asking the Court to deny the motions and set the case for trial but did not specifically address Defendants' request for open-file discovery or production of other material.

---

[173] ECF 225.

[174] ECF 226.

[175] ECF 228.

[176] ECF 234.

Following briefing on the motions, on February 17, 2022, the Court held a status conference. At the hearing, the Court set an evidentiary hearing and indicated it was considering ordering production of grand jury transcripts. Government counsel pointed out that the defense had not met the threshold for production of transcripts but did not precisely articulate the correct standard of "particularized need." Accordingly, the government filed a notice of supplemental authority to articulate the correct standard.[177]

Late on February 22, 2022, the Court enter an order finding that Defendants had shown a "particularized need" for grand jury transcripts due to three alleged factual errors and legal deficiencies in earlier indictments, explaining it was satisfied the defense was not on a fishing expedition. The Court's order further directed the government to produce all grand jury transcripts, all witness interview reports, and all agent notes on or before March 1, 2022, and, if this deadline is unfeasible from the government's perspective, the government must file a notice

---

[177] See N.D. Fla. Loc. R. 7.1(J) (providing that "[i]f a pertinent and significant authority comes to a party's attention after the party's memorandum has been filed— or after a hearing but before decision—the party may file a notice of supplemental authority").

explaining why a later deadline is necessary.[178] This order thus required the government to produce all *Jencks* materials earlier than required by statute and by case law.

Accordingly, the government immediately undertook to comply with the Court's order. The government had previously obtained transcripts of the case agent testifying four times in relation to the three indictments (June 9, 2020, August 18, 2020, March 16, 2021, and November 16, 2021).[179] Those were produced to the defense early on Friday, February 25, 2022, pursuant to their request. Prior to the Court's order, the government requested the transcript of the colloquy for the November 16, 2021, presentation to the grand jury that returned the Second Superseding Indictment,[180] and it was produced to the defense too. Another witness transcript was produced to the defense on March 1, 2022. The morning of February 23, 2022, the government requested that the

---

[178] ECF 256.

[179] Case agent or fact witness testimony is usually transcribed shorty after it. Colloquies are usually not. That is why it took additional time to order and obtain the un-transcribed colloquies and produce them as the government received them.

[180] One of the prosecutors asserted (based on memory) at the February 17 hearing that the November 2021 grand jury had received pattern instructions on honest services fraud and sought to confirm this assertion was accurate. It was.

court reporters transcribe those grand jury proceedings that were not already transcribed; that is, colloquies for the three other presentations on an expedited basis (and increased fees) in accordance with the Court's order.

A court reporter transcribed the colloquy for the March 16, 2021, presentation, and that was produced to the defense on February 28, 2022. Another court reporter transcribed the other two sessions. The government was informed by the private reporting service that this court reporter was unavailable until March 1, 2022. The government queried that service repeatedly and produced the transcripts as soon as they were received.

On March 1, 2022, the government produced additional witness interview reports and agent notes of interviews (including those for FD-302 reports produced in July 2021) indexed to the corresponding FD-302 report for counsel's convenience. The new case agent worked with the previous case agent to identify agent notes which may not have resulted in FD-302 reports. Further, the government produced interview summaries and audio recordings and transcripts of interviews for numerous witnesses who witnessed or performed Hurricane Michael

cleanup. The government had previously identified and indexed such material that related to such work performed at Defendant Anderson's residence, and that index and separate identification/organization was also produced to the defense on March 1, 2022. This represented the bulk of the government's anticipated early *Jencks* production. On March 1, 2022, the government filed a status report explaining its production efforts and expectations going forward.

Apart from the transcripts, the defense requested grand jury exhibits presented during the testimony. Many of these were duplicative of documentary evidence disclosed as far back as September 2020 (which Defendant Anderson's attorneys appears to have provided wholesale to Defendant Finch, and which Defendant Finch disclosed wholesale to ███████████ A couple of exhibits were timelines created by the case agent. The defense asked for the grand jury exhibits and the government provided them.[181]

---

[181] When the government has indicated that it responded to defense requests, the defense has sometimes claimed that the government is "shifting blame" or responsibility. That is not the case. The government recognizes its obligations. It points out these facts to show its good faith; when the defense asks for something, or suggests something might be missing, the government undertakes to look for it. That is how the pretrial and discovery process should work in a complex case that will inevitably involve numerous productions and ongoing discussion between counsel for the parties. By way of example, the *Burnette* case involved 41 government

The government thereafter conducted additional interviews and promptly disclosed the reports and agent notes from same. Defendant Finch's papers contend it was a violation of the Court's order to do so. See ECF 274 at 3 n.3. [182] There was no violation of the Court order in conducting additional interviews and promptly disclosing the results of them.

At the beginning of the March 31, 2022, evidentiary hearing, Defendant Finch's counsel submitted a list of material they believed existed but had not been produced.[183] Counsel had not asked the government about such materials or provided the list prior to its presentation. After receiving the list, the government went about compiling the items listed and produced them to the defense as soon as they were located. As detailed below, the "missing" documents are not favorable to the defense or even relevant. Defendant Finch further

---

productions over 2 ½ years, some just before trial. Notably, however, Defendants have not made *any* reciprocal discovery productions to the government which, by Rule 16 and court order, were due within 7 days of the government's request.

[182] In contrast, and to their credit, Defendant Anderson's counsel possess the intellectual honesty to at least not to assert this was a violation of a Court order. ECF 273 at 31 n.5.

[183] ▮▮▮▮▮

claimed, in conclusory fashion, that some 31 interview reports produced after February 22, 2022, contained *Brady* material. A review of each of those documents reveals they each fall into one more of these categories: (1) had already been produced); (2) the substance had been produced elsewhere; (3) is information Defendants already knew; or (4) are not favorable to the defense; or (5) are not even relevant to this case.

During and after the hearing, the government searched for items on Defendant Finch's list and others Defendant Anderson brought up and promptly produced what it had located, including BCSO notes, several more (irrelevant) FD-302s, and additional notes by SA Borghini. The government respectfully submits that it did not "disregard[] the Court's instructions in the most flagrant fashion," as Defendant Finch contends. ECF 274 at 15.

## II.   <u>The second superseding indictment is not duplicitous.</u>

Defendants contend that *all 26 counts* of the second superseding should be dismissed as duplicitous. This Court should reject that contention.

As the Court noted in its earlier order, "[d]uplicitous *counts* impermissibly charge 'two or more separate and distinct offenses.'" ECF

185 at 2 (quoting *United States v. Schlei*, 122 F.3d 944, 977 (11th Cir. 1997) (emphasis added and internal quotation marks omitted). "The problems with a duplicitous count are threefold: '(1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy defense; and (3) A court may have difficulty determining the admissibility of evidence.'" *Id.* (quoting *Schlei*, 122 F.3d at 977).

The role of a court reviewing an indictment for duplicity is "solely to assess whether the indictment itself can be read to charge only one violation in each count." *United States v. Mancuso*, 718 F.3d 780, 792 (9th Cir. 2013) (internal quotation marks and citation omitted); *see also United States v. Morse*, 785 F.2d 771, 774 (9th Cir. 1986) (same); *United States v. Smallwood*, 3:09cr249, 2011 WL 2784434, at *6 (N.D. Tex. July 15, 2011) (same). "A duplicitous count is one that charges two or more separate offenses, *not* one that merely describes factual matter relevant to proving more than one criminal offense." *United States v. Buckingham*, No. 4:18cr376, 2018 WL 6570874, at *3 (N.D. Ala. Dec. 13, 2018); *see also United States v. Lombardo*, 582 F. App'x 601, 614 (6th Cir. 2014) ("The incorporation clauses were explicitly limited to the general allegations,

manner and means, and overt acts. This particularization thus avoided the problem of duplicity.").

The second superseding indictment is not duplicitous.[184] Count 1 plainly charges Defendant Finch and Defendant Anderson with conspiring to defraud the City and its citizens of the honest services of Defendant Anderson and another city commissioner through bribery with respect to *Defendant Finch's projects* identified therein. It specifically alleges that Defendants Finch and Anderson "did knowingly and willfully combine, conspire, confederate, and agree together and with other persons to devise a scheme to defraud the City of Lynn Haven and its citizens of their right to the honest services of **ANDERSON**, the elected Mayor of Lynn Haven, and Barnes as commissioner, through bribery or kickbacks," and that the manner and means of the conspiracy were that these Defendants

> used **ANDERSON**'s public official position as the Mayor of Lynn Haven and Barnes' position as City Commissioner to offer, give, solicit, receive, agree to accept, and accept things of value from **FINCH**, which were offered and provided by **FINCH** to **ANDERSON** and Barnes, in exchange for

---

[184] Even if were duplicitous, a "cure for an otherwise duplicitous indictment is to give an augmented instruction requiring unanimity on one or the other of the acts charged within a count that otherwise appear to constitute separate offenses." See *United States v. Miller*, 891 F.3d 1220, 1230 (10th Cir. 2018). The structure of this indictment plainly allows for appropriate instructions to cure any defect.

> performing official acts. **FINCH** offered things of value to **ANDERSON** and Barnes with the intent that they would be influenced in the performance of official acts. **ANDERSON** agreed to accept and did accept things of value from **FINCH** with the intent that she would be influenced in the performance of official acts *related to specific matters, to wit, **FINCH**'s business interests before, including the 17th Street project, projects under the ½ Cent Surtax contract, and City business for hurricane recovery*, as specific opportunities arose. Thereafter, **ANDERSON** used her position as Mayor of Lynn Haven to take official action favorable to **FINCH**'s business interests as specific opportunities arose, which included voting on measures pending before the Lynn Haven City Commission, signing resolutions, contracts, agreements, and promissory notes, and pressuring and advising City officials to perform specific official acts favorable to **FINCH**'s business interests. **ANDERSON** agreed to and did perform these official acts in favor of **FINCH** in exchange for things of value from **FINCH**.

ECF 214 ¶125 (emphasis added). Neither Count 1 nor any other count charges either Defendant with conspiracy related to WorldClaim or ECS. And only Defendant Anderson is charged substantively with respect to those matters in other segregated counts.

The second superseding indictment includes 25 counts charging offenses other than the conspiracy charged in Count 1. A count that does not charge *any* conspiracy cannot be said to charge *multiple* conspiracies.

Defendant Finch repeated previous arguments from the prior motion to dismiss Count 1 of the superseding indictment to support

dismissal of the 26 counts of the second superseding indictment. Compare ECF 149 at 8-16 with ECF 225 at 7-18. Defendant Anderson incorrectly asserts that the government disregarded the Court's prior order. ECF 226 at 4. They each overlook that the government carefully retooled the second superseding indictment in accordance with the Court's previous order (and accounting for the guilty pleas of co-defendants). The second superseding indictment is not duplicitous.

Defendant Finch says in a footnote, however, that 25 *non-conspiracy* counts should be dismissed because factual allegations (which he says contain multiple conspiracies) are incorporated by reference into the other counts. ECF 225 at 14 n.10. Defendant Anderson makes a similar argument. ECF 226 at 2. But neither Defendant cites any case, or any other authority, supporting the contention that such incorporation of relevant *facts* makes duplicitous this conspiracy charge, or *any* non-conspiracy charges.

Defendants are incorrect that the facts of each scheme are irrelevant to each other. See *e.g.*, ECF 226 at 6 (incorrectly asserting that "[t]he allegations pertaining to the alleged Finch schemes are only relevant to the offenses arising from those alleged schemes" and [t]he

same goes for the allegations pertaining to the alleged Erosion Control Services schemes and World Claim scheme."). Factual allegations that Defendant Anderson committed fraud against the City with respect to ECS and accepted a bribe/kickback with respect to WorldClaim are plainly relevant to whether she agreed to accept a thing of value from Defendant Finch *with the intent to be influenced* in the performance of an official act. Allegations that Defendant Finch bribed Defendant Anderson regarding his projects are relevant to her intent regarding the ECS and WorldClaim schemes. Allegations that Defendant Finch paid a bribe to Commissioner Barnes are relevant to whether Defendant Finch offered things of value to Defendant Anderson intending to influence or reward her for favorable action. See, *e.g.*, *United States v. Ellisor*, 522 F.3d 1255, 1267-68 (11th Cir. 2008) (holding that similar frauds were admissible to prove intent to engage in charged conduct). Both the ECS and WorldClaim schemes are relevant to show why the partial payment for the Motorhome was eventually made in December 2019, after other persons were charged with respect to ECS and Defendant Anderson was interviewed by the FBI in November 2019 and are therefore necessary to complete the story of the crimes. See, *e.g.*, *United States v. Wright*, 392

F.3d 1269, 1276 (11th Cir. 2004) (explaining that "evidence of . . . events contributed to the understanding of the situation as a whole").

Even if such facts were irrelevant to each other, the remedy would be to strike surplusage. A motion to strike surplusage should not be granted, however, "unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial . . . . [T]his is a most exacting standard." See *United States v. Huppert*, 917 F.2d 507, 511 (11th Cir. 1990) (internal quotation marks omitted) (citing 1 Charles A. Wright, Fed. Practice and Proc. §127 at 424–29 (1982)).  Defendants have not brought a motion to strike surplusage, likely because such a motion would undoubtedly fail under the applicable legal standard and they believe more ground can be made adding a legally insufficient duplicity claim to the generalized airing of grievances.

Additionally, Defendant Finch's supplemental paper (ECF 274 at 4-5 & n.5) asserts, for the first time, and in non-specific terms, that offenses were improperly joined. Such a claim has no merit. Offenses may be joined if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan," and defendants may be joined "if they are

alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." See Fed. R. Crim. P. 8. The allegations of the second superseding indictment meet that criteria.

Accordingly, the Court should deny the defense motions to dismiss the second superseding indictment for duplicity.

### III. <u>This Court should not dismiss the second superseding indictment with prejudice.</u>

Defendants seek dismissal of the superseding indictment, claiming (1) misconduct before the grand jury; (2) failure to timely provide evidence favorable to the defense; and (3) violation of their Sixth Amendment rights. The Court should reject these contentions.

### A. There was not knowingly false testimony or other misconduct substantially influencing the grand jury's decision to indict.

*1. Legal standard*

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]" The grand jury belongs to no branch of government "but is [instead] a constitutional fixture in its own right." *United States v. Williams*, 504 U.S. 36, 47 (1992)). "It is

axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." *Id.* at 51. In sum, the grand jury's principal task is to determine whether probable cause exists and, if so, to return indictments.

Federal courts must apply an exacting harmless-error analysis to claims of error or defect in the grand jury process. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254–255 (1988) (citing Fed. R. Crim. P. 52(a)). Where "a court is asked to dismiss an indictment prior to the conclusion of trial[,] . . . dismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Id.* at 256 (internal quotation marks omitted). Alternative explanations or interpretations of evidence, or "a mere disagreement with the Government regarding what the evidence shows or whether the evidence supports the charges in the indictment," is "not a proper basis for setting the indictment aside." *United States v. Gilbert*, No. 2:17-cr-00419-AKK-TMP, 2018 WL 2095832, at *2 (N.D. Ala. May 4, 2018).

88

When faced with a request to dismiss an indictment, a federal court's "role must be informed by a recognition that dismissal of an indictment . . . is an extreme sanction which should be infrequently utilized." *United States v. DiBernardo*, 775 F.2d 1470, 1475 (11th Cir. 1985) (internal quotation marks omitted).  Even false testimony "does not automatically vitiate an indictment based on that testimony; to dismiss an indictment the district court must . . . find an abuse of the grand jury process such as perjury or government misconduct." *Id.*

At the evidentiary hearing, counsel for Defendant Finch presented the case of *United States v. Leeper*, No. 06-CR-58A, 2006 WL 1455485 (W.D. N. Y. May 22, 2006), as a significant case that supported his motion to dismiss the indictment. Defendant Finch's reliance on that case is clearly misplaced. The district judge in *Leeper* found that the prosecutor placed undue influence on the grand jury to return a Second Superseding Indictment without fully considering the matter, listing several reasons for the undue influence finding, including "[t]he haste of the proceeding, the jury's knowledge that another grand jury had already indicted the defendant, the prosecutor's assurances that the error was merely an 'oversight' or an 'omission in paperwork,' the implication that the

original grand jury would have fixed the error itself had it not expired, the immediacy with which the May 16th grand jury was being asked to return the superseding indictment, and their knowledge that a petit jury had already been picked and the trial had started." *Id.* at *4. The facts of that case are dissimilar to the grand jury presentation in this case. Indeed, the Court in *Leeper* dismissed the indictment without prejudice.

In conducting its investigation, the grand jury is not bound by the evidentiary rules and hearsay evidence is admissible. *Costello v. United States*, 350 U.S. 359, 363 (1956). Inadequate or incompetent evidence before a grand jury cannot be a basis for challenging an indictment because the "[t]he result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury." *Costello* 350 U.S. at 363 (1956). As the Supreme Court explained, "[a] complaint about the quality or adequacy of the evidence can always be recast as a complaint that the prosecutor's presentation was 'incomplete' or 'misleading.'" *Williams*, 504 U.S. at 54. The government respectfully suggests that what the Supreme Court rejected in *Costello*

and *Williams* is precisely what Defendants tried to do, in part, in their papers and at the evidentiary hearing.

Defendants seek dismissal of the second superseding indictment because the Court dismissed certain counts of the original indictment and superseding indictment. That afforded Defendants relief from prejudice regarding those counts. Such errors in those earlier indictments do not serve as a basis for dismissal of the second superseding indictment because the proper analysis is the facial validity of the operative charging document. See *e.g.*, *United States v. Vigil*, 2006 WL 8445505, *4 (D. N. Mex. Mar. 20, 2006) (explaining that "[d]efendant argues that, in light of the prior dismissal of two counts of the Second Superseding Indictment, there is a real possibility that the Third Superseding Indictment also is deficient. However, any motion to dismiss the Third Superseding Indictment will evaluate the facial validity of the indictment, and [d]efendant's argument does not met the standard of 'particularized need' sufficient to outweigh the need for secrecy in the grand jury process.").

The Court has rightly apprehended that this is indeed the correct framework of analysis. ECF 260 at 1 n.1. Defendants have not provided any contrary authority. Defense counsel complain, however, about the

November 2021 grand jury presentation; both the colloquy and the witness testimony. The Court should reject the complaints as unfounded in fact or law.

### 2. Knowledge of earlier indictments

A superseding indictment replaces the original indictment. *See United States v. McKay*, 30 F.3d 1418, 1424 (11th Cir. 1994). Where there is no allegation that the grand jury returning an indictment was tainted by prior grand jury events, a defendant cannot show prejudice from those events. *United States v. Collins*, 300 F. Appx. 663 (11th Cir. 2008); *United States v. Brooks*, 2012 WL 12961099, *1 (E.D.N.Y. Aug. 24, 2012); *United States v. Bok*, 1997 WL 148815, *3 (S.D.N.Y. 1997); *United States v. Fisher*, 692 F. Supp. 495, 500-501, 507 (E.D. Pa 1988), appeal dismissed, 871 F.2d 444 (3rd Cir. 1989); *United States v. Newman*, 534 F. Supp. 1109, 1110 (S.D.N.Y. 1982).

Defense counsel complained in opening statement that the government had informed the November 2021 grand jury about previous indictments.[185] There was nothing improper about doing so. See, *e.g.*, *United States v. Feng Tao,* 499 F. Supp. 3d 940, 970-971 (D. Kan. 2020)

---

[185] ███████████████████████████████████

("The Court finds there is nothing inherently prejudicial about presenting a superseding indictment to a grand jury, which by definition conveys that an indictment came before it . . . Unlike the case relied on by the defendant (*Leeper*), there is no indication that here the prosecutor 'placed undue influence on the … grand jury to return the Second Superseding Indictment without fulling considering the matter.'"); *United States v. Chambers,* No. 3:18cr79, 2019 WL 1014850, at *5 (D. Conn. March 4, 2019) ("grand jury being asked to return a superseding indictment is always going to know  that a previous indictment was returned"); *United States v. Galindo,* No.4-053 DAE, 2008 WL 018405, at *6 (D. Haw. Apr. 4, 2008) ("The Court first notes that GJ #4 would have been aware that Defendant had been indicted previously based on the fact that they were considering a *Third* Superseding Indictment.").

Moreover, defense counsel failed to mention that the government had specifically informed the grand jury that prior actions on indictments was *not* probable cause for that grand jury and "[y]ou have to find probable cause based on what we present to you today"[186] Before giving

---

[186]  ███████████

a summary (and correct) overview of the expected evidence, the government informed the grand jury that the testimony presented, not statements of counsel, controlled the probable cause determination.[187] This is consistent with DOJ Grand Jury Practice Manual, Chapter 11.36 which actually suggests that *more* information should be provided to the grand jury ("The grand jury should be advised that a superseding indictment is being presented, the date the original indictment was returned, the nature of the intended change in the indictment, and the manner in which the case will be re-presented. They should be advised that they should deliberate anew on the proposed superseding indictment, and that they should not give any weight to the fact that a prior indictment was returned.").[188]

Finally, the November 2021 grand jury was not a novice grand jury. It met monthly for nine months before that meeting. It had returned six

---

[187] DX 8 at 3.

[188] The additional detail makes sense when, as the Manual states a preference for, the same grand jury is asked to take additional action in the same matter. But where, as here, a *new* grand jury is considering the matter (because the earlier one expired) there is no need for such detail, and only an instruction to determine probable cause based on the evidence presented, not earlier action, which is exactly how this grand jury was properly instructed. This is not all that different than the Court sometimes informing a petit jury, during trial, of what is going on, while instructing them on their proper role.

superseding indictments in the past, including another one that very morning.[189]

### 3. Time of presentation

At the hearing and in papers, Defendant Finch's counsel complained that the grand jury did not deliberate long enough.[190] Defendant Anderson's motion contends that the grand juries did not consider the case for enough time before returning indictments, without citing any legal authority for relief on that basis. At the hearing, the Court rightly apprehended there was not any such ground. The Court is correct. Some cases take a while to present. Some take very little. How long the grand jury deliberates is not under the government's control. It is up to the grand jury to deliberate for as long as they wish before returning an indictment or not. It is no basis to claim misconduct.

Defense counsel then asserted in opening statement at the evidentiary hearing, without any factual basis, that the grand jury returning the second superseding indictment was rushed. Specifically, defense counsel stated "[t]hen right before getting started with Mr.



189

190

Borghini's testimony in front of the third grand jury, counsel for the government says, if there aren't any questions, [']let's get started and hopefully we can finish this by lunch,['] and that's what they did."[191]

The grand jury transcripts conclusively show the government counsel said and did no such thing at any grand jury.[192] In fact, the prosecutors traveled to Pensacola the morning of November 16, started with the presentation after lunch, spent more than four hours presenting the controlling law and testimony across 171 pages of transcripts, along with providing copies of 63 grand jury exhibits to each grand juror which was reviewed by grand jurors as the grand jury testimony was conducted, asked the grand jury if they had any questions, and departed the room for the grand jury to deliberate for as long as they wished before they returned the second superseding indictment.[193]

---



## 4. Legal Instructions

The defense has raised three issues about the legal instructions to the November 2021 grand jury. None have merit.

The legal standard is this. Prosecutors are not required to instruct a grand jury on the law. See *United States v. Lopez-Lopez*, 282 F.3d 1, 9 (1st Cir. 2002). Nor are prosecutors forbidden from giving legal advice. See *United States v. Singer*, 660 F.2d 1295, 1303 (8th Cir. 1981). If prosecutors instruct the grand jury on the law, the instructions should be accurate and, of course, should not deliberately mislead the grand jury. See *United States v. Wiseman*, 172 F.3d 1196, 1205 (10th Cir. 1999). A conviction by a petit jury will usually cure any initial defect by demonstrating that the error was harmless. See *United States v. Anderson*, 61 F.3d 1290, 1297 (7th Cir. 1995). "Challenges going only to the instructions given to the grand jury as to the elements of the offenses are not grounds for dismissal of an indictment that is valid on its face," which the second superseding indictment is. See *United States v. Buchanan*, 787 F.2d 477, 487 (10th Cir. 1986).

Defendants point to a dispute about the nuances of honest services fraud to claim prosecutorial misconduct before the grand jury. Defendants' speculative claim of misconduct is entirely misplaced.

Despite earlier claiming that the Supreme Court rejected the "opportunities arise" theory of honest services fraud, ECF 138 at 11, and failing to cite Eleventh Circuit precedent directly contrary to that position, see *United States v. Roberson*, 998 F.3d 1237, 1251 (11th Cir. 2021), Defendants now concede that theory is valid, ECF 241 at 13, focusing now on a supposed "temporality" issue, recently rejected in trial jury instructions by this Court over the government's request that the pattern instructions be used to avoid appellate issues. See *United States v. Burnette*, No. 4:18cr76-RH/EMT, 2021 WL 5987025, at \*7-\*8 (N.D. Fla. Dec. 18, 2021) ("To count as a matter that might later come before the governmental entity, a matter need not be identified at the time of the payment; it is sufficient if the payment is made in exchange for favorable treatment on any not-yet-known matter that might later come up for a vote" and "[n]othing in § 201 or *McDonnell* suggests an agreement of this kind is not a bribe"). As the Court has said, the upshot of that bribe-friendly interpretation of *McDonnell* "would be open season for [public

officials] with their hands out and for [bribers] willing to pay them." *Id.* at *7.

In short, this is not, as Defendant Anderson contends, "a stubborn position[] of law rejected by the Court." ECF 236 at 20. It is a correct statement of the law adopted by the Court in another case. But that dispute is irrelevant now.

As it relates to honest services fraud, the transcript reflects that the government instructed the grand jury according to Eleventh Circuit pattern instructions, precisely to avoid this sort of claim. If the Defendants take issue with pattern instructions, it is an issue to raise with the Eleventh Circuit, should the need arise, and is no ground to speculatively assert prosecutorial misconduct.

At the evidentiary hearing, defense counsel asserted that the government failed to instruct the November 2021 grand jury about intent.[194] That is plainly not correct. The prosecutor read the pattern instructions, which included the correct statement of law that "[t]o act with the intent to defraud means to act knowingly and with the specific

---

[194] ███████████████████████████████████████

intent to use false or fraudulent pretenses, representations or promises to cause loss or injury" and "[p]roving intent to deceive [alone] without the intent to cause loss or injury is not sufficient to prove intent to defraud."[195]

Defendant Finch asserts that the November 2021 grand jury was improperly instructed on the elements of the Count 1 conspiracy charge, referring to Eleventh Circuit Pattern Jury Instruction O13.1, and suggesting that the instruction omitted reference to a required element of an overt act in furtherance of the conspiracy. That is not correct. Pattern Instruction O13.1 relates to a conspiracy charge under 18 U.S.C. §371, which requires an overt act. Count 1 charges a conspiracy under 18 U.S.C. §1349, which does not require proof of an overt act. See Eleventh Cir. Pattern Jury Instr. O54; *e.g.*, *United States v. Feldman*, 931 F.3d 1245, 1258 (11th Cir. 2019) ("A conspiracy charge under section 1349 "does not require the commission of an overt act."). Moreover, the grand jury had returned an indictment in a conspiracy case (under 21 U.S.C. §846, which has the same elements) and been instructed on those elements that very morning.

---

[195] DX 8 at 12.

The November 2021 grand jury was properly instructed on the law. There is no merit to any contrary claim.

### 5. *Introduction of Defendant Finch's November 4 letter*

On November 8, 2021, Defendant Finch's counsel, Mr. Lewis, sent the government another letter.[196] In the letter, Mr. Lewis falsely stated that the government had previously rejected requests to present exculpatory material to the grand jury. The government had done no such thing, as counsel well knew. Mr. Lewis' letter specifically requested that the government present to the grand jury a news article critical of one of the prosecutors in another case (which Defendant Finch gave to the Sheriff in December 2020)[197] and stated "[w]e also request that you submit the recent letter dated November 4, 2021, submitted to the press containing James' detailed denials of the government's allegations."[198]

---

[196] ███████████████████████████████

[197] ████████████████████████████████ After the government brought up the apparent irrelevance of this article in its December 22 response to the motion to dismiss, see ECF 246 at 72 n.27, defense counsel made discovery requests for all communications between prosecution team members and their supervisors about that subject (and other topics), claiming same was discoverable for a vindictive-prosecution claim. ████████████████████████████████████
████████████████████

[198] ████████████████████████████

Among other things, the referenced November 4 letter by Defendant Finch criticized "ignorant people," discussed his opinion of the case, and concluded with his statement "As for me, you can kiss my ass."[199] Mr. Lewis' letter asserted it would be *unethical* not to present this information to the grand jury.[200] Yet, at the hearing, Mr. Lewis asserted that presentation of that very information he demanded be presented was misconduct, contending "you went over the line there."[201]

As the Court noted, Rule 403 does not apply in grand jury proceedings. But Defendant Finch's statement is relevant. And defense counsel demanded it be presented.

### 6. Leading questions to the grand jury witness

Defense counsel complained about leading questions to Special Agent Borghini.[202] But a court must not dismiss an indictment on the basis that the grand jury heard exclusively hearsay, or that all the



199 ███████████████████████████████

200 ████████████████████████████████

201 ██████████████████████████████████████

202 ██████████████████████████████████████

questioning was leading. *United States v. Brown*, 872 F.2d 385, 388 (11th Cir. 1989).

### 7. Information about guilty pleas

Defendant Finch contends, without citing any authority, that it was improper to elicit testimony (or preview such testimony in a colloquy) that certain individuals had been charged and pleaded guilty. ECF 274 at 49. That is not correct. It is entirely proper for the case agent to explain the source of his information and circumstances that will help the grand jury asses the reliability of that information; say that the source was an admitted fraudster. And it is entirely proper to explain what happened to other persons engaged in criminal conduct, as the Court apprehended at the hearing.[203]

Part of Defendant Finch's complaint, made repeatedly at the evidentiary hearing, was that there was not a specific cautionary instruction to the grand jury that day comparable to Eleventh Circuit Basic Instruction B10.4 used at trial. But when a grand jury is empaneled in this District, the Court gives the "Charge to the Grand Jury" that includes the following instructions:

---

[203] ███████████████████████████████████████

21. The determination of whether a witness is telling the truth is something that you must decide. Neither the court nor the prosecutors nor any officers of the court may make this determination for you. As you listen to witnesses presented to you in the grand jury room and hear their testimony, remember that you are the judge of each witness's credibility. You may believe the witness's testimony, or you may not believe it, in whole or in part. Determining the credibility of a witness involves a question of fact, not a question of law. It is for you to decide whether you believe the person's testimony. You may consider in that regard whether the witnesses are personally interested in the outcome of the investigation, whether their testimony has been corroborated or supported by other witnesses or circumstances, what opportunity they have had for observing or acquiring knowledge concerning the matters about which they testify, the reasonableness or probability of the testimony they relate to you, and their manner and demeanor in testifying before you.

22. Hearsay is testimony as to facts which are not personally known by the witness but which have been told or related to the witness by persons other than the person being investigated. Hearsay testimony, if deemed by you to be persuasive, may in itself provide a basis for returning an indictment. You must be satisfied only that there is evidence against the accused showing probable cause, even if such evidence is composed of hearsay testimony that might or might not be admissible in evidence at a trial.

23. Frequently, charges are made against more than one person. It will be your duty to examine the evidence as it relates to each person, and to make your finding as to each person. In other words, where charges are made against more than one person, you may indict all of the persons or only those persons who you believe properly deserve indictment.

Benchbook for U.S. District Judges §7:04 (2013) (most current edition). Indeed, even defense counsel conceded that it is not necessary to reinstruct the grand jury on such concepts at every presentation.[204]

### 8. *The grand jury testimony of* ███████████

Defendant Finch's counsel disclosed at the February 17 hearing the intention to call one particular witness, whom he incorrectly described as Defendant Finch's former "secretary" and the government would know who it is.[205] The witness that counsel described is ███████████ a former bookkeeper at Phoenix Construction. Based on prior interactions with defense counsel, the government suspected the purpose of presenting the witness' testimony at the evidentiary hearing was to raise a claim of grand jury abuse by using it to strengthen an indicted case or in improperly coercing an interview of an employee of a represented corporation by threat of having to appear before the grand jury. Neither potential claim had any merit. Documents the government disclosed to the defense conclusively refute assertions of grand jury abuse. Defense

---

[204] ███████████████████████████

[205] Noteworthy is that with the exception to two law enforcement witnesses whom the defense asked the government to accept service of witness subpoenas, the defense did not advise of any other proposed witnesses for the hearing, despite a contrary representation at the status conference.

counsel did not call the witness at the recent evidentiary hearing but still made unfounded accusations of grand jury abuse and improper contact with a represented party, in part through the cross examination of SA Borghini.

The legal standard for this sort of claim of grand jury abuse is well established. The government may not use a grand jury for discovery concerning a pending prosecution; however, it may continue the investigation from which information relevant to a pending prosecution may be an incidental benefit. See *United States v. Alred*, 144 F.3d 1405 (11th Cir. 1998). The grand jury may continue to investigate additional criminal culpability on the part of a previously indicted defendant or the defendant's co-conspirators. *Beverly v. United States*, 468 F.2d 732, 743 (5th Cir. 1972). After indictment, the grand jury may be used if its investigation is related to a superseding indictment of additional defendants or additional crimes by an indicted defendant.[206] That is what the government was properly doing and told counsel as much.

The witness was part of the continuing investigation concerning additional wire fraud acts or a possible obstruction of justice by Defendant

---

[206] Justice Manual §9-11.120.

Finch. After Defendant Anderson had her initial appearance in this District, on August 25, 2021, and was specifically ordered not to have direct or indirect contact with Mr. Finch, Mr. Finch repeatedly contacted Defendant Anderson's ███████ phone before and after Mr. Finch had lengthy conversations with his longtime lawyer, Mr. Vezina, with whom Mr. Finch had already formed an attorney-client relationship as to the allegations in this case. Then, just before Mr. Vezina substituted in for Defendant Anderson, Mr. Finch directly transferred counsel $200,000. After the government learned of the attorney-fee payments, brought it to defense counsel's attention, and asked for a conflict hearing, on March 24, 2021, Defendant Finch made statements to local media that, after her arrest, Defendant Anderson brought him a quit claim deed to her house, asked him for money for legal bills, and he "loaned" her money for her lawyer bills.[207] Between the government bringing this to defense counsel's attention on March 18, and over the weekend to Defendant Finch's interview on March 24, there were *seventeen* phone calls made or

---

[207] A loan for the hundreds of thousands of dollars in legal bills, if that is what is what such payments were, would make Defendant Anderson quite beholden to Defendant Finch. But the government does not believe these are actually loans inasmuch as there is clearly no understanding or expectation on either side they will ever be repaid, similar to the $45,000 in "loans" made by Defendant Finch to then-Commissioner Barnes.

attempted between Defendant Finch and Defendant Anderson's ██████████ phone totaling over 60 minutes of conversation.

A few weeks later, following a conflict hearing and the pretrial services officer petitioning for Defendant Finch's pretrial release violation, on April 27, 2021, a quit claim deed to Defendant Anderson's house from the Andersons to Defendant Finch was recorded in Bay County, which falsely states that $200,000 had been transferred to the Andersons as of September 4, 2021. If the transaction took place in September 2020, Defendant Finch permitted Defendant Anderson to live in the residence she supposedly sold him in September 2020 until the end of April 2021. Thereafter, Defendant Anderson posted on social media that she was spending her last night in her house.

████████████████████████████████████████████████

██████████████████████████ Accordingly, the government sought the witness' testimony before the grand jury as part of an investigation whether Defendants (or anyone else) had committed additional offenses; namely additional acts of wire fraud and-or obstruction of justice related to the attorney-fee payments (*Defendants* furthering the conspiracy, not

counsel) and potentially a false deed meant to conceal the nature of such payments and create a sympathetic cover story.[208]

On May 24, 2021, AUSA Kunz issued the grand jury subpoena to the witness. At the bottom, it bore AUSA Kunz's name, address, and telephone number. AUSA Kunz signed his initials next to his name.[209] This generally is the same procedure for many other subpoenas the government issues in this District.[210] An attachment to the letter advised the witness of ███ rights and indicated the grand jury was investigating possible violations of criminal law including obstruction of justice and conspiracy.[211] AUSA Kunz provided the subpoena to the case agent with explicit instructions to serve the subpoena, engage in no substantive

---

[208]   As detailed at length in the second superseding indictment and the government's response to the motions to dismiss, Defendant Finch engaged in similar behavior to conceal the nature of the Motorhome transaction; a bill of sale dated July 2018 and presented to the FBI, which falsely described the nature of a transaction which occurred in February 2018.

[209]   ████████████████████████████████████████

[210]   A more modern practice, made more common through the recent necessity of telework, is to use digital signatures encoded through the DOJ attorney's PIV card and personal identification number.

[211]   ████████████████████████████████████████

conversation, and to instruct the witness to contact the USAO witness coordinator to arrange travel to Tallahassee for testimony.[212]

On May 25, 2021, the case agent served the subpoena. Per the issuing AUSA's express instructions, the case agent did not engage in substantive discussion with the witness, but simply gave the witness instructions to contact the USAO witness coordinator to arrange travel to Tallahassee for testimony. The agent documented the interaction in a FD-302 report.[213]

The next day, defense counsel called the government, made suggestions of grand jury abuse, and requested to know what the government was looking into. The government confirmed issuance of the subpoena, declined to give specifics to preserve the integrity of the testimony, but assured counsel that the government was investigating whether uncharged offenses had been committed.

---

[212] ███████████████████████████████████

[213] ████████████████████████████████████████████████ During Special Agent Borghini's cross examination, defense counsel questioned SA Borghini about the FD-302, suggesting to the Court it had not been produced to the defense. It had been, a month before the hearing. A report about serving a subpoena is generally not discoverable anyway.

On May 27, 2021, Mr. Lewis sent a letter to the Deputy Attorney General of the United States regarding the subpoena to the witness. The letter made unfounded and unsupported claims that the subpoena was "retaliatory and vindictive." In the letter, Mr. Lewis made false accusations that the subpoena was "unsigned" (it was initialed) and that the agent had directed the witness to contact the FBI office to *avoid* appearing before the grand jury (which did not happen, and which defense counsel could not have learned from the witness, who counsel had not spoken to, and who did not relay such information). The letter did not disclose the source of the information counsel relied upon.[214]

On the morning of June 1, 2021, defense counsel sent an email to the prosecutors and the U.S. Attorney. In the email, counsel stated they believed the government was claiming to investigate obstruction of justice and asserted "We believe you are improperly using the Grand Jury to gather evidence on a case that has already been indicted."[215]



[214] ███████████████████████

[215] █████████████████████████████



At the recent evidentiary hearing, defense counsel asserted the witness was mistreated through having to wait "4 hours" to testify. That is not accurate. The witness was scheduled to testify at a particular time. ███ apparently arrived early. A previous grand jury presentation ran long. So, the government asked █████████ if ██ would kindly return after lunch. ███ did. The government paid ██ witness fee and all claimed travel expenses.[217]

---

216 ████████████████████████████████████

217 ████████████████████████████████████ This complaint of witness inconvenience is especially specious since, as the Court observed, defense counsel subpoenaed multiple cooperating witnesses who traveled to Tallahassee with their counsel (and no doubt incurring significant expense) to sit around all day on March 31, 2022, while defense counsel made lengthy arguments he could have put in his papers, only to be released without testifying.

On June 10, 2021, the United States Attorney and several Assistants met with Mr. Lewis and Mr. Forman regarding this matter. At nearly the beginning of the meeting, Mr. Lewis again complained that the FBI agent served an "unsigned" subpoena and had instructed the witness to contact the FBI office to avoid appearing before the grand jury. Knowing what had actually happened, U.S Attorney Coody politely advised Mr. Lewis he might want to check his facts on the matter. Again, Mr. Lewis did not disclose the source of his information.

On October 5, 2021, AUSA Grogan and the former FBI case agent had a phone conference with defense counsel, Mr. Forman. The lead up to the phone conference included defense counsel asking that Defendant Finch not be arrested following a second superseding indictment and demanding the government present evidence the defense thought was exculpatory to the grand jury. The government responded that it planned to ask for a summons and asked specifically what evidence the defense wanted presented.

During the ensuing phone conference, defense counsel stated the government had previously rejected defense presentations. AUSA Grogan asked for any example where that had happened. Defense counsel first

brought up service of the subpoena on the witness (who counsel erroneously described as "Finch's secretary, ███████ that the U.S. Attorney had told the defense to check its facts, that the defense had done so, and the defense's facts were correct. Having knowledge of the subpoena, the written instructions to the case agent, and the case agent's FD-302 report, AUSA Grogan asked what the source of the defense information on the subject was. To the best of counsel's recollection, after a noticeable pause, defense counsel stated the information came from the witness. The government asked specifically if the defense had obtained the information directly from the witness. Counsel indicated that they had.

That was not true. At the status conference on February 17, 2022, defense counsel indicated that it may subpoena the witness to testify at the evidentiary hearing scheduled for March 8, referring to her again as "Finch's former secretary." Defense counsel stated (incorrectly) that the witness had been "interviewed." ECF 255 at 5. Because of the representation that she was no longer an employee of Phoenix Construction, on February 18, 2022, two different FBI agent subsequently interviewed the witness and ███████. Both confirmed the material

aspects of the serving case agent's account and completely refuted the defense's false assertions. But the witness stated that after the grand jury testimony, defense counsel approached ███ to find out the substance of ███ testimony. According to defense counsel, this was Mr. Lewis. According to the witness, the conversation did not last long, the attorney never spoke about anything related to service of the subpoena, and the witness never said that the agent offered to speak with ███ in lieu of grand jury testimony because that "definitely never happened."[218]

During the hearing, defense counsel stated, during cross examination of Special Agent Borghini, that the witness quit ███ job at Phoenix because "███ was so scared and didn't know—afraid ███ was going to get into trouble."[219]  However, on February 18, 2022, the witness told two other FBI Special Agents that ███ quit working at Phoenix because the work environment was "toxic."[220]

---

[218] ████████████████████████████████

[219] ████████████████████████████████ This is another instance of defense counsel testifying.

[220] ████████████████████████████████

In correspondence referred to above, and at the evidentiary hearing,[221] defense counsel implied government misconduct because the witness had been personally served with the grand jury subpoena. That accusation is unfounded for several reasons.

First, Federal Rule of Criminal Procedure 17(d) provides "[t]he server must deliver a copy of the subpoena to the witness[]." Defense counsel cites no authority for the proposition that doing exactly that is misconduct.

Second, to the extent defense counsel was referring to bar rules regarding communication with represented parties, Rule of Professional Conduct 4-4.2 provides that, "[i]n representing a client, a lawyer must not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer." But the rule expressly provides for direct personal service on the witness. *Id.* Defense counsel was immediately aware of the subpoena and had every opportunity to

---

[221] ███████████████████████████████████

move to quash it but did not. And, indeed, Defendant Finch's conduct created a conflict of interest for Mr. Lewis anyway.[222]

In sum, it was entirely proper, and not misconduct of any sort, to personally serve this witness with legal process.

### 9. *Testimony about attorney's fees*

Defendant Finch contends that "[i]mproper and prejudicial testimony regarding attorney's fees was presented to the grand jury. ECF 274 at 58. Such testimony and evidence was not improper.

Among other things, the government must prove at trial that Defendants Anderson and Finch conspired to and did engage in a scheme to defraud the City of its right to the honest services of Defendant Anderson when she was Mayor. The government expects that a defense at trial will be that the stream of benefits flowing from Defendant Finch to Defendant Anderson and her husband were made from longstanding friendship and not as part of a corrupt bargain. Evidence that an individual selected an attorney, hired an attorney, and-or paid an attorney to represent another suspected member of a conspiracy is highly

---

[222] In the government's experience, this usually results in the corporation retaining separate counsel for the employee witness to avoid such conflicts. It does not appear that Phoenix Construction did that for ███████████

relevant to show the existence and nature of a criminal conspiracy. See *United States v. Simmons*, 923 F.2d 934, 949 (2d Cir. 1991); *In re Grand Jury Proceedings (Pavlick)*, 680 F.2d 1026, 1028-29 (5th Cir. 1982) (en banc) (plurality opinion); *United States v. Hodge & Zweig*, 548 F.2d 1347, 1354 (9th Cir. 1977); *United States v. Gotti*, 771 F. Supp. 552, 560 (1991). Here it tends to show the benefit stream was part of a corrupt bargain for Defendant Anderson and Defendant Finch to take care of each other as their relative abilities allowed; the Mayor can steer City business to Defendant Finch; Defendant Finch can provide the Mayor with benefits, and when the Mayor is criminally charged, select and pay an attorney who did good work for Defendant Finch in the past, even while technically representing another entity. As Defendant Anderson put it to the former City Manager, "you have my back and I've got yours." As one court aptly said, "the jury could conclude that [the] benefactor payments . . . reflected interests other than friendship or a detached concern for the [S]ixth [A]mendment rights of colleagues." *United States v. Castellano*, 610 F. Supp. 1151, 1154 (S.D.N.Y. 1985). It is also a basis to impeach Defendant Anderson's testimony for bias should she testify. See *United States v. Frazier*, 944 F.2d 820, 824 (11th Cir. 1991).

The evidence obtained clearly indicates that Defendant Finch selected and hired Mr. Vezina based on an existing attorney-client relationship where Mr. Vezina represented not just Defendant Finch's company, but where Mr. Vezina represented other parties for the ultimate benefit of Defendant Finch's company in a case of great personal importance to him. The evidence further indicates that Defendant Finch verbally agreed to pay Defendant Anderson's legal bills; that is, Defendant Finch repeatedly paid the bills directly, not loaning the money to Defendant Anderson for her to pay the legal bills, contrary to Defendant Finch's public statement. Nor has the government found any transfer of $200,000 to Defendant Anderson as of September 4, 2020, for the claimed sale of her home, as represented in the purported quit claim deed. Rather, records indicate that Defendant Finch sent the $200,000 directly to the Vezina Firm trust account several weeks later on October 1, 2020, the day before counsel filed a motion to substitute, and has subsequently provided multiple checks directly payable to the law firms.

Defendant Finch contends that it was improper to ask the case agent about



 That questioning is not improper.

*11.   The actual testimony about the easement was correct; there was a transcription error.*

At the hearing, defense counsel asserted there was a misrepresentation regarding an easement. Defendant Anderson contends that there was a "false statement that the easement was located on Anderson's property." ECF 273 at 38. This is the testimony from the November 16, 2021, transcript provided by the court reporter a couple weeks after it (with emphasis added)[224]:

---

[223] ECF 274 at 53.

[224] The government was occupied responding to the Defendants' 4 motions to dismiss and did not flyspeck it for court reporter errors at that time.

Q: And is it accurate that Mrs. Anderson wanted trees removed so she could move her motor home to and from her property; is that correct?

A: Correct.

Q: And on the far wall -- first of all, was there an easement next to the property?

A: *There was an easement on the property _and_ back of her property.*

Q: Was the City obligated to remove the debris from her property because of the easement?

A: They were not.

O: And, in fact, the director of public records for Lynn Haven would not have authorized the city to pay for the removal; is that correct?

A: That's correct.[225]

The government was and is aware that a 20-foot easement for stormwater drainage runs on the western boundary of the property (514 Virginia Avenue) directly to the east of Defendant Anderson's property (513 Tennessee Avenue) and abutting it. That is why the prosecutor asked the question "was there an easement *next to* the property?"[226] The conjunction "and" in the answer does not really make any sense. The

---

[225] DX 7 at 92.

[226] DX 7 at 92 (emphasis added).

government therefore suspected that this is a transcription error; that the answer actually was "there was an easement on the property *in* back of her property." The government asked the court reporter to check the audio recording, and that is exactly what happened. According to the court reporter, "[i]t's clear on the audio, which is purely a backup, that 'in' [rather than 'and'] was said by the witness."[227] There was no misrepresentation of fact during this exchange, merely a transcription error by the court reporter, which has been corrected.

12. *The case agent gave accurate testimony about the check reports.*

The second superseding indictment describes in detail what Defendant Anderson is alleged to have done with respect to ECS. She was aware that the City contracted with ECS for cleanup.[228] She verbally approved a check of $224,722 four days later.[229] She directed the City Manager to have ECS clean up not just an easement next door but trees blocking the way for the Motorhome, and then accepted additional work

---

[227] ██████████████████████████████████████

[228] ECF 214 ¶59.

[229] ECF 214 ¶61.

that was billed to the City.[230] In addition to the earlier check, she approved accounts payable reports totaling $1,782,290 between October 26, 2018, and January 31, 2019.[231] Defendant Anderson told the FBI that she usually learns what the City has paid when the list of checks paid is sent to her.[232]  Yet she claimed that she learned that the City was paying ECS large amounts of money only when she had invoices pulled (without suspicion of fraud), and this apparently led her to go to the Sheriff.

Contrary to Defendant Anderson's contention, the second superseding indictment does not allege that she approved other invoices or checks. The charges related to ECS are not that she participated in the whole of the ECS scheme. The charges related to ECS are far narrower; Count 17 (related to hurricane cleanup at her property under 18 U.S.C. §666); and Counts 18 and 19 (related to fraudulent invoices submitted to the City for same).

This information shows Defendant Anderson had knowledge of ECS' role in the cleanup contrary to her statement to FBI in November

---

[230] ECF 214 ¶77.

[231] ECF 214 ¶87.

[232] ███████████████████████████████████████████

2019. Knowledge that the City had paid at least $2 million in only a few months tends to show that her "whistleblowing" may have been in part motivated by concern that law enforcement was searching Michael White's phone, which contained evidence of ECS performing work at *her* property, which Defendant Anderson did not disclose to the Sheriff on April 1.

The case agent testified accurately that checks are issued twice monthly "after which a report is generated and it is distributed for approval by Mayor Anderson, the city manager, and finance people and so forth."[233] When asked about this again, the case agent referenced his prior testimony and said again "[t]hat check run is then that's printed off at the time after check run has specific signature it's circulated to people approving the check, such as Mayor Anderson, the city manager and the finance director."[234] The case went on "[i]n this particular case, the check was captured. It was issued to ECS, and Mayor Anderson signed acknowledging the check had -- these checks had been issued, one of them

---

[233] █████████████

[234] ████████████

being the ECS check."[235] In context, the whole testimony accurately conveys what happened and was not misleading.

### 13.   *Whistleblowing*

Defendant Anderson claims the case agent gave "inaccurate" testimony about her not being a "whistleblower." The case agent testified that the investigation began before Defendant Anderson brought information to law enforcement. [236] That is correct. It did. Clearly Defendant Anderson came to law enforcement in the early stages of the investigation. But this is not black and white. Defendant Anderson made her report just after the arrest of Michael White (and as ▮▮▮▮▮▮▮▮▮▮ was promising Michael White that he and Defendant Finch would take care of him). The U.S. Attorney's Office had an open matter from 2018 regarding corruption in that area. BCSO officers located text messages on Michael White's phone indicative of corruption independent of Defendant Anderson's report to the Sheriff.

Defendant Anderson says that the case agent "suggested Anderson delivered an insignificant 'piece of paper to the sheriff with some

---

[235] ▮▮▮▮▮▮▮▮

[236] ▮▮▮▮▮▮▮▮

numbers on it.' "[237] The case agent accurately testified "[s]he had brought a piece of paper to the sheriff with some numbers on it and was concerned about the amount of money that had been paid to ECS." That testimony is correct. Defendant Anderson brought a sheet of paper with numbers on it listing invoices paid to ECS.[238] This is the document:



The case agent explained, further, that Defendant Anderson made public statements that she made this report because she recently learned about the amount of money paid to ECS. However, she had given prior approval (the $224K check) and given after the fact approval of reports of $1.7

---

237

238

million to ECS, and she did not disclose to the Sheriff that work on her property (including removing trees and moving furniture around)[239] was included within the invoices until after the search of ECS and the backdated invoices were found on April 12, 2019.

### 14.   *Other city employees*

The defense complains about the case agent's testimony regarding City Manager having work done at other City employees' properties. The alleged inaccuracy pertains to the both the category of employees (police officers versus all employees) and work performed (tarping roofs versus other work). The agent's testimony was not accurate. But the thrust here is a meritless selective prosecution claim masquerading as grand jury misconduct. There is a significant difference between City employees accepting tarps and such when the City Manager authorizes it (a City Manager who was accepting cash bribes and having ECS work at his residences, and does not have the best judgment) and the Mayor directing the City Manager to have trees removed from her lawn (and lots of other work) so she could park the Motorhome she and her husband received

---

[239] Notably, the stormwater easement described above does not run through living rooms.

from a contractor (Finch), just after she had steered $3.4 million the contractor's way. Defendant Anderson has not shown that this inadvertently inaccurate testimony substantially influenced the grand jury's decision to indict.

15.   *The ownership of the Motorhome*

Defendant Anderson contends that the government made "repeated false statements to Grand Jury 3" regarding the ownership of the Motorhome. ECF 273 at 52.

The second superseding indictment accurately describes the Motorhome transaction: (1) Defendant Finch paid the City Engineer $75,000 for the Motorhome; (2) the City Engineer transferred title to the vehicle to Defendant Anderson's spouse; (3) Defendant Anderson's spouse registered the vehicle in his name and falsely asserted to state authorities that the sale price was $35,000; (4) the Andersons paid no money for the Motorhome at that time; (5) Defendant Anderson was routinely seen about town driving the vehicle; (6) Defendant Anderson ordered the City Manager to have ECS clean-up her property after the hurricane so she could move what she later publicly claimed was "our" Motorhome; (7) the Andersons paid Defendant Finch $20,000 by check 22

months after receiving the Motorhome and only after individuals were indicted in the related case and the FBI interviewed Defendant Anderson about her involvement with ECS; and (8) Defendant Finch gave the FBI a bill of sale which falsely described the nature of the transaction; that ▮▮▮▮▮▮▮▮ had paid $35,000 for it by July 2018.[240]

The grand jury was presented with state registration documents showing that ▮▮▮▮▮▮▮ registered the vehicle ▮▮▮▮▮▮▮.[241] It was presented with the July 2018 bill of sale which Defendant Finch provided to the FBI.[242] The case agent accurately testified to all of these facts. The Motorhome is a marital asset and a thing of value provided to Defendant Anderson for her use and enjoyment (and her spouse's) regardless of whose name it was titled. And, finally, the case agent referred to the Motorhome the same way Defendant Anderson did in her public statement about the cleanup: "I requested the former City Manager to have the City remove three trees from this easement, two which had fallen on our pole barn preventing us from moving *our motorhome* back

---

[240] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[241] ▮▮▮▮

[242] ▮▮▮▮

underneath it, and the third tree had blocked access to the power pole from . . . preventing us from getting electricity connected to our home."[243] It is no misrepresentation to refer to the Motorhome exactly as she does.

Defendant Finch asserts that the case agent "affirm[ed] the prosecutor's unsworn testimony that '[Grand Jury Exhibit 41]' was signed by both ███████ and at some point and Ms. Anderson," citing DX 7 at 68 at this portion of the transcript.[244] That makes no sense. DX 41 is an FD-302 report, not a grand jury exhibit. That portion of the transcript relates to Defendant Finch's former employee notarizing the July 2018 bill of sale, not the vehicle registration documents.

16.   *The 17th Street Project*

Defendant Anderson contends that "[t]he case agent testified that the City awarded James Finch the opportunity to finance the construction project without considering alternative financing opportunities." ECF 273 at 44-45 ███████████ That was not the testimony. The testimony was this:

---

[243] ███████████████████████████████████████
███

[244] ECF 274 at 30 n.22 (██████████

130

> Q: Were there any other vendors or any advertisements made for other people to say, hey, I can finance it, too, for your, or was it just given to Mr. Finch?
>
> A: No. There was no advertisement or solicitation for additional financing or a competitive bid for any financing.

That answer is correct. There was not. ████████████████████ ████████████████████████████████ After awarding Defendant Finch's company a $335,132 contract, the City expanded it to $3.7 million. The City did not solicit or advertise for other contractors before doing so.

Defendant Anderson says that the case agent testified inaccurately that the city attorney was concerned about financing the project with a city vendor. ECF 273 at 44-45. According to the FD-302 report, the city attorney told the FBI that there were "bonding issues" regarding Defendant Finch financing the project and the promissory note (to pay Defendant Finch's company) may be unenforceable. The case agent answered affirmatively to a question asking if the City Attorney was "concerned about the City basically financing work with a vendor." The government believes that SA Borghini was referring to the "bonding issues" described in the FD-302 and concedes that this testimony was

incorrect. SA Borghini did testify accurately about the note, which is testimony favorable to Defendants.

As indicated above, facts regarding the initiation of certain projects, including this one, are set out to provide context for later events. Defendant Anderson is not charged with pressuring ███████████ ████████ regarding the award of this project. She is charged with pressuring City Manager White with the later execution of this project.[245]

███████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

███████████████████

██████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

---

[245] See ECF 214 ¶44.

[246] ECF 273 at 46-48.



---

[247] ECF 273 at 47.

[248] ████████████████████████████



███████████████████████████████████████████

███████████████████████████████████████████

████████████

### 18.  *Municipal rebuild / FEMA reimbursement*

Defendant Anderson contends that SA Borghini gave "inaccurate" testimony that FEMA would not reimburse the City if a design/build process was used. ECF 273 at 49. At the recent hearing (day 2 at 110), Defendant Anderson asserted that as a matter of law, FEMA *would* reimburse the City.

The second superseding indictment accurately describes the municipal rebuilding process. ECF 214 ¶¶, 102-113, 115-118. Then City Attorney Albritton was concerned about Lynn Haven losing FEMA funds and prepared a memo documenting such. Albritton and the City Manager repeatedly advised the City Commission, including Defendant Anderson, that there was risk of losing FEMA reimbursement. At the June 23 Commission meeting, Defendant Anderson said she wanted to use insurance funds because they were *not* subject to FEMA guidelines. Additionally, other Commissioners reported, at a workshop on August 10,

---

250 ███████████

2020, from meetings with FEMA, about how FEMA had serious concerns about the City's activities and the way to "not piss FEMA off" was to go back to the design-bid-build process.[251] Defendant Anderson's position was not that this advice was wrong, but that it did not matter; they should go with Defendant Finch's proposal anyway.

### 19.   *Hurricane Debris Pit*

Defendant Anderson complains that SA Borghini gave "inaccurate" testimony that Defendant Anderson directed Michael White to have ███████████ use Defendant Finch's property to dispose of vegetative debris. ECF 273 at 51-52. Counsel asserted that "[t]he case agent testified that the November 1, 2018, email directive by Michael White to ███████ ███ 'referenced . . . a directive of Mayor Anderson [that] you must start leaving your vegetative debris or chips in Mr. Finch's pit . . . .' " That contention is unfounded. Here is the pertinent exchange:

> Q: Now, on November 1, 2018, was Mr. White told to advise the two haulers, ████████ and ██████ ], that any vegetative debris would be to taken to James Finch's JDF properties and to be disposing all vegetative debris or chips?"
>
> A: Yes, he was directed to do that.

---

[251] ████████████████████████████████████████████ ████████████████████████

Q: And, in fact, an email was sent by Mr. White to ███████████; is that correct?

A: Yes.

Q: *And he referenced the thing, a directive of Mayor Anderson you can no longer – you must start leaving your vegetative debris or chips in Mr. Finch's pit; is that correct?*

A: *That's correct.*

Now, have you investigated that ████████████ ███████████████████ they were already dropping off the vegetative debris or chips?

A: Yes, they had a site already located. They had a pit. They had set up, they had monitors there and so forth. And they actually delivered chips there through the 1st through the 5th until they could get Mr. Finch's site set up to receive the chips.

Defendant Anderson contends that "Grand Jury 3 was left to believe that the Government possessed documentary evidence that Anderson directed Michael White to send all City debris to a pit owned by James Finch. ECF 273 at 52. The Court should reject that contention because (1) the government provided the grand jury with exhibits 1 through 63, including grand jury exhibit 34 (which included the email); and (2) the email *is* (contemporaneous) documentary evidence that

Defendant Anderson directed Michael White to have the haulers use Defendant Finch's pit.[252]

20.   *Barnes 2/28 timeline issue*

Defendant Finch asserts there was an error in the timeline SA Borghini presented to Grand Jury 3, Grand Jury Exhibit 59. ECF 274 at 46-47. That portion of the timeline indicates that the City Commission approved a change order for the 17th Street project on March 14, 2017 (and Defendant Finch's purchase of some City property) and Defendant Finch gave Commissioner Barnes a check for $2,500 on March 15, 2017. The votes in question did occur on February 28, 2017. Defendant Finch contends that the timeline was "manufactured so that the jurors would believe that a check was written to Barnes ***immediately*** after Barnes voted in favor of Finch." ECF 274 at 47.

The government asked SA Borghini about this. According to SA Borghini, he made a mistake. He reviewed the agenda for the March 14, 2017, Commission meeting, where the minutes of the February 28 were

---

attached and shows the minutes were signed on March 14, 2017, and annotated this incorrect date on the timeline. This error was inadvertent.

Notably, though, the second superseding indictment accurately puts the date of the vote on February 28, 2017, and accurately notes that the City Manager recommended the action. ECF 214 ¶19. This was because the prosecution team used the source documents (the Commission meeting agenda and minutes) to prepare the operative charging document. The defense has not shown that this minor error substantially influenced the grand jury's decision to return the second superseding indictment, especially in light of the fact that Defendant Finch gave Barnes $42,500 in other checks in proximity to other official acts, as accurately described in the second superseding indictment.

### 21.   *Comparison with other Phoenix business*

Defendants both point to an exchange near the end of the presentation. Defendant Finch's counsel submitted a letter dated November 8, 2021, which outlined, among other things "General Exculpatory Evidence" which counsel wanted presented to the grand jury, including the assertion "Phoenix has been awarded over $700 MM in government (federal and state) construction contracts, and less than

8% of this amount was awarded by the City of Lynn Haven over the past 40 years." The prosecutor referenced this assertion and asked the case agent "Is that significant to you that 8 percent was obtained fraudulently?[253] The question was based on a factual premise not supported by evidence presented to the grand jury and should not have been framed that way. But the answer did not endorse the premise, focused on the relevant time frame, and was essentially correct:

> I mean, I don't understand what counsel is trying to get at. He's comparing a 40-year period, performance of Phoenix construction, right? So I don't understand how that is relevant to the last five years of Phoenix Construction and [the] City of Lynn Haven.[254]

The point thus conveyed to the grand jury was that if certain, specific evidence indicates favorable treatment was obtained through bribery, it is not particularly significant how much other business one otherwise obtained.

22.   *Conclusion*

In the end, after twenty separate complaints of grand jury misconduct, there were five issues. There was inadvertently inaccurate

---

253  ███████████████

254  ███████████████

testimony about the scope of City employees who received assistance at their residences shortly after the storm and, perhaps, the scope of work done. There was not specific testimony recounting what Michael White said about the initiation of the ½ Cent Contract. There was inadvertently inaccurate date on the timeline about the date of a vote. There was inadvertently inaccurate testimony about the former City Attorney's opinion that he was concerned about financing the 17th Street project with a City vendor. And there was a question with an incorrect factual premise that the case agent did not endorse but answered correctly.

The grand jury had evidence before it which was more than sufficient to find probable cause regarding the charged offenses including four hours of testimony and 63 exhibits. It has not been established that any of those five things, singularly or cumulatively, substantially influenced the grand jury's decision to indict, or that there is grave doubt that the decision to indict was free from the substantial influence of such violations. *Bank of Nova Scotia,* 487 U.S. at 254–255. But even if there was, the appropriate remedy would not be dismissal with prejudice.

### B. Discovery Issues

Defendants complain about government discovery productions. This is not a basis to dismiss the second superseding indictment.

### 1. Legal standard

A prosecutor has a constitutional obligation to provide a defendant with all evidence in the government's possession materially favorable to the defense. *Brady v. Maryland*, 373 U.S. 83 (1963). "[C]onstitutional error results from the withholding of *Brady* evidence only if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Simms,* 385 F.3d 1347, 1357 (11th Cir. 2004). There is no suppression by the government of exculpatory evidence, and thus no *Brady* violation, if either the defendant or the defense attorney knows before trial of the allegedly exculpatory evidence. See, *e.g.*, *Felker v. Thomas*, 52 F.3d 907 (11th Cir. 1995).

The government recognizes that this Court's local rules and discovery orders go further than *Brady*, requiring early disclosure of favorable evidence without regard to materiality. On this point, "[e]vidence is *favorable* to the accused if it either tends to show that the

accused is not guilty or if it impeaches a government witness." *United States v. Gil*, 297 F.3d 93 (2d Cir. 2002) (emphasis added).

The defense is not entitled under *Brady* to know everything a government investigation has unearthed. See *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1144 (2d Cir. 1978). However, Defendants appear to hold an erroneous view of what is "favorable" information. The position seems to be that if the government interviews a witness, the witness does not provide *only* inculpatory evidence, then it is necessarily exculpatory. That is wrong.

Consider, for example, *United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989). There the indictment charged false representations to members of a class of victims. *Id.* at 1037. The district court concluded that certain statements by members of the class were neither material nor exculpatory. *Id.* The defendant argued that "because the prosecution alleged that [he] made false representations to members of the class of victims described in the indictment, *any* statement by *any* member of this class in which such false representations were *not* mentioned or reported is exculpatory within the meaning of . . . *Brady*," seemingly arguing that "any information gleaned from any witness by a federal prosecutor that

does not incriminate the defendant necessarily exculpates him." *Id.* The Ninth Circuit upheld the district court order denying discovery of such statements, explaining that the defendant's "proposition is supported by neither law nor logic." *Id.*

Likewise, the individual must testify as a government witness for impeachment information to be discoverable; *Giglio* does not apply to non-government witnesses. See, e.g., *United States v. Aleck*, 2017 WL 4799787, at *1 (D. Nev. Oct. 24, 2017); see also *United States v. Gilbert*, 57 F.3d 709, 711 (9th Cir. 1995) (explaining that a party cannot call a witness simply to impeach the witness' credibility).

The delayed disclosure of *Brady* material may be grounds for reversal (post-conviction), but only if the defendant can show prejudice; for example, if the material came so late that it could not be effectively used. *United States v. Bueno-Sierra,* 99 F.3d 375 (11th Cir. 1996); *United States v. Bailey,* 123 F.3d 1381 (11th Cir. 1997); *United States v. Beale,* 921 F.2d 1412 (11th Cir. 1991). Impeachment evidence should be disclosed in time to permit defense counsel to use it effectively in cross-examining the witness. *United States v. Jordan,* 316 F.3d 1215, 1253 (11th Cir. 2003); see also *United States v. Knight,* 867 F.2d 1285 (11th Cir.

144

1989) (information disclosed to defense during trial was not so late that the information could not be effectively used); *United States v. Burroughs,* 830 F.2d 1574 (11th Cir. 1987) (disclosure of favorable treatment afforded witness's wife was made during government's re-direct examination of the witness; because jury learned about this *Giglio* material there was no cause for setting aside the verdict).

In determining a remedy for untimely disclosures, and assuming a violation, courts are to consider "the reasons for the Government's delay in affording the required discovery, the extent of prejudice, if any, the defendant has suffered because of the delay, and the feasibility of curing such prejudice by granting a continuance or, if the jury has been sworn and the trial has begun, a recess." *United States v. Euceda–Hernandez*, 768 F.2d 1307, 1312 (11th Cir. 1985). Dismissal for "a discovery violation in the criminal context must meet the two requirements of prejudice and willful misconduct, the same standard applicable to dismissal for a *Brady* violation," and appellate courts "do not expect that trial courts will dismiss cases under their supervisory powers that they could not dismiss under *Brady* itself." See *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 258–59 (3d Cir. 2005).

## 2. No-Contact List

Defendant Anderson now complains that the government failed to follow the magistrate judge's instruction to provide a no-contact list to her. ECF 273 at 3. The government concedes a list should have been provided earlier. But Defendant Anderson is in no position to complain. The single person the government identified at the hearing, and that the magistrate judge specifically directed her to avoid, is James Finch. Phone records clearly establish that Defendant Anderson and Defendant Finch *were* having extensive contact; among other things, for Defendant Finch to procure and pay for her legal expenses, and later extensive communication immediately after the government brought the conflict issue to defense counsel's attention for the apparent purpose of concocting a cover story.

Defendant Finch is not prejudiced either. First, immediately after the magistrate judge ordered Defendant Finch not to have contact with City officials, Defendant Finch violated that condition by doing so at least eight times. Second, just a few days ago, and long after the no-contact list

was provided, Defendant Finch violated it again by contacting two persons listed on it about the substance of the case.[255]

### 3. Recorded Statements

Defendant Anderson complains about recorded statements produced in March 2021.[256] They relate to the municipal rebuild. There were no allegations in the original indictment about the rebuild. Accordingly, the recorded statements of Defendant Anderson concerning the municipal rebuild was not a "relevant recorded statement" of Defendant Anderson to the original indictment under Rule 16(a)(1)(A), and not provided in discovery for the original indictment. An investigation of the municipal rebuild activity by Defendant Anderson and unindicted conspirator Finch continued until the return of the superseding indictment, when Defendant Finch was charged. There were allegations in the superseding indictment about the municipal rebuild as a result of further investigation.

Accordingly, the recordings were thus disclosed in the second production in April 2021. In its discovery letter, the Government

---

[255] █████████████████████████████████████████

[256] ECF 273 at 4-5.

explained to Defendants the additional discovery related to the superseding indictment.

### 4. *Production of City Commission Meeting Recordings*

Defendant Finch contends the government committed *Brady* violations by not producing recordings of two City Commission meetings on February 28, 2017, and September 12, 2018.[257] The February 28, 2017, meeting concerns approval of the 30-year promissory note. The September 12, 2018, meeting concerns approval of a task order on the ½ Cent Sales Tax Contract and an addendum to the 17th Street Financing Agreement. Defendant Finch is incorrect for the following reasons.

First, the government did not have those recordings in its possession when providing discovery.

Second, there is no *Brady* violation where, as here, the documents in question are publicly available and where the defense was reasonably aware of the underlying event that gave rise to the document. See, *e.g.*, *Bell v. Bell*, 512 F.3d 223, 234-235 (6th Cir. 2008). Here the defense represented it did not want a protective order to apply to this type of

---

[257] The February 28, 2017, meeting relates to the approval of the 30-year promissory note described above. The September 12, 2018, meeting relates to the 17th Street project and the ½ Sales Tax Contract.

document (publicly available records) because it had obtained such documents itself from public sources such as the City. Defendant Anderson's attorneys (who are obviously working closely with Defendant Finch's attorneys) gave copies of the minutes of those meetings to the government in January 2021. Defendant Anderson was present at both City Commission meetings, and they related to Defendant Finch's projects. Defendants cannot plausibly claim they were not aware of the recordings or minutes if for no other reason than they are bringing them up now and are aware of the contents.

### 5. *Redactions in five FD-302 reports*

As noted in earlier filings, and to briefly recap, the government produced voluminous discovery in September 2020 and April 2021 to the respective Defendants. The government compiled approximately 300 pages of witness interview reports in late May and sought a protective order, in part due to now-confirmed information that Defendant Finch had disclosed the previously provided government discovery to another of the FBI's investigative targets, ███████████ [258] The government

---

[258] The government presented that information in its December 22, 2021, response. In his reply, Defendant Finch did not address that information or dispute that he had so disseminated that material. Defendant Finch had a long business relationship with that individual. The government has subsequently confirmed that

produced those FD-302 reports promptly after the protective order was entered, which was months before the scheduled trial date. Five FD-302 reports had redactions.

Following ███████████████ Defendant Finch requested unredacted versions of the reports, representing that the defense believed that the redactions were favorable to the defense because ███████ was orchestrating a massive conspiracy. Knowing of Defendant Finch's relationship with ██████████ the government did not understand how that favored the defense and said as much to defense counsel and in its response to the defense motion to compel. It produced the unredacted reports pursuant to the Court's November order.

Some of redactions contained information about Bay County Sheriff's Office Major Jimmy Stanford; mostly hearsay that certain witnesses heard that ██████████ provided Major Stanford things of value over the years. Specifically, Mickey White stated he did work at Major Stanford's house for free in 2007 or 2008 and again several years prior to his arrest. While he has no personal knowledge, Mickey White

---

this individual used the discovery provided to Defendant Finch to call ██████ ███████ , read ██████████ detailed information from ██████████ bank accounts included in the discovery, and suggested ██████████ was cooperating with the government.

said he heard that ███████████ provided other things of value to Major Stanford.

Major Stanford told the government that ███████████ contributed to the gift of a used motorcycle in 2010,[259] that Mickey White did some (compensated) work at his residences but denied receiving other things from ███████████.[260]   On March 2, 2022, Major Stanford told the government in an interview that he had paid for his sister's funeral with his credit card.

Following his testimony on March 31, on April 4, 2022, Major Stanford contacted the FBI and stated that he had recently contacted the funeral home to obtain confirmation of what he told the government and the Court, and confirmed that he paid $3,000 on his credit card, but learned that ███████████ made an additional payment the next day unbeknownst to him.[261] The government disclosed that information to the

---

[259] Major Stanford testified about this at the hearing, explaining he thought it was a bit much and tried to give it back. In response, defense counsel falsely stated "Because there's nothing in [the FD-302] about you trying to give the motorcycle back, going back in forth. Did you tell them that?" ███████████ ███████████ The FD-302 specifically documents that Major Stanford provided that information during the interview. ███████████

[260] ███████████

[261] ███████████

defense, who promptly brought it up at the start of the April 6 hearing. However, defense counsel's reference incorrectly suggested that ████ ████ paid the entirety of the Major Stanford's sister's funeral expenses, which is *not* what Major Stanford relayed.[262]

Additionally, Mickey White said he "heard" from ████████ ████████████████████████ that ████████ and Major Stanford "set up" former Assistant State Attorney ████████████ ████████ a criminal history reflective of a history of drug addiction. The government understands that although ████████ died of ████████ ████████████████████████████████████ ████████ subsequently reported to the BCSO that ████████████ was alive, had been kidnapped, and was being held for ransom.

The term "set up" can mean various things, but the meaning most applicable here is "something done by deceit or trickery in order to compromise or frame someone."[263] Public records equally available to defense counsel conclusively show that Major Stanford did not "set up"

---

[262] ████████████████████████████████████████████

[263] Merriam-Webster.com, "Set Up," Definition 8, https://www.merriam-webster.com/dictionary/setup.

███████ The Sheriff's Office suspected that ████████ had committed a crime(s) by apparently introducing drugs to an inmate-client with whom he had a romantic relationship, monitored him engaging in similar conduct, ███████ lied about it in a sworn statement, and he was found guilty beyond a reasonable doubt.

In hindsight, the redaction about ████████ opinion that ███████ was "set up" was probably unnecessary because ██████ was himself stating a similar opinion of his own to folks around town (as defense counsel asserted)[264] and the facts of the case are public record and common knowledge. Indeed, ████████ was represented in that case, at least for a time, by Defendant Anderson's former attorney, Mr. Judkins. But, in any event, this is not manufacturing false evidence against an innocent person so that they appear guilty; it is other persons in the Sheriff's Office catching someone actually committing a crime and him committing another crime by lying about doing so in a sworn, recorded statement.[265]

---

[264] ████████████████████████████████████████ ("He ████████ said it [that ██████ thinks Stanford set him up] to a bunch of people.").

[265] The government is no expert about the nuances of these state offenses and the merits of any potential defenses and has no opinion on the wisdom of the prosecution. But there does not appear to be any factual dispute about what was said

Here are the public record details. On August 17, 2017, Bay County Sheriff's Sergeant Marc Bailey, who was stationed at the jail, heard a concerning jail call conversation between ███████ and ████████████ ████████████████████████, who was in inmate at the jail on DUI and drug possession charges, and ███████ client, indicating that ██████ may have passed narcotics to ██████ on a prior occasion during an attorney visit; they were speaking in code about ██████ retrieving something from her vehicle and bringing it into the jail.[266] ████████████ ████████████████████████████████████ Sergeant Bailey brought the matter to the Warden, Major Rick Anglin.[267] Major Anglin notified Sheriff Ford.[268] There was a meeting between these three with Major Stanford and the State Attorney present. There was a decision to have a camera visually (not audio) monitor ██████'s interactions with his client.[269]

---

on the jail call recordings, the video recordings of ███████████ and ████████████ and what ████████ said to Sergeant Bailey during the recorded interview.

[266] ████████████████████████████████████

[267] ████████████████████████████████

[268] ████████████████████████████████████████████
████████████████

[269] ████████████████████████████████████

On September 13, 2017, Sergeant Bailey, Major Anglin, and Major Stanford viewed a subsequent jail video recording showing ███ passing contraband from ███—a message between ███ and ███, who ███ also represented, and who was also an inmate at the jail.[270]

On September 25, 2017, Sergeant Bailey viewed another video of ███ passing ███ what appeared to be a business card but was actually a "half kite," apparently a message between ███ and ███[271]On September 29, 2017, ███ gave a sworn audio recorded statement to Sergeant Bailey. ███ unequivocally denied doing so.[272] According to Sergeant Bailey, Major Stanford was not in his chain of command and did not ask him to do anything or pressure him in any way.[273]



155

Major Anglin and Major Stanford took a recorded statement from ███████████████ in which she stated that ██████ gave her a business card soaked in his cologne and that she had asked ██████ to retrieve Suboxone from her car, a drug ████ used to ward off opiate withdrawals.[274]

After a trial, ████████ was found guilty in state court for introducing contraband and lying about it.[275]

According to Major Stanford, he had a falling out with ████████████ because of charges brought against ██████████ Apparently, ████████ was ████████████ preferred choice to be State Attorney.[276] ████████ corroborated this, explaining that ███████████████ threatened Major Stanford—or, more precisely—███████████████ said he threatened Major Stanford.[277]

---

[274] ███████████████████████████████

[275] ████████████████████████████████████████████████████████████. Subsequently ██████ (and apparently more than 4 people working for his business) was associated with ECS and Mickey White. ██████ was prosecuted but acquitted for failing to maintain unemployment compensation insurance. The government understands that the Court found ██████ not guilty because the state failed to prove a required element. In January 2022, the Florida Supreme Court revoked his ability to practice for disciplinary reasons.

[276] ███████████████████████████████████████

[277] ███████████████████████████████████

Regarding this information, the government did not willfully violate *Brady* or the Court's orders for several reasons.

First, in hindsight the government recognizes that the better course last year would have been to seek a protective order under Rule 16(d) and present its concerns regarding Defendant Finch and ██████████'s activities (*e.g.*, attempted tampering with a witness) and defense counsel's repeated false statements about Defendant Finch, including, but not limited to, his interactions with ██████████, and the impending search of ████ See *Jordan,* 316 F.3d at 1253. That concern has proven warranted, as it appears that Defendants Finch and Anderson had provided discovery to ██████████ to appraise him of the ongoing investigation and his likely culpability. Those reasons are relevant to the Court's consideration and demonstrate that the government was acting in good faith.[278] See *Euceda–Hernandez*, 768 F.2d at 1312. But the redactions were evident, the defense asked the Court to

---

[278] Defendant Finch's counsel stated at the hearing this is what should have been done. Defendant Anderson made the same point her reply. ECF 241 at 7. Yet, when the government recently filed a Rule 16(d) motion *ex parte*, and notified defense counsel it was doing so, Defendant Finch's counsel objected (through Defendant Anderson's counsel placing the call to relay the objection). So, again, it is not clear what the government could have done to avoid some complaint from the defense.

order disclosure of unredacted reports, the Court entered an order for production, and the government produced them according to that order.

Second, while the government did not believe this information was "favorable" to the defense, it has been produced to the defense so far in advance of trial that there is no conceivable prejudice to the defendant's due process rights at trial.

Third, there is no *Brady* violation where the defense is already aware of it. See, *e.g.*, *Bell v. Bell*, 512 F.3d 223, 234-235 (6th Cir. 2008). Because of Defendant Finch's very close relationship with ███████████ that ███████████ apparently said he done so to numerous people,[279] and defense counsel's September 3, 2021, assertion that "it is clear that some of the redacted information relates to ███████████,"[280] the government does not believe the joint defense can credibly assert they were unaware of such information already. How could it be that Defendant Finch, who had approximately 800 calls with ███████████ in a single year, be the one person in town who does *not* know what ███████████ says about his



relationship with Major Stanford? And if, as defense contends, Major Stanford leaked information to ██████████ about the search warrant before it was executed (as the former denies), how is it that never came up in the many meetings Defendant Finch had with ██████████ while they were working together to thwart the investigation and prosecution? If the defense has direct evidence that Major Stanford leaked the impending search to ██████████ why did they not present it at the hearing? And, as indicated above, ██████ perjury prosecution, and his opinion about Major Stanford's role, appear to be common knowledge that the defense cannot credibly claim to have been unaware of. Indeed, Defendant Anderson's former attorney represented ██████ in that case.

Fourth, based on the information the government had prior to the defense motions (which the defense has not substantiated), the material in question was not "favorable" to the defense. That ██████████ helped pay for a used motorcycle twelve years ago says nothing about whether Defendants are guilty of the charged offenses. The opinions of ██████████ ██████ (and-or ██████████ for that matter) about Major Stanford do not tend to show that either Defendant did not commit the charged offenses, and do not impeach a government witness. See, *e.g.*, *United States v. Fort*,

55 F. App'x 222, 224 (6th Cir. 2002) (witness statement that investigator was "dirty" not favorable to defense where it lacked a factual basis).

The leading case in the Eleventh Circuit on limiting cross-examination at trial of law enforcement officers concerning pending investigations or involvement in corruption is *United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001). There the defense attempted cross examine one government agent on his potential involvement in the "Miami River Cops Scandal" where that officer had been suspended with pay for four months but was later reinstated and no criminal charges were ever brought against that agent, "although he was formally reprimanded for failing to document a conversation with an informant." *Id.* at 1004. The defendants had argued to the district court that cross-examination of the officer regarding this matter should be permitted because it could show the agent's bias or motive to lie. The defendants also sought to cross examine another government agent concerning one pending investigation and one completed investigation where the same source had sent the DEA a letter alleging that the agent had stolen cocaine during a drug seizure. *Id.* at 1004–05. The district court held that those investigations were "'irrelevant, and even if [they were] relevant,

[their] probative value is outweighed by [their] prejudice.' " *Id.* at 1005. In affirming the district court's evidentiary rulings, the Eleventh Circuit reasoned that the "insertion" of one agent's involvement in the "Miami River Cops Scandal," where the agent "was thoroughly investigated in connection with that scandal, but was never charged with any crime and only received a reprimand for failing to document a conversation with an informant," was irrelevant and "any potential relevance" was substantially outweighed by the likelihood of unfair prejudice and thus was properly excluded under Rule 403. *Id.* at 1007. Similarly, the *Novaton* Court also affirmed the exclusion of the "unproven allegations" that the second agent had stolen cocaine, ruling that the injection of the evidence into trial "had the obvious potential to cause serious and unfair prejudice to the government." *Id.* at 1007.

The *Novaton* decision was relied upon by the Eleventh Circuit four years later to affirm the exclusion of unproven citizen complaints against a police officer (that included allegations of planting evidence or brutalizing arrestees). *United States v. Taylor*, 417 F.3d 1176 (11th Cir. 2005). In *Taylor*, unlike the *Novaton* case which involved an effort to introduce evidence solely under Rule 608(b), the defendant also

attempted to admit the prior claimed instances of "racial harassment, brutality, and evidence planting" under Rule 404(b) as evidence that the officer had racial bias and thus had a motivation to frame the defendant and lie at trial. 417 F.3d at 1180. The Eleventh Circuit held that the defendant's arguments were "trumped under Rule 404(b) for similar reasons that they were under Rule 608. The *Taylor* case has been followed in affirming the denial for cross-examination of unsubstantiated complaints to internal affairs of a police officer's alleged aggression and being an "over aggressive guy" in dealing with citizens, *United States v. Edwards*, 307 Fed Appx.340, 345(11th Cir. 2009) and limiting cross-examination of an officer on previous incidences of unproven misconduct, *United States v. Robinson*, 341 Fed Appx.340, 546, 548 (11th Cir. 2009). Based upon the prevailing case law, the defense cannot at trial cross-examine unfounded allegations against BCSO Major Stanford claiming corruption.

Moreover, it has been abundantly clear, and disclosed to the defense long ago, that Mickey White had the invoices created at ███████ behest shortly before the search. The defense theory seems to be that Major Stanford is corrupt, that he leaked information about the

impending search to ▮▮▮▮▮▮▮▮, and that ▮▮▮▮▮▮▮▮ had Mickey White create the invoices to falsely implicate Defendant Anderson.

Until the defense made that unsubstantiated accusation, the government had no reason to believe that had happened. The defense claimed to have direct evidence that Major Stanford leaked the information but did not produce any such evidence at the hearing or otherwise. While Mickey White's valuation estimates may not be particularly reliable,[281] ECS crews *did* perform work at these 3 residences, which *was* billed to the City, and Mickey White had the invoices made *before* ▮▮▮▮▮▮▮▮ told him that the FBI was "coming" the night before the search. And, according to Mickey White, Defendant Finch told ▮▮▮▮▮▮▮▮ that Defendant Anderson was going to the Sheriff and thus had already given ▮▮▮▮▮▮▮▮ a reason to tell Mickey White to have the invoices created.

A final point about Major Stanford. Defendant Finch asserted that "the reports implicated BCSO Major Jimmy Stanford in criminal

---

[281] The defense position on this shifts given the circumstances. The defense points to Mickey White's estimate about the value of work performed at Major Stanford's residence years ago as a substantial benefit. But then the defense says his estimate of work performed at Defendant Anderson's property (and that of her relatives) is grossly inflated.

conduct—much of which occurred while investigating this very case."[282]

Defendant Finch further asserted that Major Stanford was "involved in significant criminal conduct[.]"[283] That is not correct. No report implicates Major Stanford in any criminal activity, much less any in this case. That is the assertion defense counsel made and utterly failed to substantiate. And, after making the accusation, claiming to have evidence of it, and failing to substantiate it, defense counsel made it again in a public filing as if what had not been proven had been.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ ███ .

---

[282] ECF 274 at 11-12.

[283] ECF 274 at 12.

Though it may seem so on the surface, other information provided to the defense (had they reviewed it before claiming a *Brady* violation) establishes that information is actually not "favorable" to defense. Records provided to the defense in September 2020 establish that ███

████████████████████████████████████████████

██████████████████████████████████████ ██ ██

████████████████████████████████████████████

██████████████████████████████████████.

████████████████████████████████████████

████████████████████████ █ ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████ ██████████████████████████████████

████████████████████████ [286] This is consistent with ███

████████████████████████████████████████████

---



[284] ██████████

[285] ██████████

[286] ████████████████████

█████████████████  Recall that text messages establish that Mickey White got over to Defendant Anderson's residence on November 9, 2018. No one has suggested that ECS was still at Defendant Anderson's property on November 21, 2018. This information is not "favorable" to the defense. It is irrelevant to the pending charges.

### 6. CHS reports

In response to the Court order to produce witness interview reports, the prosecutors directed the FBI to provide all of same. The new case agent identified several Confidential Human Source ("CHS") reports. The prosecutors reviewed the reports, assessed they had information relevant to the issues raised by the defense, produced redacted reports to the defense, and filed a motion under Rule 16(d) regarding the redacted portions, which the Court granted. The government was not certain that CHS reports were included within the Court's order but produced them anyway in an abundance of caution.

The first CHS report from a contact on ██████████, relates to ██████████ allegedly performing work at BCSO Major Stanford's residence, which the CHS believed he was never charged for. This

---

[287] 2019.12.30 FD 302 Joshua Anderson at 6.

information is cumulative of information contained in David "Mickey" White's FD 302-report, which was attached as a sealed exhibit to Defendant Finch's motion to dismiss, and which was disclosed to the defense in November 2021.

The second CHS report from a contact on ███████████████, relates to ███████████ and other individuals. Certain portions relate to ███████████ relationship with Major Stanford and former Assistant State Attorney ███████████ discussed in Defendants' pending motions to dismiss. Nothing in this report is "favorable" to the defense.

The third CHS report from a contact on ███████████████. The CHS indicated that Defendant Finch stated he would not be indicted on federal charges but ███████████ and ███████████ (David "Mickey" White) would be indicted. If this report is accurate, then Defendant Finch was aware of his own self-serving statement of belief. And if Defendant Finch believed in September 2019 that ███████████ would be indicted, one wonders why Defendant Finch would continue to associate with ███████████ for the next two years and obstruct the government's investigation of ███████████ by sharing discovery with someone he suspected would be indicted. Nothing exculpatory there.

167

The fourth CHS Report from a contact on ███████████████, pertains to the aftermath of ███████████████ and the FBI's execution of a search warrant ███████████████████ The CHS reported that Defendant Finch and others were worried about ███████████████ ██████████████████████. This is inculpatory, to a limited extent, and not exculpatory.

The fifth CHS report from a contact on ███████████████, relates to Defendant Finch attempting to purchase City property in 2019. Defendant Finch's proposal was, in part, to pay the City for its property by providing $50,000 in fill dirt from the land in question. Information that Defendant Finch's proposal was to pay the City for its land with the City's own dirt, which Defendant Finch was undoubtedly aware of (since he made the proposal), is in no way exculpatory to the charges in any indictment.

The last CHS report from a contact on ███████████████ relates to a City trash removal contract. According to the CHS, a bidder on the contract approached Defendant Finch looking for his help with the bid and spoke to him about three weeks before the final bid was taken. Finch talked all about the bid and explained the bid but did not say that he

would help and did not provide help. This appears to be irrelevant information.

       *7.* ███████████

Defendants contend that the government suppressed exculpatory information about ████████████ creating backdated invoices for the Defendant Anderson's property and that of her relatives at Mickey White's direction. ECF 272 at 26. That contention is wrong.

The government believes this information is inculpatory; that ██████████████ wanted Mickey White to cover the latter's backside about what Defendant Anderson clearly got the latter to do when the gig was about to be up. The defense has another narrative; that the invoices were "fabricated." Obviously, people involved were papering over; information disclosed in September 2020 shows the invoices were created and backdated (see above regarding backdate note). Since ████████████ ██████ and Mickey White only knows what ████████████ told him, *Defendants* may be the only living persons who know exactly what was going on, and they have not provided information on the subject. But the government disclosed Mickey White's statement on the subject in July 2021; that ████████████ told him to get the invoices and he had them

made. And the government included the substance of the invoice creation

in an earlier filing on June 11, 2021:

> Relevant here, though, is that long after the work was
> performed, and suspicions were raised about ECS, D. White
> says that the owner of Company A (as described in the
> indictments) came to him and asked if he had invoices for
> work performed at Defendant Anderson's residence. When D.
> White said he did not, the owner of Company A replied that
> he had "better get some." At D. White's direction, an ECS
> employee prepared invoices backdated to when the work was
> performed in November 2018.

ECF 157 at 4. These details were expressly alleged in the second

superseding indictment. ECF 214 ¶93. There was no suppression of this

information.

       *8.* ████████████

At the evidentiary hearing, Defendant Finch complained about the

"missing" FD-302 of ████████[288]████████ was interviewed on a

separate corruption matter unrelated to the charges in the second

superseding indictment pertaining to Defendants. ████████████

████████████████████████████████

████████████████████. Lt. Mathis summarized the interview

---

[288] ████████

in his report. SA Borghini participated in the interview. Lt. Mathis indicated in his report that SA Borghini would create another report.[289] The government has searched for but cannot locate such a report and does not believe one was created. The information provided by █████████ is not favorable to the defense.

9. ████████

At the evidentiary hearing, Defendant Finch complained about the "missing" FD-302 of ████████.[290] On ████████████, Lt. Mathis and SA Borghini interviewed ████████████████████████████ █████████ ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████. This has nothing to do with the charges in the second superseding indictment and did not provide any proof of fraud or a crime against ECS. Lt. Mathis summarized the interview in his

---

[289] ████████████████████████████████████

██ ██████

report.[291] The government has searched for but cannot locate such an FD-302 report and does not believe one was created.

      10.      ██████████

      At the evidentiary hearing, Defendant Finch complained about the "missing" FD-302 of ██████████.[292] On ██████████ Lt Mathis and SA Borghini interviewed ██████████. ██████████████████████ ████████████████████████████████████████████ ████████████████████████. ██████████████████████ ████ Lt. Mathis summarized the interview in his report.[293] The government has searched for but cannot locate such an FD-302 report and does not believe one was created. Nothing in this interview is interview is "favorable" to the defense or even relevant to the charges.

      11.      ██████████

      At the evidentiary hearing, Defendant Finch complained about the "missing" FD-302 of ██████████.[294] Lt. Mathis and SA Borghini

---

[291] ████████████████████████████████

[292] ████████████

[293] ████████████████████████████████

[294] ██████ The date of the interview on ██████ is incorrect.

interviewed on ███████████. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████. This interview has nothing to do with charges in

indictment and concerned another unrelated investigation; possible

fraud involving ██████████ Lt. Mathis summarized the interview in his

report.[295] The government has searched for but cannot locate such an FD-

302 report and does not believe one was created. Nothing in this

interview is interview is "favorable" to the defense or even relevant to the

charges.

       *12.*       ██████████▬

At the evidentiary hearing, Defendant Finch complained about the

"missing" FD-302 of ██████████.[296] ████████████████████

████████████████████████████████████████████

████████████████████. This interview is unrelated to the

charges of the indictment and relates to possible other crimes in another



[295] ████████████████████████████████

[296] ██████████

municipality. The government produced the report to the defense after reviewing ███████ None of this has anything to do with this case.[297]

*13.* ████████

At the evidentiary hearing, Defendant Finch complained about the "missing" FD-302 of ██████████.[298] ████████████████████

████████████████████████████████████

████████████████████████████████████

███████ This relates to a separate public corruption investigation, completely unrelated to the charges of the indictment, and relates to possible other crimes in another municipality. None of this has anything to do with this case. Lt. Mathis summarized the interview in his report.[299] The government has searched for but cannot locate such an FD-302 report, and does not believe one was created.

---

[297] ███████████████████████

[298] ████████████

[299] █████████████████████

14.　█████████████

At the evidentiary hearing, Defendant Finch complained about the "missing" FD-302 of ██████████.[300] ████████████████████████

████████████████████████████████████████

████████████████████████. Lt. Mathis summarized the interview in his report.[301] The government has searched for but cannot locate such an FD-302 report, and does not believe one was created. This interview was unrelated to the charges of the second superseding indictment. It is not "favorable" to the defense.

15.　█████████████

At the evidentiary hearing, Defendant Finch complained about the "missing" FD-302 of ██████████.[302] The government located the report and produced it on ██████████. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████. This relates to a separate

---

[300] ████████

[301] ████████████████████████

[302] ████████

fraud and corruption investigation and is totally unrelated to the charges of the second superseding indictment. It is not "favorable" to the defense.

16.    ███████████

At the evidentiary hearing, Defendant Finch complained about the "missing" BCSO report of interview of ███████████.[303] ███████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████ Lt Mathis interviewed ███████████
The report of the interview was included in Lt Mathis' report,[304] which was produced by the March 1, 2022, deadline, and which defense thus had a month before representing it had not been produced. It is not "favorable" to the defense.

---

[303] ███████████

[304] ███████████████████████████

17.   ████████████

At the evidentiary hearing, Defendant Finch complained about the "missing" BCSO report of interview of ████████████.[305] ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████. Lt. Mathis interviewed

████████████████████ The report of the interview was included in

Lt Mathis' report,[306] which was produced by the March 1, 2022, deadline,

and which defense thus had a month before representing it had not been

produced. It is not "favorable" to the defense.

18.   ████████████

At the evidentiary hearing, Defendant Finch complained about the "missing" BCSO report of interview of ████████████.[307] The BCSO report

of ████ contains similar information that was included in the FBI 302

of ████ on ████████████ that was provided to the defense on July

---

[305] ████████

[306] ████████████████████████

[307] ████████

19, 2021. The BCSO report of the interview was included in Lt Mathis'
report,[308] which was produced by the March 1, 2022, deadline, and which
defense thus had a month before representing it had not been produced.
It is not "favorable" to the defense.

       *19.*    ███████████

    At the evidentiary hearing, Defendant Finch asserted that the ████
████, FD-302 relating to ████████ contained *Brady* material.[309]



█████████████████████████.[310] It is not "favorable" to the

defense.

---

20.  █████████████

At the evidentiary hearing, Defendant Finch asserted that the April

███████ FD-302 relating to █████████ contains *Brady* material.[311]

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████ It is not "favorable" to the defense.

21.  █████████████

At the evidentiary hearing, Defendant Finch asserted that ████████

██████████ BCSO report relating to █████████████ contains *Brady*

material.[312] ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████. Another witness, ██████████████ gave essentially

the same information (naming ██████████████████████ which was

disclosed in July 2021. This report is cumulative of that report. To the

---

[311] ████████████

[312] ████████████

extent anything is "favorable" to the defense (doubtful), it was already disclosed long ago.

22.  

At the evidentiary hearing, Defendant Finch asserted that the ██████ BCSO report relating to ████████ contains *Brady* material.[313] ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████,

which they have admitted to in plea documents disclosed to the defense. This report is cumulative of the ████ report described above. To the extent anything is "favorable" to the defense (doubtful), it was already disclosed long ago.

23.  ████████

At the evidentiary hearing, Defendant Finch asserted that the ██ ██████ BCSO report relating to ██████ contains *Brady* material.[314]

████████████████████████████████████████████

---

[313] ████

[314] ████

██████████████████████████████████████

████████████████████. It is not "favorable" to the defense.

  *24.* ██████████████████████

At the evidentiary hearing, Defendant Finch asserted that the ████

█████ BCSO report relating to ██████████ and ███████████

contains *Brady* material.[315] Investigator Chance and Major Stanford

served a subpoena at ██████████████. ████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████. This report is not "favorable" to the defense.

  *25.* ████████████████

At the evidentiary hearing, Defendant Finch asserted that the ████

█████ FD-302 relating to ██████████ contains *Brady* material.[316] This

interview related to ████████████████████████

████████████████. ████████████████████

██████████████████████████████████████

██████████████████████████████████████

---

[315] ██████████

[316] ██████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

█████████. All of this information was consistent with █████████

████████████████████████████████ and other

evidence. This report related to the original Michael and White

indictment and is not "favorable" to the defense. Additionally, ████

████ is not a witness for the government.

26.    █████████

At the evidentiary hearing, Defendant Finch asserted that a ████

████ 9, BCSO report relating to █████████ contains *Brady* material

and that it was not produced until after the Court's February 17, 2022,

order.[317] Defendant Anderson made the same assertions. ECF 273 at 22.

███████████████████████████████████

███████████████████████████████. The government

provided in discovery to the defense in July 2021 a copy of Lt. Mathis'

single-spaced, two- page report of the same interview. That report is far

---

[317] ████████

more detailed, and nothing in Major Stanford's report is not included in

Lt. Mathis' report. Defense already received the information, and it is not

*Brady* or *Giglio* information.

      *27.* ███████████ ▬

      At the evidentiary hearing, Defendant Finch asserted that a ████

████ 9, BCSO report relating to ████████ contains *Brady* material.[318]

There is no specific report of this interview, but on page 18 of Lt. Mathis

report, there are four lines concerning the very brief interview of ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ This is clearly not relevant to the charge in the

indictment and is not *Brady* or *Giglio* information.

      *28.* ████████████

      At the evidentiary hearing, Defendant Finch asserted that a ████

████████ BCSO report relating to ████████████ contains *Brady*

---

[318] ████████

████████ █.[319] ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████. This same incident was included in SA Borghini's ████████████ FD-302 of ██████ at page 6, second paragraph, that was provided to the defense in July 2021. The only difference in the BCSO interview is they questioned ████████████

████████████████████████████████████████

████ The BCSO interview is an unfounded allegation concerning ██████████████ and accordingly not *Brady* or *Giglio* information.

    *29.*   ██████████████

At the evidentiary hearing, Defendant Finch asserted that the ██████ ██████, FD-302 relating to ██████████████ contains *Brady* material.[320]

████████████████████████████████████████

████████████████████████████████████████

---

[319] ██████████

[320] ██████████



This FD-302 report of ████████ was provided to defense in July 2021, so the defense already had detailed information about ████████ ██████████████████████████. The ████ report is not *Brady* or *Giglio* information.

30.  ████████████████████████

At the evidentiary hearing, Defendant Finch asserted that FD-302s relating to ████████████████ contain *Brady* material.[321] The

reports relate to their traffic stop of ███████████ for potential impaired driving. ██████ told the FBI that ███████████ did not seem to be impaired and he wrote a citation relating to ████████████ driver's license and allowed someone to pick him up. ███████ said he thought ███████████ was impaired. This is not related to the pending indictment and was part of a separate corruption investigation that was looking at corruption activities by ████████████ with the ██████ ███████████████████████████████████████████████████ It is not "favorable" to the defense.

31.    ███████████

At the evidentiary hearing, Defendant Finch asserted that an FD-302 relating to ███████████ contains *Brady* material.[322] This is an interview of the ████████████████████████████████████ ██████████████████████████.████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████

---

[322] ███████████

███████████████████████████████████

████████████ which documents were provided to the defense in the

initial discovery.

      *32.*      ████████████████

At the evidentiary hearing, Defendant Finch asserted that a ██████

████████, BCSO report relating to ███████████ contains *Brady*

material.[323] ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████. This

information is not relevant to the charges in the indictment, and is not

*Brady* or *Giglio* information.

---

[323] ██████████

33. ████████████████

At the evidentiary hearing, Defendant Finch asserted that a ████

████████, FD-302 report relating to ████████████ contains *Brady*

material.[324] ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████. This

concerned a separate investigation unrelated to the Lynn Haven

indictment. ████████████████████████████████████

████████████████████████████████████████████

████████ already provided to the defense in discovery in July 2021.

34. ████████████████

At the evidentiary hearing, Defendant Finch asserted that ████

████████, FD-302 report relating to ████████████ contains *Brady*

material.[325] This report of interview of ████████████ was a short report

in which the agent reached out to speak to ████████████ but upon

advice of his counsel, ████████████ chose to not to be interviewed. This

is not *Brady* or *Giglio* information.

---

[324] ████████████

[325] ████████████

35. ███████████

At the evidentiary hearing, Defendant Finch asserted that a ████████ ████████ FD-302 report relating to ████████ contains *Brady* material.[326] This is an interview of ████████████ concerning a separate, unrelated corruption investigation of █████████████████████. This information is not relevant to the charges in the indictment and is not *Brady* or *Giglio* information.

36. ███████████

At the evidentiary hearing, Defendant Finch asserted that an ████████████, FD-302 report relating to ████████ contains *Brady* material.[327] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████rd. This information is not relevant to the charges in the indictment, and is not *Brady* or *Giglio* information.

---

[326] ███████

[327] ███████

37.   ███████████

At the evidentiary hearing, Defendant Finch asserted that a ████████████, BCSO report relating to ██████████ contains *Brady* material.[328] This interview relates to a █████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████ This is an interview of a ██████ ████████ concerning a separate, unrelated corruption investigation of ████████████████████. This information is not relevant to the charges in the indictment and is not *Brady* or *Giglio* information.

38.   ███████████

At the evidentiary hearing, Defendant Finch asserted that a ████████████████, FD-302 relating to ██████████ contains *Brady* material. [329] ████████████████████████████

████████████████████████████████

---

[328] ██████████

[329] ██████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████ This interview

relates to a separate fraud and corruption investigation and is totally

unrelated to the charges of the pending indictment. This information is

not relevant to the charges in the indictment and is not *Brady* or *Giglio*

information.

    *39.*    ███████████████

Defendant Anderson complains about the interview of ██████████

████████ by BCSO Investigator Chance and contends (inaccurately) that

it was only produced in March 22 pursuant to Court order. ECF 273 at

25-26. That is not correct; the government disclosed this report to

Defendants in July 2021:



In his sworn recorded statement, the transcript and audio which has now

been provided to defense, ████████      related      ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████There is nothing exculpatory in the sworn statement

not included in the summary, which Defendant Anderson apparently did

not apprehend had already been disclosed to her long ago.

    *40.*   ████████████████

Defendant Anderson complains about the interview of ████████

████████ by BCSO Lt. Mathis and contends (inaccurately) that it was

only produced in March 22 pursuant to Court order. ECF 273 at 27. That

is not correct; it was produced in July 2021, along with SA Borghini's

█████████████ interview of the same witness (which Defendant Anderson complained about earlier in her paper, ECF 273 at 12). The reports contain the same essential facts that Michael White pleaded guilty to, and nothing contained therein is favorable to the defense. And the substance of what █████████████ conveyed was included in the initial discovery production to Defendant Anderson in September 2020 and to Defendant Finch in April 2020: a search warrant application stating ████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████

*41.*   ████████████████ ──

██████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

---

330 ████████████████████████████████████████

193

███████████████████████████████████████████

████████████████  ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████.[332]

Defendant   Finch   contends   that   "[t]he   government's   use   of
████████ testimony is another dramatic example of suppressing *Brady* information  and  actively  misleading  the  Grand  Jury  and  the  defense." ECF 274 at 24. That is not correct on several levels.

The government has not "used" ████████████ testimony and has not  decided  whether  to  do  so.  The  government  has  interviewed ██

███████████████  ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[331] ███████████████████████████████

[332] ███████████████████████████████



42.

333 ███████████████████

334 ███████████████████







*43.     Conclusion*

For these reasons, the government respectfully submits that it did not willfully suppress information favorable to the defense. Defendants' motions had the effect of accelerating the compilation of material for the *Jencks* production. To the extent any of the material is arguably favorable

to the defense, and should have been included in earlier productions, the government regrets the oversight. However, now that the defense has been provided every witness report, agent note, or transcript the government possesses months for trial, there is no prejudice to the defense.

### C. Sixth Amendment issues

At the hearing and in their supplemental papers, Defendants raise Sixth Amendment claims. The Court should reject those claims as unfounded.

### 1. Factual Background



is a former ████████████████████ Assistant State Attorney ████████████████████ ████████████████████.339 ████████████████.340 As noted above, he was arrested, prosecuted, and convicted of introducing contraband into the county jail and perjury.



339 ████████████████████
340 ████████████████████

SA Borghini served in the FBI for 26 years.[341] In May 2019, SA Borghini served a subpoena on ██████ for records and they met to discuss the production.[342]

While on probation for those convictions, ██████ was arrested for workers compensation fraud.[343] ██████████████████, was a subcontractor for ECS in October 2018.[344] The investigation determined that he employed more than 4 people. The BCSO arrested ██████ on June 23, 2020. While enroute to the BCSO, he was read his *Miranda* rights and waived them.[345] SA Borghini was informed that ██████ wanted to

---

[341] ████████████████████████

[342] ████████████████████████

[343] ████████████████████████

[344] ███████████████████

[345] ███████████████████████ During SA Borghini's testimony, defense counsel questioned him about FBI policy regarding, apparently utilizing something from 1981 and printed from the internet, to suggest misconduct in not obtaining a written advice of rights waiver form. Because defense counsel did not show the document presented to the witness to the Court or the government, which he represented to be FBI policy, it is not clear what it is. But SA Borghini's actions were in accord with the *actual* FBI policy, which provides that "[w]hile an express waiver, including signing a waiver portion of the FD-395, is preferred, waiver may be inferred, in some instances, from the actions and words of the interviewee after advice of rights are given." It is a moot point, though, because SA Borghini did complete the form. ████████████████████████

speak with him and confirmed that with ██████ .[346] ██████ did not want to stay at the BCSO so SA Borghini transported him to the FBI office.[347] ██████ indicated that he had information about corruption ██████ ██████████████████████████████ .[348] ██████ also provided other information, including that some of his people went to Defendant Anderson's residence for hurricane cleanup.[349] ██████ said he did not want his attorney (or anyone else) to know that he was talking to the FBI and did not want SA Borghini to intervene to obtain his release from custody.[350] SA Borghini did not intervene to obtain his release from custody.[351]

On July 1, 2020, SA Borghini interviewed ██████ pursuant to a proffer agreement.[352] ██████ ██████████████████████████████████████

---

346 ████████████████████████████

347 ██████████████████████████████████████
███████████████████

348 ██████████████████████████████

349 █████████████████

350 ████████████████████████████

351 ██████████████████████

352 ████████████████████████████████████████

████████████████████████████████████████████████████.[353]

████████ subsequently contacted SA Borghini and they spoke again on July 3, 2020, about matters unrelated to this case.[354]

On July 20, 2020, they spoke again.[355] ████████ related that ████████ ████████ said Defendant Finch was worried.[356] That would make sense since the FBI had interviewed Defendant Finch about the Motorhome a week ago (where Defendant Finch presented the false bill of sale) and the FBI had served him with a grand jury subpoena. Neither Defendant had been charged at that time.

On August 14, 2020, ████████ relayed that ████████████ thought Defendant Finch was the weak link and described a phone call ████████ ████████ made to an Assistant State Attorney.[357] Neither Defendant had been charged at that time.



[353] ████████████████████████████████████

[354] 2022.4.6. ████████████████████████████████

[355] ████████████████

[356] ████████████████████████

[357] ████████████████████████████████████

203

On October 27, 2020, ▮▮▮▮ relayed that ▮▮▮▮▮▮▮ came by ▮▮▮▮▮▮ house and stated "can't trust anybody," "▮▮▮▮▮ told ▮▮▮▮ ▮▮▮▮ that ▮▮▮▮▮ was working with the FBI regarding campaign contributions to ▮▮▮▮▮▮▮▮▮▮ and that Defendant Finch was concerned about things and has a 1 terabyte box (discovery) that ▮▮▮▮▮ ▮▮▮▮ had access to. [358]

On November 12, 2020, ▮▮▮▮ relayed that, according to ▮▮▮▮ ▮▮▮▮ another Assistant State Attorney told ▮▮▮▮▮▮▮ that ▮▮▮▮ was "meeting with the feds and to be careful."[359] ▮▮▮▮ further related that Defendant Finch provided ▮▮▮▮▮▮ discovery (which the government had produced to Defendant Anderson's attorney).[360]

▮▮▮▮ began working in the ▮▮▮ office in February 2021 as an employee of ▮▮▮▮▮▮.[361] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[358] ▮▮▮▮▮▮▮▮▮▮

[359] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[360] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[361] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Defendant Finch would come in on daily basis.[362] Defendant Finch and ▮▮▮▮▮▮▮ had conversations.[363] ▮▮▮▮ did not ask questions of Defendant Finch. As ▮▮▮ explained, ▮▮▮ told SA Borghini what he heard.[364] ▮▮▮ testified that on virtually all the conversations he had with SA Borghini, ▮▮▮ was relating what ▮▮▮▮▮ believed or heard about various things.[365] ▮▮▮ further testified that he was never instructed to seek anyone out, confirming what SA Borghini testified to at the hearing.[366]

On May 8, 2021, ▮▮▮ reported that ▮▮▮▮▮ was collaborating with Defendant Finch on discovery (which Defendant Finch received from his attorney) every day at the ▮▮▮▮ ▮▮▮▮▮ was looking through it to determine who were the informants working with the government.[367]



On August 5, 2021, the FBI searched ███ pursuant to a search warrant for various items related to ███ and corrupt practices relating to false billings submitted to ████████████. The search at ███ failed to reveal the discovery drive that ███ had reported that Defendant Finch had provided to ████████ in late April or early May 2021. The text message interaction provided by the defense indicates what ███ reported; that the box marked "attorney client privileged" was gone by the time of the search.[368] The government had a taint team (FBI agent and another AUSA) assigned if any potentially privileged information was located.

Contrary to the testimony of ███ at the evidentiary hearing, ███ did not ask for, and SA Borghini did not authorize ███ to engage or participate in any criminal activity whatsoever. Consistent with DOJ policy, as explained by SA Borghini, the United States Attorney would have to authorize a specific criminal act to be committed

---

[368] SA Borghini turned in his FBI issued phone when he retired in December 2021 and did not have the benefit of reviewing text messages with ███ As a result, he testified incorrectly that he did not have contact with ███ between May 10, 2021, and August 26, 2021, and he did not learn of the "box" until August 26. As indicated in the text messages, ████████ when the box had already been removed, was when SA Borghini first learned of the "box."

by a cooperating individual as part of an undercover operation, but it would be limited and specific – not blanket immunity for anything except murder.[369]

Both ███████ and SA Borghini testified that the last contact between them took place in late August 2021.[370] Both appear to be incorrect.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████ m). The government believes the September 2021 conversation was ████████ relaying information about what █████████████████ had asked him about.

Defense counsel's April 26, 2022, brief disclosed for the first time that Defendant Finch had a joint-defense agreement with ████████████ It further disclosed, as counsel's statements at the hearing on March 31, and ███████ April 4 testimony did for the first time, Defendant Finch's attorneys were consulting with ███████ about the case.

---

[369] ████████████████████████████████

[370] ████████████████████████████████

2. *Analysis*

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." A defendant therefore has the right to exclude admissions elicited by government informants in the absence of counsel once the right to counsel has attached after the initiation of formal charges. See generally *Maine v. Moulton*, 474 U.S. 159 (1985); *United States v. Henry*, 447 U.S. 264 (1980); *Massiah v. United States*, 377 U.S. 201 (1964). This right to counsel is specific to the particular offense charged. *Texas v. Cobb*, 532 U.S. 162, 167–68 (2001).

"[T]he primary concern of [this] line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). "[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the [government] obtains incriminating statements from the accused after the right to counsel has attached." *Moulton*, 474 U.S. at 176. "[A] defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or

voluntarily, reported his incriminating statements to the police."
*Kuhlmann*, 477 U.S. at 459.

Accordingly, to establish a Sixth Amendment violation of that sort, Defendants must show that (1) ███████ acted as a government agent; (2) ███████ deliberately elicited incriminating statements from one or more Defendants regarding the charged offenses. See *Lightbourne v. Dugger*, 829 F.2d 1012, 1020 (11th Cir. 1987). ███████ was not acting as a government agent, and he did not deliberately elicit (or even obtain without elicitation) any incriminating statements from either Defendant after the right to counsel had attached[371]; ███████ provided him information not solicited by SA Borghini or ███████ Indeed, Defendants do not argue to the contrary in their papers.

Instead, Defendants assert Sixth Amendment claims based on alleged intrusion into the defense camp, claiming "outrageous" government conduct.[372] The Court should reject such claims.

---

[371] On July 1, 2020, ███████ gave the FBI historical information that Defendant Finch had given ███████ $10,000 with instructions to deliver it to ███████ would "know what to do with it." ███████ The Sixth Amendment had not attached at that time, and it is offense specific, therefore not applying to such information about other such activity.

[372] Such a defense has never succeeded at the Eleventh Circuit or the Supreme Court. See *United States v. Cannon*, 987 F.3d 924, 941 (11th Cir.), *cert. denied sub*

Once a defendant's right to counsel has attached, government intrusion into the attorney-client relationship violates the Sixth Amendment if the defendant can show a realistic possibility that he or she was prejudiced by that intrusion. See *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977) (no violation when undercover agent and defense counsel met twice because no evidence that agent conveyed defense strategy to prosecution). Courts have identified the following factors to consider in determining whether the requisite amount of prejudice needed to establish a Sixth Amendment violation is present: (1) whether the government's intrusion was intentional; (2) whether the prosecution obtained confidential information pertaining to trial preparations and defense strategy as a result of the intrusion; and (3) whether the information obtained produced, directly or indirectly, any evidence used at trial, or was used in some other way to the defendant's substantial detriment. *E.g.*, *United States v. Noriega*, 764 F. Supp. 1480, 1489 (S.D. Fla. 1991). The defendant bears the burden of proving a government

---

*nom. Holton v. United States*, 142 S. Ct. 283 (2021). And for such a claim to theoretically succeed, "the actionable government misconduct must relate to the defendant's underlying or charged criminal acts." *Jayyousi*, 657 F.3d at 1112. Here it does not.

intrusion into defense strategy and trial preparation. See, *e.g.*, *United States v. Danielson*, 325 F.3d 1054, 1073-74 (9th Cir. 2003). "[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate" because the remedy is "limited to denying the prosecution the fruits of its transgression." *United States v. Morrison*, 449 U.S. 361, 365 (1981); *United States v. Jayyousi*, 657 F.3d 1085, 1112 (11th Cir. 2011) (applying same).

Defendant Finch makes number of contentions which are not supported by evidence: that "[t]he government violated the defendants' and other represented parties' constitutional rights by obtaining communications and information pertaining to trial preparation and trial strategy originating from joint defense group communications between defendants and between defendants and their counsel."[373]

First, regarding interactions with counsel, it is not clear why Mr. Lewis felt the need to seek the advice of a convicted, functionally disbarred perjurer to defend this case.[374] But SA Borghini did not ask

---

[373] ECF 274 at 65.

[374] See, *e.g.*, ECF 274 at 70 (███ participated in defense strategy discussion with both attorneys representing Finch").

██████ to obtain Defendants' defense strategy. There is no evidence ██████ ever relayed any such information to the government regarding his conversations with Mr. Lewis or Mr. Forman.  The government did not know Mr. Lewis enlisted ████ to help the defense until Mr. Lewis announced as much at the hearing.[375] But even if ████ had provided such information, there is no rule of law precluding such a third party from disclosing such information to the government or preventing the government from receiving it. See *Weatherford*, 429 U.S. at 554-559 ("The mere presence of a government agent, informant, or cooperating witness at conferences between defendant and counsel does not violate the sixth amendment."). And nothing specific was communicated to the government. *E.g.*, *United States v. Ofshe*, 817 F.2d 1508, 1515 (11th Cir. 1987) (no violation because no specific facts overheard through listening device planted on counsel and none communicated to prosecutor).

There was no constitutionally impermissible intrusion. Nor was any such intrusion intentional; the government cannot very well send a witness to chat up the defense counsel about counsel's strategy when it

---

[375] In candor, the government has heard that ████████ car has recently been seen at Defendant Finch's place of business with some regularity.

has no idea the defense counsel decided to chat up the witness. The government had no reason to think Mr. Lewis would solicit advice from ███████ Nor is there any prejudice; the government does not know what was said (and did not ask ██████ at the hearing). In any event, the defense strategy of attacking the prosecution with a barrage including the kitchen sink is rather obvious.

Second, regarding interactions outside the presence of counsel, Defendant Finch contends that "[i]t is unequivocally clear that defense strategies were disclosed to the government and its agent when ████████ as a government operative intentionally and surreptitiously acquired knowledge relating to defense strategies through active participation in joint defense meetings between █████████ and Defendant Finch." ECF 274 at 71. But the evidence does not support that contention either.

The government had no information that Defendant Finch had a joint defense agreement with █████████, so any intrusion would not be intentional.[376] But there was none; in general, communications between ████████ and Defendant Finch outside the presence of

---

[376] It is Defendants' burden to establish such a privilege exists. No record evidence has been offered on the subject.

counsel are not privileged.[377] See, *e.g.*, *United States v. Krug*, 868 F.3d 82, 87 (2d Cir. 2017) ("The mere fact that the communications were among co-defendants who had joined in a joint defense agreement is, without more, insufficient to bring such statements within the attorney-client privilege."). Nothing ███████ relayed indicated that ██████████████ was relaying any attorney's legal strategy or privileged information; it seems it was his own opinions with little if any basis for them.

████████ did not relay any legal strategy or privileged information. ████████ observing ████████████ attempting to tamper with ████████████ is not privileged. ██████ observing that Defendant Finch brought the discovery drive to ████████████, and he and Defendant Finch were looking through it together is not privileged. Other than establishing that Mr. Lewis falsely denied that Defendant Finch disseminated the discovery to avoid a more restrictive protective order (which the government would have eventually learned anyway when it searched ██████, the government is hard pressed to identify any significant information ██████ received from ████████████ (or Defendant Finch)

---

[377] Indeed, the Court noted "the risks associated with a coordinated defense" when it authorized Defendants to have contact outside the presence of counsel. ECF 111 at 3.

about this case. See *Unites States v. Hernandez*, 937 F.2d 1490, 1493-94 (9th Cir. 1991) (per curiam) (no violation when codefendant acted as government agent because codefendant learned nothing of importance concerning defendant's defense).

In short, the fact that Individual X and Individual Y have lawyers and a joint defense agreement while a criminal investigation or prosecution is underway does not require everyone around Individual Y to stick their fingers in their ears when Individual Y blurts out information to a third party (a person working for Individual Y's ███████ 's company out of Individual Y's conference room) relayed by Individual X or Individual Y's lawyers (if that is what ████████ did, which is unclear). Defendants have not shown any violation of their Sixth Amendment rights.

Relatedly, Defendant Finch's papers suggest that SA Borghini sought "potentially privileged" information about Defendant Finch from ████████████████████ ████████ [378] in May 2021. ECF 274 at 68

---

[378] According to the survey Mayor Anderson had done on her property, the stormwater easement runs over ████████████████████████████ ████████. ████████████████ was interviewed by BCSO early in the investigation and advised that ███ had trees that fell on ██ property from the easement but the City *did not* clean them up. ████████████████

n.38. Recall that after Defendant Finch's initial appearance on March 18, 2021, where he was specifically ordered not to have contact with City officials, Defendant Finch promptly and repeatedly violated that order by contacting several City officials, including repeated contact with ███████████████ When asked by the City Manager, ████████████ ████ lied in an email and said ███ had no contact with Defendant Finch after his arrest stating "NONE," and then asked if the FBI was asking.[379]

████████████████████████████████████████████████████████ ██████████████████████████████. Another witness, Commissioner ██████████ said he heard a rumor that Defendant Finch gave ████ money, which ██████████████████ denied to FBI.[380] Post-indictment, Defendant Finch is a regular customer at ██████████████████ ████████████ Regardless, as far as the government knows, ████████████ ████████ is not part of the "defense camp" in a legal sense, and anything Defendant Finch said to ████ (in violation of the release condition) is not privileged. And there is nothing improper about law enforcement asking

---

███ to keep a record of Defendant Finch making prohibited contact with

███

Defendants have shown no violation of their Sixth Amendment rights. And even if they had, dismissal is not the appropriate remedy. The remedy would be suppression. But here there is nothing to suppress. Logically, that shows there was no violation.

## CONCLUSION

Accordingly, this Court should deny Defendants' motions to dismiss and set this case for trial.

Respectfully submitted on July 8, 2022,

JASON R. COODY
United States Attorney

*/s/ Stephen M. Kunz*
STEPHEN M. KUNZ
ANDREW J. GROGAN
Assistant U.S. Attorneys
Florida Bar No. 322415
Florida Bar No. 85932
111 North Adams St., 4th Floor
Tallahassee, FL 32301
(850) 942-8430
stephen.kunz@usdoj.gov
andrew.grogan@usdoj.gov